ORAL ARGUMENT SCHEDULED FOR FEBRUARY 20, 2015
————————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
————————————————

**Case No. 14-1242**
————————————————

**CBS CORPORATION, SCRIPPS NETWORKS INTERACTIVE, INC.,
THE WALT DISNEY COMPANY, TIME WARNER INC., TWENTY-
FIRST CENTURY FOX, INC., UNIVISION COMMUNICATIONS INC.,
and VIACOM INC.,**

**Petitioners**,

v.

**FEDERAL COMMUNICATIONS COMMISSION and
UNITED STATES OF AMERICA,**

**Respondents**.
————————————————

Petition for Review of an Order
of the Federal Communications Commission
————————————————

**OPENING BRIEF OF PETITIONERS**

Robert A. Long
Mace Rosenstein
Andrew Soukup
Kevin King
Ashley Anguas Nyquist
COVINGTON & BURLING LLP
One CityCenter
850 10th Street NW
Washington, DC 20001
Telephone: (202) 662-6000

December 15, 2014                                    *Attorneys for Petitioners*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Petitioners hereby certifies as follows:

## A.    Parties and Amici.

1.    The parties who appeared before the Federal Communications Commission ("FCC") are CBS Corporation, Discovery Communications, LLC, Scripps Networks Interactive, Inc., The Walt Disney Company, Time Warner Inc., TV One, LLC, Twenty-First Century Fox, Inc., Univision Communications Inc., and Viacom Inc.

2.    The petitioners appearing before this Court are CBS Corporation, Scripps Networks Interactive, Inc., The Walt Disney Company, Time Warner Inc., Twenty-First Century Fox, Inc., Univision Communications Inc., and Viacom Inc. The respondents are the FCC and the United States. The intervenors appearing in this Court are the National Association of Broadcasters (in support of Petitioners) and American Cable Association, AT&T Inc., Charter Communications, Inc., Comcast Corporation, DISH Network Corporation, DIRECTV and Time Warner Cable Inc. (in support of Respondents). There are no *amici curiae* at this time.

## B.    Ruling Under Review.

The ruling under review is the November 10, 2014 order issued by the FCC. *See* JA 1-5 (Order, FCC 14-202, *In the Matter of Applications of Comcast Corp. and Time Warner Cable Inc. for Consent to Assign*

*or Transfer Control of Licenses and Authorizations and AT&T, Inc., and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, Media Bureau Docket Nos. 14-57 & 14-90 (Nov. 10, 2014)).

  **C.** **Related Cases**. Petitioners are not aware of any related cases pending before this Court or any other Court. Some of the issues presented in this case were the subject of an earlier petition for review and a related petition for a writ of mandamus, both filed in this Court on November 10, 2014. *See In re CBS Corp.*, 14-1236; *CBS Corp. v. FCC*, 14-1237. Before this Court issued any orders in those proceedings, the parties stipulated to a dismissal of the proceedings on November 12, 2014.

           */s/  Robert A. Long*
           Robert A. Long
           COVINGTON & BURLING LLP
           One CityCenter
           850 10th Street NW
           Washington, DC 20001

Dated:  December 15, 2014    *Attorney for Petitioners*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rules 18(a)(4) and 26.1, Petitioners state as follows:

<u>CBS Corporation.</u>  National Amusements, Inc., a privately held company, directly or indirectly owns a majority of the voting stock of Petitioner CBS Corporation.  No publicly held corporation has a 10% or greater ownership interest in the stock of National Amusements, Inc.  To CBS Corporation's knowledge without inquiry, GAMCO Investors, Inc., on March 15, 2011, filed a Schedule 13D/A with the Securities and Exchange Commission reporting that it and certain affiliates owned, in the aggregate, approximately 10.1% of the voting stock of CBS Corporation.

<u>Scripps Networks Interactive, Inc.</u>  Petitioner Scripps Networks Interactive, Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in its stock.

<u>The Walt Disney Company.</u>  Petitioner The Walt Disney Company has no parent company, and no publicly-held company has a 10% or greater ownership interest in its stock.

<u>Time Warner Inc.</u>  Petitioner Time Warner Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in its stock.

Twenty-First Century Fox, Inc.  Petitioner Twenty-First Century Fox, Inc. has no parent company, and no publicly-held company has a 10% or greater ownership interest in its stock.

Univision Communications Inc.  Petitioner Univision Communications Inc. is wholly owned by Broadcast Media Partners Holdings, Inc., which is wholly owned by Broadcasting Media Partners, Inc.  No publicly held corporation has a 10% or greater ownership interest in the stock of Broadcasting Media Partners, Inc.

Viacom Inc.  National Amusements, Inc., a privately held company, directly or indirectly owns a majority of the voting stock of Petitioner Viacom Inc.  No publicly-held corporation has a 10% or greater ownership interest in the stock of National Amusements, Inc.  To Viacom Inc.'s knowledge without inquiry, GAMCO Investors, Inc., on November 6, 2009, filed an amendment to a Schedule 13D with the Securities and Exchange Commission reporting that it and certain affiliates owned shares representing 11.3% of the voting stock of Viacom Inc.

 /s/  Robert A. Long
Robert A. Long
COVINGTON & BURLING LLP
One CityCenter
850 10th Street NW
Washington, DC 20001

Dated:  December 15, 2014

*Attorney for Petitioners*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............... i

DISCLOSURE STATEMENT ............................................................................... i

TABLE OF AUTHORITIES .............................................................................. vi

GLOSSARY ....................................................................................................... xi

INTRODUCTION .............................................................................................. 1

JURISDICTIONAL STATEMENT ................................................................... 3

STATUTES AND REGULATIONS ................................................................. 4

STATEMENT OF THE ISSUES ...................................................................... 4

STATEMENT OF THE CASE .......................................................................... 4

      A.     Petitioners' Distribution Agreements .................................................... 4

      B.     The Bureau Invites Comment On Whether To Make Distribution Agreements And Related Negotiation Materials Available To Third Parties. ................................................................... 6

      C.     The Bureau's Initial Decision To Permit Third-Party Access To VPCI. ....................................................................................................... 8

      D.     Petitioners Seek Commission Review Of The Bureau's Disclosure Decision ........................................................................... 10

      E.     The Bureau *Sua Sponte* Accelerates Third-Party Access To VPCI. ..................................................................................................... 11

      F.     By A 3-2 Vote, The Commission Authorizes The Release Of VPCI To Third Parties ........................................................................ 13

      G.     Petitioners Seek Review From This Court. ........................................ 16

SUMMARY OF ARGUMENT ....................................................................... 17

STANDING ..................................................................................................... 20

STANDARD OF REVIEW ....................................................................21

ARGUMENT ........................................................................................22

I.   THE FCC ARBITRARILY DEPARTED FROM LONG-STANDING
     POLICY BY PERMITTING ACCESS TO CONFIDENTIAL
     MATERIAL BEFORE A PARTY'S RIGHT TO ACCESS SUCH
     MATERIAL IS SETTLED..............................................................22

     A.   Petitioners Have A Right To Meaningful, Pre-Disclosure
          Review Of A Disclosure Decision. .......................................23

     B.   The FCC Deprived Petitioners Of Their Right To Meaningful
          Pre-Disclosure Review. .......................................................26

          1.   The Commission Rejected Petitioners' Intra-Agency Appeal
               Without Explanation. ................................................. 27

          2.   The Bureau Did Not Provide A Reasoned Explanation For Its
               Departure From The FCC's Longstanding Policy.................. 30

II.  THE FCC'S DECISION TO DISCLOSE PETITIONERS' VPCI TO
     THIRD PARTIES IS ARBITRARY AND CAPRICIOUS. .........................34

     A.   The Trade Secrets Act and The FCC's Rules Generally Prohibit
          The FCC From Disclosing VPCI To Third Parties............................35

     B.   The FCC Did Not Make A "Persuasive Showing" That VPCI
          Must Be Disclosed Here.......................................................38

          1.   The FCC Did Not Justify Its Unprecedented Decision To
               Disclose Distribution Agreements and Negotiation Materials. 38

          2.   The FCC Did Not Identify A "Compelling Public Interest"
               Justifying Disclosure Of VPCI. ................................ 40

          3.   The FCC Did Not Establish That VPCI Is "Necessary" To
               Resolve An Issue Before The Commission. ............................ 42

          4.   The FCC Did Not Balance Any Benefit Of Disclosure Against
               The Likely Harms. ................................................. 45

C.      The FCC's Fear Of Being Accused Of Acting Arbitrarily If It Were To Adhere To Its Historical Approach Lacks Merit. ...............48

III.    THE FCC'S REFUSAL TO ADOPT ALTERNATIVES THAT PROTECT PETITIONERS' VPCI IS ARBITRARY AND CAPRICIOUS.................................................................................51

A.      The FCC Erred By Refusing To Release Only Redacted, Anonymized VPCI To Third Parties..................................................51

B.      The FCC Erred By Failing To Impose Additional Restrictions On Who May Access VPCI. ..............................................54

CONCLUSION ......................................................................................57

CERTIFICATE OF COMPLIANCE....................................................58

ADDENDUM OF PERTINENT STATUTES AND REGULATIONS .................59

CERTIFICATE OF SERVICE ..............................................................66

# TABLE OF AUTHORITIES[*]

**Page(s)**

## Cases

*Action on Smoking & Health v. Civil Aeronautics Bd.*,
   713 F.2d 795 (D.C. Cir. 1983) ...................................................................30

*AMP Inc. v. Fleischhacker*,
   823 F.2d 1199 (7th Cir. 1987) ...................................................................48

*Appleton v. FDA*,
   310 F. Supp. 2d 194 (D.D.C. 2004) ..........................................................21

*Ass'n of Data Processing Serv. Orgs. v. Bd. Of Governors*,
   745 F.2d 677 (D.C. Cir. 1984) ...................................................................49

*Bartholdi Cable Co. v. FCC*,
   114 F.3d 274 (D.C. Cir. 1997) ..........................................................24, 35

*Basic Media, Ltd. v. FCC*,
   559 F.2d 830 (D.C. Cir. 1977) ...................................................................53

*Bethesda-Chevy Chase Broad., Inc. v. FCC*,
   385 F.2d 967 (D.C. Cir. 1967) .....................................................................3

*Black Citizens for a Fair Media v. FCC*,
   719 F.2d 407 (D.C. Cir. 1983) ...................................................................31

*Burlington Truck Lines v. United States*,
   371 U.S. 156 (1962) ....................................................................................40

*City of Brookings Mun. Tel. Co. v. FCC*,
   822 F.2d 1153 (D.C. Cir. 1987) .................................................................51

*Columbia Broad. Sys. v. FCC*,
   454 F.3d 1018 (D.C. Cir. 1971) .................................................................34

---

[*]     Authorities upon which we chiefly rely are marked with asterisks.

*Comcast Corp. v. FCC*,
  526 F.3d 763 (D.C. Cir. 2008) ...............................................................42

\* *Consumer Fed'n of Am. v. FCC*,
  348 F.3d 1009 (D.C. Cir. 2003) ........................................ 8, 37, 43, 49

*Elec. Power Supply Ass'n v. FERC*,
  391 F.3d 1255 (D.C. Cir. 2004) .........................................................21

*FCC v. Schreiber*,
  381 U.S. 279 (1965) ...........................................................................36

*Greater Boston Television Corp. v. FCC*,
  444 F.2d 841 (D.C. Cir. 1970) .................................................... 23, 31

*Heartland Reg'l Med. Ctr. v. Sebelius*,
  566 F.3d 193 (D.C. Cir. 2009) ...........................................................29

*In re Papandreou*,
  139 F.3d 247 (D.C. Cir. 1998) ...........................................................23

*Int'l Telecard Ass'n v. FCC*,
  166 F.3d 387 (D.C. Cir. 1999) ...........................................................33

*Manin v. NTSB*,
  627 F.3d 1239 (D.C. Cir. 2011) .................................................... 29, 34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................... 21, 29, 40

*Nat'l Cable Television Ass'n v. FCC*,
  479 F.2d 183 (D.C. Cir. 1973) ...........................................................54

\* *Qwest Comm'cns Int'l, Inc. v. FCC*,
  229 F.3d 1172 (D.C. Cir. 2000) ............. 21, 23, 24, 31, 35, 36, 37, 41, 45, 51, 52

*Ramaprakash v. FAA*,
  346 F.3d 1121 (D.C. Cir. 2003) .................................... 21, 31, 32, 34

*Republic Airline Inc. v. U.S. Dep't of Trans.*,
  669 F.3d 296 (D.C. Cir. 2012) ...........................................................40

*Ruckleshaus v. Monsanto Co.*,
   463 U.S. 1315 (1983) ...................................................................23

*SBC Commc'ns Inc. v. FCC*,
   56 F.3d 1484 (D.C. Cir. 1995) ............................................... 37, 49

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) .....................................................................29

*United States v. Container Corp. of Am.*,
   393 U.S. 333 (1969) ............................................................. 41, 50

*United States v. Microsoft Corp.*,
   165 F.3d 952 (D.C. Cir. 1999) ......................................................24

*WSTE-TV, Inc. v. FCC*,
   566 F.2d 333 (D.C. Cir. 1977) .....................................................30

## Statutes

5 U.S.C. § 552(b)(4)......................................................................35

5 U.S.C. § 702 ..............................................................................23

5 U.S.C. § 706 ..............................................................................23

5 U.S.C. § 706(2)(A)......................................................................21

5 U.S.C. § 706(2)(E)......................................................................21

15 U.S.C. § 1 ................................................................................41

* 18 U.S.C. § 1905.................................................... 18, 21, 35, 37

28 U.S.C. § 2342...........................................................................23

28 U.S.C. § 2342(1)........................................................................3

28 U.S.C. § 2344............................................................................3

47 U.S.C. § 154(i)..........................................................................3

47 U.S.C. § 155(c)..........................................................................3

47 U.S.C. § 155(c)(5) ...........................................................................30

47 U.S.C. § 214 ......................................................................................3

47 U.S.C. § 310(d) .................................................................................3

47 U.S.C. § 402(a) .................................................................................3

## Regulations

47 C.F.R. § 0.457(d) ...................................................................... 35, 36

* 47 C.F.R. § 0.457(d)(1) ............................................ 18, 24, 34, 35, 55

47 C.F.R. § 0.457(d)(1)(iv) ............................................................ 34, 35

47 C.F.R. § 0.459 ...............................................................................24

47 C.F.R. § 0.459(g) ..................................................................... 24, 25

47 C.F.R. § 0.461 ...............................................................................24

47 C.F.R. § 0.461(i)(1) .......................................................................23

47 C.F.R. § 0.461(i)(4) .......................................................................25

47 C.F.R. § 1.115(a) ...........................................................................23

## Other administrative materials

*Application of Comcast Corp., Gen. Elec. Co. & NBC Universal Inc.*,
   25 FCC Rcd. 2140 (2010) .............................................................26

*Application of Worldcom, Inc.*,
   13 FCC Rcd. 11166 (1998) ...........................................................26

*Applications of Adelphia Commc'ns Corp.*,
   20 FCC Rcd. 20073 (2005) ...........................................................26

*Applications of AT&T Inc. & Deutsche Telekom AG*,
   26 FCC Rcd. 8801 (2011) ....................................................... 25, 46

*Applications of AT&T,*
    19 FCC Rcd. 4793 (2004) ....................................................................26

* *Applications of Comcast Corp.,*
    17 FCC Rcd. 22633 (2002) ............................................... 8, 20, 36, 37, 43, 50, 52

*Applications of Craig O. McCaw,*
    9 FCC Rcd. 5836 (1994) ...................................................................37

*Applications of Cricket License Co.,*
    28 FCC Rcd. 11803 (2013) .................................................................25

*Applications of Nynex Corp.,*
    12 F.C.C. Rcd. 19985 (1997) ...............................................................49

*Applications of Tele-Commc'ns, Inc.,*
    14 FCC Rcd. 3160 (1999) ..................................................................36

*Bell Telephone Operating Cos. Request for Confidential Treatment,* 10 FCC Rcd.
    11541 (1995)..............................................................................53

* *Examination of Current Policy Concerning the Treatment of Confidential Info.
    Submitted to the Comm'n,*
    13 FCC Rcd. 24816 (1998) ..... 6, 18, 24, 28, 31, 32, 34, 35, 36, 40, 43, 45, 51, 53

* *Examination of Current Policy Concerning Treatment of Confidential Info.
    Submitted to the Comm'n,*
    14 FCC Rcd. 20128 (1999) ........................................................... 25, 32

*Petition of Telcordia Techs. Inc.,*
    29 FCC Rcd. 7592 (2014) ..................................................................25

## Rules

D.C. Cir. R. 27(f) ...........................................................................27

## Other authorities

13 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2012)............41

# GLOSSARY

| | |
|---|---|
| Bureau | Media Bureau of the Federal Communications Commission |
| Commission | The five Commissioners of the Federal Communications Commission |
| Competitive Decision-Making | "A person's activities, association, or relationship with any of his clients involving advice about or participation in the relevant business decisions or the analysis underlying the relevant business decisions of the client in competition with or in a business relationship with [a merger party] or with a [content owner or programmer]." JA 6, 17. |
| Distribution Agreements | Agreements between Petitioners and video programming distributors under which the distributors agree to make Petitioners' programming available to their end-user subscribers. |
| FCC | Federal Communications Commission |
| Highly Confidential Information | "Information that is not otherwise available from publicly available sources; that [a merger party] has kept strictly confidential; that is subject to protection under FOIA and the Commission's implementing rules; that [a merger party] claims constitutes some of its most sensitive business data which, if released to competitors or those with whom the [merger party] does business, would allow those persons to gain a significant advantage in the marketplace or in negotiations." JA 7, 18. Highly Confidential Information includes, but is not limited to, VPCI. *See* JA 8, 19. |
| October Orders | The Bureau's October 7, 2014 orders:<br>• Order (DA 14-1463) (JA 124-31) |

|  | • The October Protective Orders (JA 132-53) |
|---|---|
| October Protective Orders | • Modified Joint Protective Order 14-57 (DA 14-1464) (JA 132-42)<br>• Modified Joint Protective Order 14-90 (DA 14-1465) (JA 143-53) |
| Outside Consultant | "A consultant or expert retained for the purpose of assisting Outside Counsel or a [p]articipant in [the merger] proceeding[s], provided that such consultant or expert is not involved in Competitive Decision-Making." JA 7, 18. |
| Outside Counsel | "The attorney(s), firm(s) of attorneys, or sole practioner(s), as the case may be, retained by a [p]articipant in [the merger] proceeding[s], provided that such attorneys are not involved in Competitive Decision-Making." JA 7, 18. |
| Order | The FCC's November 10, 2014 order (JA 1-5) |
| November Orders | The Bureau's November 4, 2014 orders:<br>• Order on Reconsideration (DA 14-1601) (JA 28-46)<br>• The November Protective Orders (JA 47-68)<br>• Order (DA 14-1605) (JA 69-79) |
| November Protective Orders | • Amended Modified Joint Protective Order 14-57 (DA 14-1604) (JA 47-57)<br>• Amended Modified Joint Protective Order 14-90 (DA 14-1602) (JA 58-68) |
| Operative Protective Orders | The Bureau's November 12, 2014 orders:<br>• Second Amended Modified Joint Protective Order 14-57 (DA 14-1639) (JA 6-16)<br>• Second Amended Modified Joint Protective Order 14-90 (DA 14-1640) (JA 17-27) |
| Participant | "A person or entity that has filed, or has a good |

|  | faith intention to file, an application, petition to deny, or material comments in [the underlying merger] proceeding[s]." JA 7, 18. |
|---|---|
| Video Programming Confidential Information | "Information that is Highly Confidential Information, *and* is an agreement, or any part thereof, for distribution of any video programming (including broadcast programming) carried by [a merger party's] (i) [multichannel video programming distribution] service and/or (ii) [online video distribution] service; a detailed description of one or more provisions of such an agreement, including, but not limited to, price terms; and information relating to the negotiation of such an agreement." JA 8, 19. |
| VPCI | Video Programming Confidential Information |

## INTRODUCTION

This case concerns an unprecedented decision by the Federal Communications Commission—narrowly approved on a 3-2 vote—to give third parties access to hundreds of thousands of pages of Petitioners' highly confidential video programming materials, including contracts, pricing information, and negotiation strategy documents. The release of this information violates the Trade Secrets Act and the Administrative Procedure Act, and it will cause substantial harm to Petitioners and the highly competitive programming industry in which they operate.

The order under review is the product of what one FCC Commissioner called "procedural shenanigans." JA 3. It marks an abrupt and unexplained departure from the FCC's longstanding recognition that programming contract materials contain extremely sensitive commercial information and therefore are entitled to the highest level of protection from disclosure. The procedural record below reflects an agency that disregarded its own past practice, judicial precedent, and the rights of entities like Petitioners, who are not parties to the transactions under review.

Instead, the agency rushed to make highly confidential material available to third parties who otherwise would not have access to such information. Rather than make the "persuasive showing" that the law requires before disclosure may

occur, the Commission issued a cursory order that adopted the reasoning of a decision of the FCC's Media Bureau to support a hasty and irregular denial of two intra-agency appeals. The Bureau's reasoning did not—and could not—address the arguments in one of Petitioners' intra-agency appeals because that appeal was filed *after* the Bureau issued its decision.

The FCC reached this decision even though it has never approved such a widespread disclosure of programming materials and negotiation strategies in prior media mergers, even though "the argument for protecting programming contracts is *more* compelling here, not less," JA 4, and even though third-party requests to access Petitioners' extremely sensitive programming contract materials and related negotiation strategies "appear to be more of a fishing expedition by interests groups and competitors to obtain market-sensitive information." JA 5. As a result of the FCC's decision, more than 260 individuals—including representatives of companies that are engaged in contract negotiations with Petitioners and stand to benefit commercially from access to Petitioners' programming contracts and negotiation materials—would be able to review Petitioners' highly confidential information.

For the reasons explained below, this Court should vacate the Order to the extent that it authorizes third parties to access Petitioners' programming contract materials and related negotiation strategies.

## JURISDICTIONAL STATEMENT

The proceedings before the FCC arise out of two proposed merger transactions. The FCC has subject-matter jurisdiction over those proceedings, including the production and inspection of documents necessary for review of the proposed transactions, under 47 U.S.C. §§ 154(i), 155(c), 214, 310(d). The FCC's Media Bureau, acting on delegated authority, issued a series of orders authorizing third-party inspection of Petitioners' highly confidential information. JA 124-31; 69-79; 28-46. Petitioners filed two intra-agency appeals of those orders, which the Commission denied in a single order dated November 10, 2014 (the "Order"). JA 1-2. Petitioners filed a Petition for Review of the Order on November 13, 2014.

This Court has jurisdiction over the Petition for Review under 28 U.S.C. § 2342(1), which grants the Court authority to review "all final orders of the [FCC] made reviewable by" 47 U.S.C. § 402(a). The Order is a "final order" because it denies Petitioners' right to maintain the confidentiality of their records under the Trade Secrets Act and FCC regulations. *See Bethesda-Chevy Chase Broad., Inc. v. FCC*, 385 F.2d 967, 986 (D.C. Cir. 1967). The Petition for Review is timely because it was filed within 60 days after the Commission issued its Order. *See* 28 U.S.C. § 2344.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an addendum bound with this brief.

## STATEMENT OF THE ISSUES

1.    Whether the FCC arbitrarily and capriciously authorized disclosure of Petitioners' programming contract materials within five days after the *Bureau* deems such access proper, in contravention of the FCC's longstanding policy that it is improper to provide access to confidential information until the merits of an individual's right to access information has been settled by *the Commission* and *a court*.

2.    Whether the Order, which fails to make a "persuasive showing" why the unprecedented disclosure of hundreds of thousands of pages of Distribution Agreements and related negotiation materials is warranted in this case, violates the Trade Secrets Act and the Administrative Procedure Act.

3.    Whether the FCC acted arbitrarily and capriciously by failing to explain adequately its refusal to adopt protective measures that would reduce the risk of harm to Petitioners, the competitive marketplace, and the public interest.

## STATEMENT OF THE CASE

### A.    Petitioners' Distribution Agreements.

Petitioners CBS Corporation, Scripps Networks Interactive, Inc., The Walt Disney Company, Time Warner Inc., Twenty-First Century Fox, Inc., Univision

Communications Inc., and Viacom Inc., through their wholly owned subsidiaries, create, produce, and license popular video programming for exhibition to the public. The revenue generated from licensing Petitioners' programming for exhibition to the public is used to (among other things) fund the development of new video programming, "a crown jewel of American creativity and a major American export to the world marketplace." JA 5.

To deliver their programming to the public, Petitioners negotiate affiliation, distribution, and retransmission consent agreements with content distributors who make Petitioners' programming available to their subscribers through cable systems, satellite systems, or other distribution platforms.[1] These agreements are referred to in this brief as "Distribution Agreements." They "contain highly sensitive information that is central to [Petitioners'] business strategies, including, among other things, pricing and business terms." JA 130, ¶ 13.

Petitioners maintain the highest level of confidentiality for their Distribution Agreements, which are subject to strict internal controls by Petitioners and distributors alike. JA 220, ¶ 6; 224, ¶ 4; 230, ¶ 5; 234, ¶ 4; 238, ¶ 4; 242, ¶ 5. Distribution Agreements generally include stringent, bargained-for mutual

---

[1]     Six of the intervenors in this case—AT&T, Comcast, Charter, DIRECTV, DISH, and Time Warner Cable—license Petitioners' programming. A seventh intervenor—the American Cable Association—represents medium-sized and smaller licensors of Petitioners' programming.

confidentiality provisions that prevent each party from disclosing their terms. JA 220, ¶ 6; 224, ¶ 4; 230, ¶ 5; 234, ¶ 4; 238, ¶ 4; 242, ¶ 5. These confidentiality provisions not only limit third parties from having access to the agreements, but also often limit even the universe of the contracting parties' own employees who may review them. JA 220, ¶ 6; 224, ¶ 4; 230, ¶ 5; 234, ¶ 4; 238, ¶ 4; 242, ¶ 5.

The FCC has recognized that Distribution Agreements are entitled to the highest level of confidential treatment. As the Bureau has observed, the "key terms" of Distribution Agreements "have historically been treated as especially sensitive from a competitive standpoint and involve Highly Confidential Information." JA 29, ¶ 3. The FCC also has acknowledged that disclosing Distribution Agreements "can result in substantial competitive harm to the information provider." *Examination of Current Policy Concerning the Treatment of Confidential Info. Submitted to the Comm'n*, 13 FCC Rcd. 24816, 24852 (1998) ("*Confidential Information Policy*").

**B.  The Bureau Invites Comment On Whether To Make Distribution Agreements And Related Negotiation Materials Available To Third Parties.**

This case arises in the context of the FCC's ongoing review of two proposed mergers involving large media companies:  one involving Comcast, Time Warner Cable and Charter Communications, and the other involving AT&T and DIRECTV. In connection with its review of the proposed mergers, the Bureau

- 6 -

directed the merger parties to produce certain information to the FCC, including the merger parties' Distribution Agreements with Petitioners and materials related to the negotiation of those agreements.  *See* JA 29, ¶ 3.

As part of its merger review process, the Bureau proposed to make "hundreds of thousands of pages" of these Distribution Agreements and related negotiation materials available to third parties.  JA 44, ¶ 34.  Fearing that third-party disclosure of their highly sensitive Distribution Agreements and related negotiation materials would cause substantial and irreparable harm, Petitioners and other content owners advised the Bureau of their concern that the existing protective orders in the proceedings did not adequately protect the confidentiality of their Distribution Agreements and related negotiation materials.  JA 29-30, ¶ 3.

The Bureau sought public comment regarding these concerns.  *See* JA 30, ¶ 3.  In response, twenty-six parties opposed making Distribution Agreements and related negotiation materials available to third parties.  JA 125, ¶ 3.  Many of these commenters urged the FCC's staff to review copies of these materials that have been (or could be) provided to the Department of Justice—which is conducting a parallel review of the proposed mergers—or through its own internal review.  JA 125, ¶ 3.  Under this approach, the FCC would not need to disclose Distribution Agreements and related negotiation materials in the record of the merger proceedings.  The FCC followed this approach in other merger review proceedings,

including the 2011 merger between Comcast and NBC Universal.  JA 227-28,

¶ 10; 235-36, ¶ 9; 244, ¶ 11.  This Court also has approved this approach.  *See*

*Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1012-14 (D.C. Cir. 2003), *aff'g*

*Applications of Comcast Corp.*, 17 FCC Rcd. 22633, 22636 (2002).

Only three commenters supported third-party access to raw, unredacted

Distribution Agreements and related negotiation materials.  JA 164 & n.10.  All

three of these commenters are distributors (or represent distributors) that compete

with the merger parties for the right to distribute Petitioners' programming.

Because these commenters purchase (or represent purchasers of) Petitioners'

programming, each would benefit commercially from access to the pricing and

other terms that appear in Petitioners' Distribution Agreements and negotiation

materials with the merger parties.  For example, one commenter, DISH, is a large

purchaser of Petitioners' programming and justified its demand to review

Distribution Agreements on the ground that it intended to "view and analyze"

prices paid by its competitors.  JA 3219.

## C.   The Bureau's Initial Decision To Permit Third-Party Access To VPCI.

On October 7, 2014, the Bureau issued three orders that together permitted

third parties to access Petitioners' Distribution Agreements and related negotiation

materials, which the Bureau collectively called "Video Programming Confidential

Information" or "VPCI."    JA 124-53.    Two of these orders—the "October

Protective Orders"—modified the existing protective orders in both merger review proceedings to permit review of VPCI by anyone who has certified they are eligible to access "Highly Confidential Information," a universe of information that encompasses *both* VPCI *and* other highly confidential materials less sensitive than VPCI.  JA 132-53.  Collectively, these three orders are referred to as the "October Orders."[2]

Because of the sensitivity of VPCI, the October Protective Orders expressly provided that any third party whose highly sensitive information would be disclosed "shall have an opportunity to object to the disclosure of its … Highly Confidential Information to any" individual who sought access to such information.  JA 136, ¶ 8; 147, ¶ 8.  Further, the Orders made clear that the filing of an objection would bar any individual who is subject to the objection from accessing Highly Confidential Information (including VPCI) until the "objection is resolved by the Commission and, if appropriate, by any court of competent jurisdiction."  JA 136, ¶ 8; 147, ¶ 8.  Taken together, these provisions ensured that Petitioners would have the right to have any objection to an individual's request to access VPCI considered by the Commission—and if necessary, the courts—*before* VPCI would be made available to that person.

---

[2]    The third order explained the Bureau's reasoning for providing access to VPCI.  JA 124-31.

### D.   Petitioners Seek Commission Review Of The Bureau's Disclosure Decision.

On October 14, 2014, Petitioners filed an intra-agency appeal asking the full Commission to review the legality of the Bureau's decision to make their VPCI available to third parties.  JA 154-86.  The intra-agency appeal explained, among other things, how the October Orders failed to make the required "persuasive showing" that third-party access to VPCI is warranted here.

To ensure that third parties not be afforded access to VPCI until the Commission resolved the intra-agency appeal, Petitioners exercised their right under the October Protective Orders to file objections to more than 260 individuals who submitted requests to access Highly Confidential Information (which includes Petitioners' VPCI) in the merger proceedings.  Just as Petitioners had explained in their Application for Review, their objections noted that the Trade Secrets Act and the FCC's rules barred third parties from accessing Petitioners' VPCI.[3]

---

[3]    Petitioners were compelled to file objections to *all* requests to access Highly Confidential Information because the Operative Protective Orders did not require requesting persons to indicate whether they wished to review VPCI.  Instead, the Operative Protective Orders automatically granted any individual entitled to access non-VPCI Highly Confidential Information a corresponding right to access VPCI. Consequently, the October Protective Orders placed Petitioners in the position of having to object to each individual's request to access Highly Confidential Information even if the requestor had no intention of accessing VPCI.  Petitioners repeatedly told the FCC that, if given the option, they would object only to individuals who seek access to VPCI and would not object to requests to access other forms of Highly Confidential Information.  JA 98-99.

- 10 -

Petitioners were not alone in asserting categorical objections to the disclosure of their most sensitive competitive data. For example, Hilton Worldwide also exercised its right under the October Protective Orders to assert categorical objections to any request for third-party access to its highly sensitive pricing information and—like Petitioners—urged the FCC to make available only aggregated, anonymized data. JA 3587-92. These objections were consistent with the views of Comcast, Time Warner Cable, and Charter, which expressly supported the Department of Justice review procedures proposed by Petitioners. JA 3457; 3459.

### E.    The Bureau *Sua Sponte* Accelerates Third-Party Access To VPCI.

On November 4, 2014—while Petitioners' intra-agency appeal was pending, and before the briefing cycle in that proceeding was complete—the Bureau on its "own motion" issued a series of orders that accelerated third-party access to VPCI. JA 28-79. Two of these orders—the "November Protective Orders"—revised the October Protective Orders by making a single change that, as discussed below, actually *increases* the risk of unlawful disclosure of VPCI to third parties. JA 47-68. The November Protective Orders, along with two other orders issued by the Bureau, are referred to as the "November Orders."[4]

---

[4]     The third order sets out Bureau's rationale for issuing the November Protective Orders. No party asked the Bureau to reconsider the October Orders; (continued…)

The November Protective Orders modified the October Protective Orders in a single, but fundamental, respect: they eliminated the prohibition on disclosure of Petitioners' VPCI while a challenge to an individual's right to access that material is pending before the Commission or a court. Whereas the October Protective Orders prohibited access to Petitioners' VPCI until Petitioners' "objection is resolved by the Commission and, if appropriate, by any court of competent jurisdiction," JA 136, ¶ 8; 147, ¶ 8, the Bureau revised Paragraph 8 of the protective orders to permit access within "five (5) business days after any objection is resolved *by the Bureau* in favor of the person seeking access." This change was buried in a four-sentence paragraph at the end of a 20-page, single-spaced order the Bureau issued to justify its decision to make VPCI available to third parties. JA 45, ¶ 36 (emphasis supplied); *accord* JA 51, ¶ 8; 62, ¶ 8. The November Protective Orders are otherwise identical to the October Protective Orders. On November 7, 2014, Petitioners filed a second intra-agency appeal challenging the Bureau's decision to change the FCC's longstanding practice of prohibiting disclosure to third parties while a challenge to the underlying disclosure decision is pending.

---

rather, the third order states that the Bureau acted on its "own motion" to do so. JA 28, ¶ 1. The fourth order disposes of nearly all of the objections Petitioners filed against requesting individuals. JA 69-79.

### F.    By A 3-2 Vote, The Commission Authorizes The Release Of VPCI To Third Parties.

The Commission, which had ignored Petitioners' two intra-agency appeals (and the emergency stay requests that accompanied those appeals), was spurred to act when Petitioners sought emergency relief from this Court on November 10.[5]  In a "cursory two-page order" that apparently had been before the Commission "for no more than a few hours," JA 3, the Commission approved the Bureau's disclosure decision on a 3-2 vote.

The Commission did not state any independent basis for its decision. Instead, the Order rejected Petitioners' challenges to the October Orders and the November Orders—including the challenge raised on November 7, 2014—solely "for the reasons stated by the Media Bureau in its November 4, 2014, *Order on Reconsideration*."  JA 1, ¶ 1.  The Commission directed the Bureau to issue new protective orders that imposed one additional minor procedural requirement with

---

[5]    The November Orders would have permitted 245 individuals (out of at least 260) to access Petitioners' VPCI on November 13, 2014.  When the Commission refused to rule on Petitioners' two intra-agency appeals—and the emergency stay requests that accompanied those appeals—Petitioners sought emergency relief in this Court on November 10 by filing a petition for review and a petition for a writ of mandamus.  Those proceedings were voluntarily dismissed when the Commission issued the November 10 order that is the subject of this Petition for Review.

respect to third-party access to VPCI.[6]  These protective orders, which were issued by the Bureau on November 12, 2014, are referred to as the "Operative Protective Orders."

If left undisturbed, the FCC's decision will give any individual who signs the Operative Protective Orders—a universe that currently includes more than 200 individuals—access to "hundreds of thousands of pages" of VPCI under the terms of the Operative Protective Orders.  Individuals are entitled to access Petitioners' VPCI simply by certifying that they are (1) not engaged in "Competitive Decision-Making," and (2) an "Outside Counsel" or an "Outside Consultant" to a "Participant" in the merger proceedings.  JA 9-10, ¶ 7; 16; 20-21, ¶ 10; 27.  Although individuals may not copy, print, or transmit a document containing VPCI, they are free to take and retain notes regarding the highly sensitive Distribution Agreements and related negotiation materials that they review.  JA 11, ¶ 10; 22, ¶ 10.  Although individuals are limited in how they may use VPCI, they are entitled to retain indefinitely any pleadings they prepare that contain VPCI.  JA 11, ¶ 12; 22, ¶ 12.  The Operative Protective Orders do not explain how the FCC intends to monitor compliance with their terms, other than by requiring individuals to self-report violations.  *See* JA 13, ¶ 21; 24, ¶ 21.

---

[6]     This added provision would make VPCI available "only at the offices of the [merger parties'] Outside Counsel of Record or at other secure locations" and would prohibit release of VPCI "through remote access."  JA 2, ¶ 2.

The FCC's decision was sharply criticized by two Commissioners, one of whom labeled the decision "outrageous," and the other of whom characterized the decision as the product of "a highly irregular maneuver" by the Bureau and "procedural shenanigans" by the FCC.  JA 3; 5.  Commissioner Pai noted that the FCC "has processed transaction after transaction in the video market … *without* supplying the contracts to any and all signatories of the protective orders," and that "the argument for protecting programming contracts is *more* compelling here, not less."   JA 4.  Commissioner O'Rielly observed that requests to access VPCI "appear[] to be more of a fishing expedition by interests groups and competitors to obtain market-sensitive information."  JA 5.

Both dissenting Commissioners also criticized the revised version of Paragraph 8 of the Operative Protective Orders, which permits access to VPCI while a challenge to an individual's right to access that information is pending. Commissioner Pai noted that "[o]nce a party has accessed confidential information, the cat cannot be put back in the bag," "[t]he harm is irreparable," and "a subsequent court ruling that the Commission erred in allowing such access is too little, too late."   JA 3-4.   Similarly, Commissioner O'Rielly found it "inexplicabl[e]" that the FCC would provide access before the affected parties can "exercise their rights to protect" such information, contrary to the FCC's "longstanding presumption that sensitive documents would not be disclosed until

any challenges were reviewed by the Commission and, if appropriate, a court of competent jurisdiction." JA 5.

### G. Petitioners Seek Review From This Court.

On November 13, 2014, Petitioners filed a Petition for Review asking this Court to vacate the Order. The National Association of Broadcasters, a trade association that represents other content providers, intervened on Petitioners' behalf to oppose the FCC's decision to release VPCI.

The five parties to the proposed mergers also obtained this Court's approval to intervene. Three of these parties—Comcast, Time Warner Cable, and Charter—have told the FCC that they believe Petitioners' proposal that VPCI should be reviewed by the FCC's staff at the Department of Justice or internally at the FCC "adequately balance[s] the various competing interests at issue." JA 3457.

Only two entities—DISH (which competes directly with the merger parties and is a major purchaser of Petitioners' programming) and the American Cable Association (which represents numerous purchasers of Petitioners' programming)—have intervened specifically for the purpose of seeking access to Distribution Agreements and negotiating strategies, which the Order will make available to them and other third parties. Several Petitioners are negotiating Distribution Agreements with DISH and ACA members, who would benefit

commercially from access to the terms of Petitioners' agreements with their competitors.  *See* JA 227, ¶ 8; 239, ¶ 7; 243, ¶ 9.

The Petition for Review was accompanied by Petitioners' emergency motion to stay the Order.  On November 21, 2014, this Court granted the stay request.  In concluding that Petitioners had met the requirements for a stay, the Court noted that the FCC "has access to the relevant documents at issue in this matter and can continue to evaluate the proposed merger during the stay."  JA 245.

## SUMMARY OF ARGUMENT

For three independent reasons, this Court should vacate the Order to the extent that it authorizes the disclosure of VPCI to third parties.

1.   *No meaningful opportunity to review individualized disclosure decisions prior to disclosure.*  The premise of the Order is that Petitioners will not be harmed by disclosure because no individual engaged in Competitive Decision-Making may access Petitioners' VPCI.  But the Operative Protective Orders fail to give Petitioners a meaningful opportunity to ensure that this is the case.  Instead, the Operative Protective Orders allow an individual alleged to be engaged in Competitive Decision-Making to access Petitioners' VPCI five days after the Bureau approves access.

Although the Operative Protective Orders thus mark a sharp break from the FCC's longstanding policy and practice, the FCC did not acknowledge that it was

- 17 -

breaking from precedent, much less provide a reasoned explanation for doing so. Instead, the Commission relied exclusively on the Bureau's reasoning in a *sua sponte* November 4 order to reject arguments raised for the first time on November 7. The Bureau's reasoning, moreover, was contrary to longstanding precedent of the FCC recognizing that a party aggrieved by a decision to release its confidential information has a right to obtain pre-disclosure review from the Commission and a court, even if exercising this right causes a delay in the FCC's proceedings.

      2.    *No "persuasive showing" that disclosure is necessary.* The Trade Secrets Act prohibits the release of Petitioners' VPCI unless "authorized by law." The FCC relies on 47 C.F.R. § 0.457(d)(1) and its *Confidential Information Policy* as providing the requisite authorization to release Petitioners' VPCI. Those rules and policy require the FCC to make, before disclosure, a "persuasive showing" why VPCI is "necessary." As part of that analysis, the FCC must identify a "compelling public interest" in favor of disclosure, make "a showing that the information is a necessary link in a chain of evidence" that will resolve an issue before the Commission, and "engage in a balancing of the interests favoring disclosure and non-disclosure." *Confidential Information Policy*, 13 FCC Rcd. at 24822-23.

      For at least four reasons, the FCC failed to make the required "persuasive showing." *First*, the FCC has never before released negotiation strategy

- 18 -

materials—much less hundreds of thousands of pages of programming contract materials—in a merger review proceeding, and it provided no explanation why it intends to depart from its historical practice here. *Second*, the FCC overstates the alleged need for public access to Petitioners' VPCI. The parties that have most aggressively insisted upon access are competitors of the merger parties and are involved in active contract negotiations with Petitioners, and would undoubtedly obtain a commercial benefit from access to Petitioners' VPCI. *Third*, the FCC has failed to comply with its self-imposed "obligation" to determine independently the relevance of highly confidential material before releasing it to third parties. *Fourth*, the FCC failed to consider the harm to Petitioners that would result if their confidential information is misused—an event that the FCC mistakenly, and without justification, assumes will never occur.

Further, the FCC's purported fear that it would be acting arbitrarily and capriciously if it failed to release VPCI to third parties is unfounded. The FCC has not identified any media merger that was challenged based on its refusal to make VPCI available to third parties, and it has no valid reason to believe that will occur here. The FCC does not act arbitrarily and capriciously by refusing competitors' and unaffiliated third parties' requests for price and other highly sensitive contract terms, particularly when, as this Court has pointed out, the FCC has access to the

full scope of such materials and ample ability to review and analyze that information.

3. *Availability of reasonable alternative protections.* The FCC also failed to explain why it refused to adopt alternative measures that would have better protected Petitioners' VPCI. For example, the FCC failed to justify its refusal to release only redacted and anonymized data, as requested by Petitioners. Moreover, to the extent the FCC contends that redaction would be unduly burdensome, any burden results from the agency's failure to adhere to its acknowledged "obligation not to overreach in [its] discovery requests when confidential third party agreements are at issue." *Applications of Comcast Corp.*, 17 FCC Rcd. at 22639. Similarly, having recognized that VPCI is entitled to heightened restrictions on access, the FCC failed to explain why it refused to require individuals seeking access to VPCI to make a particularized showing that access to the information would assist the FCC in its review of the proposed transactions. Such an approach would limit the universe of individuals entitled to access VPCI, and reduce the risk of inadvertent disclosure.

## STANDING

Petitioners have standing to challenge the FCC's disclosure decision because, absent relief from this Court, the Order authorizes the release of Petitioners' highly confidential Distribution Agreements and related negotiation

materials to third parties who do not currently have access to these materials. *See Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1261–62 (D.C. Cir. 2004); *Appleton v. FDA*, 310 F. Supp. 2d 194, 197 (D.D.C. 2004) (party has Article III standing where "disclosure of [its] trade secrets or confidential information would cause [it] to suffer an injury-in-fact" redressable by an order barring the disclosure).

## STANDARD OF REVIEW

This Court reviews *de novo* the FCC's construction of the Trade Secrets Act, 18 U.S.C. § 1905. *See Qwest Comm'cns Int'l, Inc. v. FCC*, 229 F.3d 1172, 1176 (D.C. Cir. 2000). The FCC's application of the Communications Act and its implementing regulations is reviewed under the Administrative Procedure Act, and will be "set aside" if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if "unsupported by substantial evidence," 5 U.S.C. § 706(2)(A), (E); *see also Qwest*, 229 F.3d at 1183-84. In particular, the Order must be vacated if it departed without explanation from settled agency precedent, *Ramaprakash v. FAA*, 346 F.3d 1121, 1130 (D.C. Cir. 2003), or if the Commission "failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

**I. THE FCC ARBITRARILY DEPARTED FROM LONG-STANDING POLICY BY PERMITTING ACCESS TO CONFIDENTIAL MATERIAL BEFORE A PARTY'S RIGHT TO ACCESS SUCH MATERIAL IS SETTLED.**

The FCC's flawed decision to give third parties access to VPCI rests on the assumption that no individual involved in Competitive Decision-Making will have access to the terms of Petitioners' Distribution Agreements and negotiation strategies. But the Operative Protective Orders do not give the Commission or a court a meaningful opportunity to ensure that this is the case.

Instead, in an unexplained break from its longstanding policy and practice of preventing disclosure until an individual's right to access confidential information has been settled, the FCC has concluded that individuals alleged to be unqualified to access VPCI—including those allegedly engaged in Competitive Decision-Making—may access VPCI just five days after the *Bureau* says so. If the Commission or a Court later concludes that an individual is in fact engaged in Competitive Decision-Making, it will be too late—"[t]he harm is irreparable." JA 4. The Operative Protective Orders accordingly deprive Petitioners of their statutory and regulatory rights to seek meaningful review of the Bureau's disclosure decision by the Commission (and if necessary, a court). Because it does not provide a reasoned justification for the FCC's departure from its longstanding

practice, the Order should be vacated.  *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970).

### A.  Petitioners Have A Right To Meaningful, Pre-Disclosure Review Of A Disclosure Decision.

When the FCC orders the disclosure of a party's confidential information, both Congress and the FCC have given that party the opportunity to challenge the disclosure order.  FCC regulations authorize an intra-agency appeal to the Commission regarding any decision made by the FCC's staff to release confidential information to third parties.  *See* 47 C.F.R. §§ 1.115(a), 0.461(i)(1).  If the Commission affirms a disclosure order, the Hobbs Act and the Administrative Procedure Act permit the aggrieved party to seek judicial review of the FCC ruling.  *See* 28 U.S.C. § 2342; 5 U.S.C. §§ 702, 706; *see also Qwest*, 229 F.3d at 1180-84 (holding that the FCC acted arbitrarily and capriciously in ordering release of the petitioner's confidential information).

These rights of review are effective only if a party's confidential information *remains* confidential until the merits of a disclosure order are reviewed.  *See In re Papandreou*, 139 F.3d 247, 251 (D.C. Cir. 1998) (postdisclosure review is "obviously not adequate" because, by the time of the appeal, "the cat is out of the bag"); *Ruckleshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., in chambers) (once trade secrets are disclosed to third parties, they cannot "be made secret again if the judgment below ultimately is" reversed).  For this reason, the

FCC has long recognized that confidential information should remain confidential until the merits of a disclosure decision have been fully resolved.[7]   *See, e.g.*, *Confidential Information Policy*, 13 FCC Rcd. at 24832, 24856-57.

Under the FCC's *Confidential Information Policy*, parties aggrieved by a disclosure order have two layers of protection.  First, once the FCC's staff issues an order authorizing disclosure, the "release of information, even under a protective order, will be delayed . . . to permit the [aggrieved] party to file an application for review with the Commission."  *Id.* at 24832; *see also* 47 C.F.R. § 0.459(g) ("Materials will be accorded confidential treatment . . . until the Commission acts on any timely applications for review.").[8]   Second, if the Commission denies an application for review and the aggrieved party seeks judicial review, "the material is not released until the court denies a stay request." *Confidential Information Policy*, 13 FCC Rcd. at 24856-57; *see also* 47 C.F.R.

---

[7]     As the stay this Court entered here illustrates, this Court likewise has recognized that it is appropriate to protect parties' confidential information from disclosure until judicial review is complete.  *See Qwest*, 229 F.3d at 1176 n.12 (disclosure order stayed pending completion of judicial review); *United States v. Microsoft Corp.*, 165 F.3d 952, 954 (D.C. Cir. 1999) (staying disclosure decision even though release of confidential information ultimately deemed proper); *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 279 (D.C. Cir. 1997) (same).

[8]     Although these procedures nominally govern a party's request to designate information as confidential, *see* 47 C.F.R. § 0.459, the *Confidential Information Policy* extends them to requests for access to information like VPCI, which has already been so designated, *see* 13 FCC Rcd. at 24856-57 & n.211 (discussing § 0.459 and stating that "[s]imilar provisions govern" requests for confidential records made under 47 C.F.R. § 0.461); 47 C.F.R. § 0.457(d)(1) (requests for inspection of trade secrets—including video programming contracts—are governed by § 0.461).

§§ 0.459(g) (no disclosure "until a court acts on any timely motion for stay"),

0.461(i)(4) (providing for disclosure only in the absence of a timely stay petition).

Until this case, the FCC has followed this policy consistently.  For example,

in adopting the *Confidential Information Policy*, the FCC rejected arguments that

access to confidential records should be permitted under a protective order while a

disclosure decision is under review.  *See Examination of Current Policy*

*Concerning Treatment of Confidential Info. Submitted to the Comm'n*, 14 FCC

Rcd. 20128 (1999) ("*Examination of Current Policy*").  Instead, the FCC

concluded that "disclosure pending review would effectively moot any applications

for review because it would place the assertedly confidential information in the

hands" of third parties "without first granting the objecting party the opportunity to

seek Commission or judicial review."  *Id.* at 20130.  The FCC reached this

conclusion even though it recognized that "disclosure" would "be delayed pending

the appeals process."  *Id.*  Under this policy, dozens of FCC protective orders

issued in merger review proceedings have prohibited access to confidential

information "[u]ntil any objection is resolved by the Commission and, if

appropriate, by any court of competent jurisdiction."[9]

---

[9]      *See, e.g.*, *Petition of Telcordia Techs. Inc.*, 29 FCC Rcd. 7592, ¶ 10 (2014);
*Applications of Cricket License Co.*, 28 FCC Rcd. 11803, 11806 (2013);
*Applications of AT&T Inc. & Deutsche Telekom AG*, 26 FCC Rcd. 8801, 8803
(2011); *Application of Comcast Corp., Gen. Elec. Co. & NBC Universal Inc.*, 25
(continued…)

**B.    The FCC Deprived Petitioners Of Their Right To Meaningful Pre-Disclosure Review.**

Although the October Protective Orders erroneously gave third parties access to Petitioners' VPCI, they were at least consistent with the FCC's "longstanding presumption" that "no party [may] access highly sensitive information while an objection to such disclosure remain[s] under review by the Commission or by a court." JA 3; 5. Those orders gave Petitioners an unqualified right to object to any request to access Highly Confidential Information (including VPCI), and provided that the objections would operate to bar any individual from accessing that information until the objection "is resolved by the Commission and, if appropriate, by any court of competent jurisdiction." JA 136, ¶ 8; 147, ¶ 8.

The Bureau's decision to issue the November Orders on a *sua sponte*, *ex parte* basis—after Petitioners filed their intra-agency appeal—suggests that the Bureau recognized that its initial disclosure decision was flawed. In attempting to rehabilitate that decision, however, the November Orders compounded the Bureau's error by departing from the FCC's longstanding precedent of delaying access until the merits of an individual's right of access to confidential documents has been finally resolved. Instead, Paragraph 8 of the Operative Protective Orders

---

FCC Rcd. 2140, 2145 (2010); *Applications of Adelphia Commc'ns Corp.*, 20 FCC Rcd. 20073, 20080 (2005); *Applications of AT&T*, 19 FCC Rcd. 4793, 4797 (2004); *Application of Worldcom, Inc.*, 13 FCC Rcd. 11166, 11178 (1998).

- 26 -

permits access beginning "five business days after [any] objection is resolved by the Bureau in favor of the person seeking access."  JA 10, ¶ 8; 21, ¶ 8.

The November Orders create a situation in which individuals who are ultimately determined to be *unqualified* to review VPCI—for example, because they are engaged in Competitive Decision-Making—may obtain access to VPCI unless an objecting party is able to obtain emergency relief (such as a stay) from the Commission or this Court within a narrow five-day window.[10]  For two reasons, these "inexplicabl[e]" revisions to Paragraph 8 of the Operative Protective Orders, JA 5, which "take away [Petitioners'] due process rights," JA 3, require the Order to be set aside.

### 1.     The Commission Rejected Petitioners' Intra-Agency Appeal Without Explanation.

The Bureau's revisions to Paragraph 8, which represented a "departure from [the FCC's] prior practice," JA 3, were the subject of a second intra-agency appeal filed by Petitioners.  Yet the Commission gave no independent explanation for its

---

[10]     As this case illustrates, there is no reason to believe that *the Commission* can act this quickly.  The Commission waited 27 days to rule on Petitioners' first emergency stay request—and it acted on that request only after Petitioners sought emergency relief in this Court.  If the Commission similarly ignores (or denies) an aggrieved party's request to stay an individualized disclosure decision by the Bureau, that party will have no choice but to scramble to seek emergency relief from this Court.  The unreasonableness of the Bureau's five-day window is underscored by the fact that this Court generally requires parties to seek emergency relief at least seven days before judicial intervention is required.  *See* D.C. Cir. R. 27(f).

departure from its past practice. Indeed, it wholly ignored Petitioners' second intra-agency appeal. The Order can—and should—be vacated on this basis alone.

A key sequence of events in this case's procedural history reveals the Commission's error. On November 4 the Bureau issued a series of *ex parte* orders on its "own motion" that peremptorily stripped Petitioners of their right to meaningful pre-disclosure review. JA 28, ¶ 1. Three days later, on November 7, Petitioners filed an intra-agency appeal of the November Orders. JA 80-103. Because the Bureau's *sua sponte* action deprived Petitioners of any prior opportunity to object to the Bureau's revisions to Paragraph 8 of the Operative Protective Orders, Petitioners' November 7 appeal marked the first time that a party told the FCC that the Bureau's November Orders marked a significant and unexplained shift in agency practice. *See id.* Then, on November 10, the Commission denied Petitioners' November 7 intra-agency appeal solely "for the reasons stated by the Media Bureau in its November 4, 2014, *Order on Reconsideration*." JA 1, ¶ 1.

It is logically impossible for an order issued on November 4 to respond to an argument raised for the first time on November 7.[11] The Commission had every

---

[11]    Petitioners could not have—and need not have—made this argument any earlier because, until November 4, the operative protective orders complied with the *Confidential Information Policy*'s policy of ensuring meaningful pre-disclosure review.

- 28 -

opportunity to review and address Petitioners' new procedural argument, but elected instead to base its decision exclusively on reasoning that predated and did not consider that argument. The dissenting Commissioners brought these "procedural shenanigans" to the majority's attention, to no avail. JA 3.

By rejecting Petitioners' procedural argument without articulating *any* supporting rationale, the Commission failed to meet the requirement that "the grounds upon which [an] administrative agency act[s] b[e] clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943); *see also State Farm*, 463 U.S. at 43 (agency ruling is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem"). And it is too late for the FCC's counsel to offer a new rationale. Agency action can only be upheld on the reasoning provided by the agency itself in the decision under review. *See Chenery*, 318 U.S. at 87-88; *Manin v. NTSB*, 627 F.3d 1239, 1243 (D.C. Cir. 2011) (refusing to accept a "*post hoc* justification when the reason offered by the [agency] does not withstand review"). The Commission's order therefore must be vacated. *See Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) ("[W]hen 'required explanation of the agency's action is totally absent,' vacatur is indicated lest remand invite 'wholly *post hoc* rationalization.'" (quoting

*Action on Smoking & Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 797-99 & n.2
(D.C. Cir. 1983))).[12]

### 2.    The Bureau Did Not Provide A Reasoned Explanation For Its Departure From The FCC's Longstanding Policy.

The only statement that even comes close to an explanation for the FCC's
abrupt departure from its longstanding policy and practice appears in a cursory
passage buried at the end of one of the Bureau's *sua sponte* November Orders.
There, the Bureau claims that an alleged need to promote "effective participation"
in the merger-review process and to ensure completion of that process "in a timely
manner" justifies depriving parties of the opportunity to obtain meaningful review
of its disclosure decisions.  JA 45, ¶ 36.

For at least three reasons, that superficial passage fails to satisfy the
Administrative Procedure Act's basic requirement that, when an agency departs
from its prior practice, it "must provide a 'reasoned analysis indicating that prior

---

[12]    The FCC has suggested that 47 U.S.C. § 155(c)(5), which allows the
Commission to deny an intra-agency appeal "without specifying any reasons
therefor," excuses it from compliance with the *Chenery* rule.  Not so.  Section
155(c)(5) obviates the need for an explanation in "the typical situation in which the
Commission reviews findings and determinations already articulated [by a
subordinate agency division] and therefore need not reiterate the reasons already
given." *WSTE-TV, Inc. v. FCC*, 566 F.2d 333, 337 (D.C. Cir. 1977).  It does not,
however, eliminate the "fundamental requirement" imposed by the Administrative
Procedure Act "that the basis for the agency's ultimate conclusions [must] be
clearly and fully articulated, so that judicial review can be something more than
perfunctory deference and approval." *Id.*  Section 155(c)(5) does not allow the
Commission to deny an intra-agency appeal when, as here, no branch of the FCC
addressed the merits of the arguments Petitioners advanced in their second intra-
agency appeal.

policies and standards are being deliberately changed, not casually ignored.'" *Ramaprakash*, 346 F.3d at 1124 (quoting *Greater Boston Television Corp.*, 444 F.2d at 852); *see also Qwest*, 229 F.3d at 1183-84 (granting petition for review based on the Commission's unexplained departure from practices outlined in the *Confidential Information Policy*).

*First*, the Bureau's bare-bones justification does not acknowledge that the November Orders depart from the FCC's longstanding policy and practice of guaranteeing meaningful prediscolsure review, reflected in the *Confidential Information Policy* and the protective orders cited above. *See Black Citizens for a Fair Media v. FCC*, 719 F.2d 407, 417 (D.C. Cir. 1983) (when an agency makes a "significant change in policy," it must at a minimum show that it is "aware that it [i]s changing its views"). Indeed, *every* protective order cited by the November Order as an example of the FCC's "long-established procedures" actually *prohibited* disclosure of confidential information until a challenge had been resolved by the Commission and a court. JA 37-39; ¶¶ 19-22; *see supra* at 25 n.9. This gap is particularly disturbing because *both* dissenting Commissioners raised the issue and chastised the FCC for its abrupt and unexplained departure from past practice. *See* JA 3-5; *see also Ramaprakash*, 346 F.3d at 1128 (citing similar views expressed by dissenting agency members).

*Second*, what little explanation the Bureau did provide for its sudden reversal in course—the need to promote "effective participation" in the merger-review process and to ensure completion of that process "in a timely manner," JA 45, ¶ 36—does not justify the FCC's change of direction because the FCC rejected the very same reasoning 15 years ago. *See Examination of Current Policy*, 14 FCC Rcd. at 20130.  When the FCC reaffirmed the *Confidential Information Policy* in 1999, it dismissed the notion that the *Policy*'s review-first, disclose-second framework would impede effective third-party participation.  *Id.*  And, while the FCC "agree[d] that disclosure may be delayed pending the appeals process," it nevertheless chose to prioritize a party's right to meaningful pre-disclosure review over immediate disclosure *even under a protective order* because the latter approach would come at an even greater cost of nullifying an aggrieved party's due process rights.  *Id.*  The November Orders must be set aside because they are "impossible to square with" this reasoning.  *Ramaprakash*, 346 F.3d at 1127.

*Third*, the Bureau's proffered explanation is not even factually accurate. Petitioners have not sought to suspend any aspect of the merger proceedings, "indefinitely" or otherwise.  As the Court correctly recognized in its November 21 Order, "[t]he agency has access to the relevant documents at issue in this matter and can continue to evaluate the proposed merger during the stay."  JA 245.  In fact, after the Court issued its stay, the FCC gave third parties access to

Confidential Information and non-VPCI Highly Confidential Information, set a pleading cycle for various challenges to the proposed mergers, and restarted its own informal "shot clock" to complete the review of these transactions. JA 3674-81.

The FCC's longstanding approach to prohibiting disclosure while review is pending is the right one. The alternative places aggrieved parties, the Commission, and the Court in a perpetual state of emergency. Petitioners and others have alleged that certain individuals who seek access to VPCI are engaged in Competitive Decision-Making. If the Bureau concludes otherwise, Petitioners must obtain relief from the Commission or a court within five days of the Bureau's decision. If the Commission does not act—as it failed to do here, *see supra* at 27 n.10—Petitioners will have no choice but to seek emergency relief from this Court. Moreover, because this Court generally lacks jurisdiction to review the Bureau's decisions, *see, e.g.*, *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999), the only vehicle by which Petitioners may obtain judicial review could be a petition for a writ of mandamus. There simply is no justification for this unreasonably accelerated timetable, which will force parties to take the extraordinary step of seeking mandamus relief and impose the burden of responding to emergency filings on this Court.

The Commission's "failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.'" *Ramaprakash*, 346 F.3d at 1125 (quoting *Columbia Broad. Sys. v. FCC*, 454 F.3d 1018, 1027 (D.C. Cir. 1971)). The remedy for that "inexcusable" error is to vacate the ruling below. *See id.* at 1130; *see also Manin*, 627 F.3d at 1245.

## II.  THE FCC'S DECISION TO DISCLOSE PETITIONERS' VPCI TO THIRD PARTIES IS ARBITRARY AND CAPRICIOUS.

Putting aside the "procedural shenanigans" that infected the FCC's decision-making process, JA 3, the FCC's decision to disclose hundreds of thousands of pages of VPCI is arbitrary and capricious. Petitioners' VPCI is protected by the Trade Secrets Act and may not be disclosed unless a "persuasive showing" has been made that disclosure is "necessary." *See* 47 C.F.R. §§ 0.457(d)(1), (d)(1)(iv); *Confidential Information Policy*, 13 FCC Rcd. at 24823. Here, at the time it ordered the merger parties to make VPCI available to third parties, the FCC had not independently reviewed the VPCI to determine whether it is necessary (or even relevant) to its consideration of the proposed transactions. Yet, sight unseen, it has delegated to eager competitors and other third parties the opportunity to mine hundreds of thousands of pages of Petitioners' Distribution Agreements and negotiating strategies. The FCC has never before taken such action, and it has not justified its decision to do so here.

**A.    The Trade Secrets Act and The FCC's Rules Generally Prohibit The FCC From Disclosing VPCI To Third Parties.**

Petitioners' VPCI is subject to strict legal protections that generally prohibit the FCC from disclosing it to third parties.  In the Trade Secrets Act, Congress established a criminal prohibition on agency disclosure of trade secrets and other confidential information.  18 U.S.C. § 1905.  The Freedom of Information Act also generally exempts such materials from disclosure.  *See* 5 U.S.C. § 552(b)(4); *Bartholdi*, 114 F.3d at 281.  There is no dispute that Petitioners' VPCI is protected from disclosure by these statutes.  *See* 47 C.F.R. § 0.457(d)(1)(iv).  As a result, VPCI may not be disclosed except as "authorized by law."  18 U.S.C. § 1905; *see also Qwest*, 229 F.3d at 1177-78.

The FCC claims that 47 C.F.R. § 0.457(d) and its *Confidential Information Policy* provide the requisite authority to release VPCI.  But those provisions require a "persuasive showing" that VPCI must be disclosed to third parties before the FCC may authorize such disclosure.  47 C.F.R. § 0.457(d)(1); *Confidential Information Policy*, 13 FCC Rcd. at 24822.  As part of its analysis, the FCC has insisted on the identification of a "compelling public interest in disclosure." *Confidential Information Policy*, 13 FCC Rcd. at 24822-23.   And even if a compelling interest exists, the FCC has not authorized disclosure of such sensitive information "on the mere chance that it might be helpful," but rather "insists upon a showing that the information is a necessary link in a chain of evidence" that will

- 35 -

resolve an issue before the Commission. *Id.* at 24823. The FCC also has been careful to "engage in a balancing of the interests favoring disclosure and non-disclosure." *Id.* at 24822; *see also FCC v. Schreiber*, 381 U.S. 279, 291-92 (1965). This Court has held that 47 C.F.R. § 0.457(d) imposes upon the FCC a heavy burden of explaining, before it makes highly sensitive and confidential information available to competitors, that disclosure will outweigh the risk of competitive harm. *Qwest*, 229 F.3d at 1183-84.

In light of the demanding showing that Section 0.457(d) and the *Confidential Information Policy* impose on the FCC, the FCC "has processed transaction after transaction in the video market … *without* supplying" VPCI to third parties even under a protective order. JA 4; *see also* JA 5 ("the Commission has not disclosed these agreements in the past"). Instead, the FCC has reviewed this material either *in camera* at the FCC or at the Department of Justice in connection with that agency's parallel review of merger proceedings, an approach that enables the FCC to avoid placing VPCI in the record of its proceedings. *See, e.g.*, *Applications of Comcast Corp.*, 17 FCC Rcd. at 22636; *Applications of Tele-Commc'ns, Inc.*, 14 FCC Rcd. 3160, 3233-34 (1999). As Commissioner Pai observed, the FCC followed this approach as recently as 2011 in its review of the Comcast/NBC Universal merger, which raised issues similar to those here. *See* JA 4; 227-28, ¶ 10; 235-36, ¶ 9; 244, ¶ 11; *see also* JA 1421 ("The Commission and

- 36 -

the Antitrust Division of the Department of Justice cooperated closely to harmonize their approaches (always consistent with their respective statutory commands) in the Comcast-NBCU and AT&T/T-Mobile transactions and that continues to be the way we work together today.").

This Court has long endorsed the FCC's decision to withhold confidential information from its public record. *See Consumer Fed'n*, 348 F.3d at 1012-14, *aff'g Applications of Comcast Corp.*, 17 FCC Rcd. at 22636; *see also SBC Commc'ns Inc. v. FCC*, 56 F.3d 1484, 1492 (D.C. Cir. 1995), *aff'g Applications of Craig O. McCaw*, 9 FCC Rcd. 5836 (1994). In fact, this Court previously has set aside an FCC decision ordering release of highly confidential information to a party's competitors. *Qwest*, 229 F.3d at 1183-84.

The protections afforded by the Trade Secrets Act and the FCC's rules are especially important in a case like this. Petitioners are not parties to the proposed mergers and their "rights cannot and should not be trampled over." JA 5. Petitioners have not asked for their highly confidential information to be disclosed to anyone, much less to entities with which they are engaged in active contract negotiations. Although disclosure of VPCI to anyone would be harmful to Petitioners' business interests, Petitioners would be especially harmed if a distributor became privy to the terms of a Petitioner's Distribution Agreements with that distributor's competitors. Armed with knowledge about such terms and

- 37 -

the negotiation strategies used to obtain them, a distributor would have an unfair advantage in negotiating its own distribution agreement with that Petitioner and would have no incentive to negotiate reasonable rates or other terms and conditions with the Petitioner.  JA 221-22, ¶¶ 8-11; 226-27, ¶¶ 6-9; 231, ¶¶ 7-9; 235, ¶¶ 6-8; 239, ¶¶ 6-8; 243, ¶¶ 7-8.

## B.    The FCC Did Not Make A "Persuasive Showing" That VPCI Must Be Disclosed Here.

In its haste to resolve the pending transaction reviews, the FCC has sidestepped the series of legal hurdles arising from its own regulations and policy and departed from its prior practice of protecting VPCI from third-party disclosure. The Commission's "cursory, two-page order"—which was before the Commission "for no more than a few hours"—fails to make the required "persuasive showing" why it is "necessary" to release hundreds of thousands of pages of VPCI to third parties in this case.  JA 1-2.  As explained below, there are at least four reasons why the FCC's decision should be set aside.

### 1.    The FCC Did Not Justify Its Unprecedented Decision To Disclose Distribution Agreements and Negotiation Materials.

The FCC first erred by failing to explain why third parties—including competitors of the merger parties—need access to hundreds of thousands of pages of VPCI in these proceedings, when the FCC previously has not made such information available.

The extent of the planned VPCI disclosure here is unprecedented. VPCI-related negotiation materials have *never* been made accessible to third parties in merger proceedings, even under a protective order. The FCC does not dispute this fact, and cannot point to any regulation authorizing disclosure of negotiation materials. As for Distribution Agreements, the FCC can identify only two merger proceedings in which it says certain such documents were made available to third parties. *See* JA 36-37, ¶¶ 18-19. But the universe of Agreements made available in those cases was substantially smaller than the "hundreds of thousands of pages of contract programming materials" the FCC proposes to place in the administrative record here. JA 44, ¶ 34.

The FCC has not explained why a massive volume of Distribution Agreements and negotiation documents must be made available here, when the FCC has not made this information available to third parties in prior major media mergers. As Commissioner Pai observed, the FCC "has processed transaction after transaction in the video market, including the Comcast-NBCU transaction … *without* supplying" VPCI to third parties even under a protective order, and the FCC has not offered "any persuasive explanation for why additional disclosure is necessary here." JA 4. In fact, "to the extent that these proceedings differ from prior ones, the argument for protecting programming contracts is *more* compelling here, not less" because "'the ability to capture an understanding of the

programming marketplace is greater, and potentially more troublesome,'" than in other merger reviews.   JA 4 (quoting JA 3246).   The absence of a reasoned explanation for the FCC's departure from past practice requires the Order to be set aside.  *See, e.g.*, *Republic Airline Inc. v. U.S. Dep't of Trans.*, 669 F.3d 296, 299-300 (D.C. Cir. 2012) ("One of the core tenets of reasoned decision-making is that 'an agency [when] changing its course … is obligated to supply a reasoned analysis for the change.'" (quoting *State Farm*, 463 U.S. at 43)); *see also State Farm*, 463 U.S. at 43 (noting that in a review under the "arbitrary and capricious" standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962))).

### 2.   The FCC Did Not Identify A "Compelling Public Interest" Justifying Disclosure Of VPCI.

The FCC also failed to explain why disclosure of Petitioners' VPCI serves a "compelling public interest."  *Confidential Information Policy*, 13 FCC Rcd. at 24822-23.

The only public interest rationale the FCC identifies is an alleged "need for interested parties to have access to that information in order to participate meaningfully in the transactions' review."  JA 40, ¶ 23.  But, as this Court has pointed out, the FCC itself has unfettered access to VPCI.  *See* JA 245.

- 40 -

Meanwhile, of the entities the FCC identified in its November Orders as supposedly needing access to VPCI in connection with the merger proceedings, *see* JA 28-46, only five have specifically filed requests to access VPCI.  Three are distributors that carry Petitioners' (and other content owners') programming; the fourth is a trade association that represents other distributors.  As Commissioner O'Rielly observed, these requests "appear[] to be more of a fishing expedition by interests groups and competitors to obtain market-sensitive information."  JA 5.

A general desire to permit broad public participation must yield when sensitive information will be disclosed to competitors.  *See Qwest*, 229 F.3d at 1180-84 (FCC acted arbitrarily and capriciously by ordering release of party's confidential information to its competitors).  This is especially true when the antitrust laws—which like the Communications Act are designed to protect the public interest—generally restrict competitors from sharing pricing information. *See* 15 U.S.C. § 1; *United States v. Container Corp. of Am.*, 393 U.S. 333, 337-38 (1969) (holding exchange of price information violated the Sherman Act); 13 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶¶ 2111c, 2111g(5) (3d ed. 2012) ("The basic concerns of any exchange of information among rivals are collusion or collusion-like behavior, and exclusion. . . . Ad hoc competitor-to-competitor 'exchange' of particularized price information, such as the price offered

- 41 -

or made to a particular customer, should ordinarily be considered a naked or nearly naked restraint.").

Here, the benefits of public participation are amorphous at best. As its prior treatment of major media mergers illustrates, the FCC is well-equipped to assess the impact of these transactions without giving third parties access to VPCI, and the FCC previously has acceded to concerns that such materials not be placed in the record. Indeed, it is telling that when its own distribution agreements were at issue, DISH—a competitor of the merger parties, a purchaser of Petitioners' content, and one of the most emphatic proponents of disclosure here—urged the FCC to keep those agreements out of the public record because disclosure "would have a devastating effect on [DISH's] business and place the companies at a significant competitive disadvantage." *E.g.*, JA 3271 & n.8. Unlike here, the FCC apparently acquiesced. Neither the FCC nor DISH has explained why DISH should have access to third party materials in this case when its own VPCI was kept out of the public record in a prior merger proceeding. *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008) ("An agency must provide an adequate explanation to justify treating similarly situated parties differently.").

### 3. The FCC Did Not Establish That VPCI Is "Necessary" To Resolve An Issue Before The Commission.

Under its *Confidential Information Policy*, the FCC has long refused to make confidential information available to third parties "on the mere chance that

[the information at issue] might be helpful." *Confidential Information Policy*, 13 FCC Rcd. at 24823; *see also Applications of Comcast Corp.*, 17 FCC Rcd. at 22636 (the FCC must disclose only "documents or evidence of decisional significance").   Rather, the FCC "insists upon a showing that the information is a necessary link in a chain of evidence" that will resolve an issue before it. *Confidential Information Policy*, 13 FCC Rcd. at 24823.  Here, the FCC failed to explain why it needs to make every Distribution Agreement—and all negotiation materials related to those Agreements—available to third parties when it does not even know whether how much (if any) of that information is even relevant—let alone *necessary*—to its decisionmaking.  *See id.*

In prior merger proceedings, the FCC has observed that it has the "obligation" to make "antecedent determinations regarding which documents or other evidence will be most probative and relevant to our decision-making." *Applications of Comcast Corp.*, 17 FCC Rcd. at 22636.  Moreover, the FCC has noted that coordinating its public review with the Department of Justice's confidential review enables the FCC to "focus its inquiry on the public interest issues that are truly relevant to a proposed transaction."  *Id.* at 22639.  This Court has approved that approach.  *See Consumer Fed'n*, 348 F.3d at 1012-14.

In the case of Petitioners' VPCI, the FCC has abdicated its "obligation" to review highly confidential materials *before* releasing them to third parties.[13]  The FCC plans to place all hundreds of thousands of pages of programming contract materials into the public record without "pre-vetting" that material for relevance— a process that the Commission believes would "entail[] delay and diversion of resources to no productive end."  JA 36, ¶ 16.  In other words, the FCC apparently does not intend to review the VPCI it will make available, but rather plans to provide commenters—including competitors—with access to those hundreds of thousands of pages "on the mere chance" that commenters will identify some manner in which some—or perhaps just one—of those documents are relevant that was "not apparent to the Commission."

The FCC has it backwards.  It cannot make the "persuasive showing" required by the Trade Secrets Act that hundreds of thousands of pages of contract programming materials must be disclosed unless it has reviewed all of these materials and determined that they are relevant to its review of the proposed mergers.  Unless and until it has reviewed the Distribution Agreements and

---

[13]      In fact, when another party—Hilton Worldwide—asserted similar categorical objections intended to prevent any third party from accessing highly confidential pricing information contained in its agreements with certain of the merger parties, *see* JA 3587-92, the Bureau sustained Hilton's categorical objection and concluded that it could complete its review of the merger proceedings without placing Hilton's highly confidential information in the public record, *see* JA 3642.  The FCC has not explained why Hilton's categorical objection was sustained but Petitioners' identical objection was rejected.

negotiation strategy materials—which the FCC concedes it has not done and does not intend to do—the FCC cannot reasonably conclude that *all* those hundreds of thousands of pages of materials are "necessary" to resolve an issue before the Commission. *Confidential Information Policy*, 13 FCC Rcd. at 24823.

### 4.    The FCC Did Not Balance Any Benefit Of Disclosure Against The Likely Harms.

Finally, no "persuasive showing" can be made unless the FCC has balanced the benefit of providing third-party access against the harm to Petitioners, the programming industry, and the public interest if VPCI is misused.  In engaging in this balancing, the Commission must be "sensitive to ensuring that the fulfillment of its regulatory responsibilities does not result in the unnecessary disclosure of information that might put its regulatees at a competitive disadvantage." *Confidential Information Policy*, 13 FCC Rcd. at 24822.

The FCC did not balance the benefit of disclosure against the harm from misuse, and did not consider that once Petitioners' VPCI is used commercially, the FCC can never undo the resultant harm to Petitioners' business, the programming industry, and the public interest.  *See Qwest*, 229 F.3d at 1183-84 (remanding to FCC for further consideration whether protective order can adequately protect private party's competitive interests and explanation why an unprecedented release of raw audit data to competitors was the only way to achieve meaningful public comment).  Instead, the FCC appears to assume that the Operative Protective

- 45 -

Orders are sufficient to prevent Petitioners' VPCI from being misused.  For at least

two reasons, this assumption is misguided.

*First*, as Commissioner O'Rielly noted, "[n]o matter how safe or protected

… information may seem, you can never promise with any level of certainty that

the information won't get out in some form."  JA 5.  The truth of this statement is

illustrated by a prior FCC proceeding involving AT&T's proposed merger with T-

Mobile.  Even though the protective order in that proceeding required AT&T to

redact Highly Confidential Information from its public filings, *see Applications of

AT&T & Deutsche Telekom AG*, 26 FCC Rcd. at 5892, its counsel inadvertently

filed publicly an unredacted document that contained highly sensitive information

about the company's business strategy.  *See* JA 3851-57.  Although the mistake

was corrected after a few hours, the document was widely distributed, and it

remains available on the Internet three years later.[14]

The point is not whether, as the FCC contends, the Operative Protective

Orders will ensure that reviewing parties will act in good faith and root out bad

actors.  It is, rather, that protective orders do not always protect extremely sensitive

information and cannot always safeguard third parties like Petitioners against

---

[14]    *See* http://tinyurl.com/pjwbkqy (simplified address for document linked in
JA 3843-45).

- 46 -

irreparable harm. Whether a leak is intentional or inadvertent, the resulting harm is identical and cannot be undone.[15]

*Second*, the FCC's suggestion that the threat of sanctions is enough to protect the confidentiality of Petitioners' VPCI rings hollow. As a threshold matter, the FCC has not explained—by, for example, reviewing its prior efforts to enforce protective orders—how it plans to detect, investigate, and prosecute violations of the Operative Protective Orders. Instead, the FCC places the onus on an individual who violates the Operative Protective Order to *self-report* that violation to the Commission, even though the FCC did not cite even one example where it imposed sanctions after an individual self-reported a Protective Order violation.

There are ample reasons to believe that the threat of sanctions will not protect Petitioners' VPCI from improper use. As AT&T's experience in the T-Mobile merger illustrates, the threat of sanctions will not deter inadvertent misuse of VPCI.[16] Nor is the prospect of sanctions likely to deter individuals who are non-

---

[15]     In this case, after it determines who is entitled to access Highly Confidential Information like VPCI, the FCC plays no role in the mechanical process of administering the protective order. Instead, the process of ensuring that the appropriate documents are released to the appropriate individuals falls on the merger parties. This additional layer represents yet another opportunity for inadvertent violations to occur.

[16]     There is no indication that the FCC imposed sanctions on AT&T or its counsel for the protective order violation that occurred in the AT&T/T-Mobile merger proceeding.

lawyers, or who have no regular business before the Commission. Finally, any misuse of VPCI for commercial purposes—whether intentional or accidental—will be impossible to prove.[17] Tellingly, the FCC does not explain how it plans to monitor the industry to ensure that VPCI has not been misused.

### C. The FCC's Fear Of Being Accused Of Acting Arbitrarily If It Were To Adhere To Its Historical Approach Lacks Merit.

The FCC relies upon the untenable argument that if it does not disclose VPCI to third-party competitors, its decision will be subject "to judicial challenge as arbitrary and capricious in denying interested parties the ability to analyze whether additional documents undercut evidence on which the Commission relied, in violation of the Communications Act and the Administrative Procedure Act." JA 36, ¶ 17. As Commissioner O'Rielly observed, this concern reflects "a dubious reading of the statute." JA 5.

The FCC has a long history of reviewing media mergers without making VPCI available to third parties, and it has not cited a single instance in which a

---

[17]    For example, the Operative Protective Orders ignore the marketplace reality in which Outside Counsel and Outside Consultants operate. Even if individuals are not *currently* engaged in Competitive Decision-Making, they act on behalf of distributor clients in a variety of settings and may *later* be in a position to engage in Competitive Decision-Making. As federal courts have recognized, once a person gains access to highly confidential information, there is a high risk that the person may inadvertently use the information inappropriately because the individual cannot "perform a prefrontal lobotomy on himself or herself" to eradicate knowledge of confidential information. *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1205 (7th Cir. 1987).

merger decision has been challenged on that basis.  In fact, when the FCC's refusal to make confidential information available to third parties has been challenged, this Court has recognized that the FCC has broad discretion to shield such material from public review.  *See Consumer Fed'n*, 348 F.3d at 1012-14; *see also SBC Commc'ns Inc.*, 56 F.3d at 1492.

As *Consumer Federation* demonstrates, lack of unrestricted "access to the full universe of documents" at issue does not prevent objectors from mounting a challenge to the lack of disclosure, prevent the FCC from addressing commenters' arguments, or prevent this Court from "meaningfully examin[ing]" that decision. JA 36, ¶ 16.  Here, the FCC has access to all VPCI and can use that information to evaluate commenters' arguments, including those made without access to VPCI. Furthermore, the Commission can and has issued orders based on its review of documents not available to the parties, *see, e.g.*, *Applications of Nynex Corp.*, 12 F.C.C. Rcd. 19985, 20000 (1997), and this Court's review of such orders has not been hampered by the lack of specific discussion of the contents of such documents, *see SBC Commc'ns, Inc.*, 56 F.3d at 1492.

At most, the FCC must place the "most critical factual material that is used to support the agency's position on review" into the public record.  *See Ass'n of Data Processing Serv. Orgs. v. Bd. Of Governors*, 745 F.2d 677, 684 (D.C. Cir. 1984).  Here, the Commission did not even analyze whether any VPCI materials

were among the "most critical" to its position, *see supra* at 42-45; *Applications of*

*Comcast Corp.*, 17 FCC Rcd. at 22636, let alone make any finding to that effect.

Nor did it point to any prior court or FCC decision holding that VPCI is among the

"most critical" material in a media merger proceeding.   The Commission,

therefore, has no legitimate basis to believe that its refusal to release hundreds of

thousands of pages of VPCI to third parties would be tantamount to arbitrarily and

capriciously excluding the "most critical factual material" from review.  *See, e.g.*,

JA 4 (noting that the FCC "has processed transaction after transaction in the video

market," including at least one "in which programming was directly at issue,"

"*without* supplying" VPCI).

That distinction is especially important here, where the parties who would

gain access to VPCI are primarily the competitors of the merger parties and entities

actively engaged in contract negotiations with Petitioners.  It cannot be the case

that an agency acts arbitrarily and capriciously by refusing competitors' and

unaffiliated third parties' requests for price and other highly sensitive contract

terms, particularly when the FCC has access to the full scope of such materials and

ample ability to review and analyze the information they contain, as it has done in

the past.  Given that the antitrust laws ordinarily would prohibit competitors from

sharing this type of information, *see Container Corp. of Am.*, 393 U.S. at 337-38, a

decision to *avoid* sharing of sensitive information could hardly be called arbitrary

and capricious. Rather, as this Court has recognized, the decision to *release* sensitive information to competitors is arbitrary and capricious. *See Qwest*, 229 F.3d at 1180-84.

## III. THE FCC'S REFUSAL TO ADOPT ALTERNATIVES THAT PROTECT PETITIONERS' VPCI IS ARBITRARY AND CAPRICIOUS.

Even if the FCC made a "persuasive showing" that some VPCI must be disclosed to third parties in this proceeding—and it has not—the Operative Protective Orders do not adequately protect Petitioners' confidentiality interests. The FCC refused to adopt several measures identified by Petitioners that would provide greater protection for their confidentiality interests. Because the FCC failed adequately to explain this refusal, even though it "has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives," *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (internal quotation mark omitted), its decision must be set aside.

### A. The FCC Erred By Refusing To Release Only Redacted, Anonymized VPCI To Third Parties.

The FCC has long recognized that it is appropriate to rely on "redaction" or "aggregated data or summaries" when it seeks "to balance the interests in disclosure and the interests in preserving the confidentiality of competitively sensitive materials." *Confidential Information Policy*, 13 FCC Rcd. at 24823-24.

- 51 -

Consistent with this policy, Petitioners urged the FCC to redact identifying information from any Distribution Agreements the FCC made available to third parties.  Petitioners also encouraged the FCC to release only an anonymized spreadsheet or schedule prepared by the FCC's staff that sets out the universe of the most relevant terms and conditions in the Distribution Agreements.

The FCC refused to adhere to its policies and adopt these reasonable alternatives.  Where, as here, the FCC failed to "consider plausible alternatives and discount them" before releasing highly confidential data in raw form, its decision must be set aside.  *Qwest*, 229 F.3d at 1183.

The FCC complains that it would be "unworkable" to redact or anonymize VPCI before releasing it to third parties, *see* JA 33, ¶ 10, but this burden is of the FCC's own making.  The FCC created an "unworkable" situation by issuing sweeping and overly broad information requests.  The FCC cannot now complain that it is too difficult to protect the confidentiality of Petitioners' VPCI when it could reduce any burden associated with anonymizing VPCI by scaling back its information requests or minimizing the amount of VPCI it plans to make available to third parties.  Indeed, doing so would be consistent with the FCC's acknowledged "obligation not to overreach in [its] discovery requests when confidential third party agreements are at issue." *Applications of Comcast Corp.*, 17 FCC Rcd. at 22639.

- 52 -

The FCC also complains that it would be "inappropriate" to ensure "that the parties and programming involved are not identifiable from the material" because it would "undermine the utility of making such documents available."  JA 44, ¶ 34. Yet this view conflicts with the FCC's observation in the *Confidential Information Policy* and elsewhere that the use of "aggregated data or summaries" adequately "balance[s] the interests in disclosure and the interests in preserving the confidentiality of competitively sensitive materials."  13 FCC Rcd. at 24823-24;[18] *see also Basic Media, Ltd. v. FCC*, 559 F.2d 830, 834 (D.C. Cir. 1977) ("[W]hile administrative agencies can … fashion exceptions and qualifications, they must explain departures from agency policies or rules apparently dispositive of a case." (internal quotations omitted)).

The FCC itself identified only two VPCI elements—"price and exclusive contracting terms"—as relevant to its review of these mergers.  Yet it offers no reasoned explanation why it cannot prepare a presentation that contains only these terms on an anonymous basis—an approach that unquestionably provides better protection to Petitioners than releasing hundreds of thousands of pages of raw, unredacted VPCI.  *Cf. Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 195

---

[18]    *Accord Bell Telephone Operating Cos. Request for Confidential Treatment*, 10 FCC Rcd. 11541, 11542 (1995) ("[R]elease of commercial and financial information of only a summary nature does not present the concerns about competitive harm that normally lead us to withhold … information from public disclosure.").

(D.C. Cir. 1973) (noting anonymized data can be released under FOIA if original information is a trade secret protected from disclosure).

**B.    The FCC Erred By Failing To Impose Additional Restrictions On Who May Access VPCI.**

The FCC also failed to explain why every individual who requests access to Highly Confidential Information should also be entitled to access VPCI.  The Protective Orders correctly recognize that VCPI is a special category of Highly Confidential Information for which heightened restrictions are necessary.  For example, the Operative Protective Orders limit *how* VPCI may be accessed by limiting where VPCI may be viewed and imposing restrictions on copying, printing, and transmitting VPCI.

However, having recognized that VPCI should be treated differently than other forms of Highly Confidential Information, the Operative Protective Orders fail to place additional restrictions on *who* can access VPCI.  There are compelling reasons to limit the universe of individuals entitled to access VPCI here.  As the FCC's staff acknowledged, any individual who has access to VPCI could "obtain a detailed, industry-wide overview of the current and future programming market."  JA 3246.  The staff also recognized that "the ability to capture an understanding of the programming marketplace is greater, and potentially more troublesome," because the FCC is simultaneously reviewing two major proposed mergers.  JA

3246.  As one FCC Commissioner recognized, "the argument for protecting programming contracts is *more* compelling here, not less."  JA 4.

Here, Petitioners proposed restricting the universe of individuals who can access VPCI to the narrow group of requesters who could make a particularized, good-faith showing that they needed access to VPCI in order to support a specific argument or proposal to be made in the merger review proceedings.  This proposal is consistent with the requirement in 47 C.F.R. § 0.457(d)(1) that a party that seeks access to trade secrets and commercial or financial information must make a "persuasive showing as to the reasons for inspection."

If VPCI must be disclosed at all, or on an unredacted basis—and, as explained above, *see supra* at 34-51, it should not—then the only way to minimize the risk of improper disclosure—inadvertent or otherwise—is to limit the universe of individuals who may access VPCI.  The protective orders in these cases have been signed by more than 260 individuals so far, and additional Outside Counsel or Outside Consultants are entitled to sign the protective orders if they represent an entity that merely intends to participate in these proceedings at some unspecified point in the future.[19]  The existence of so many signatories makes it difficult, if not

---

[19]    Under the Bureau's interpretation of the Operative Protective Orders, even "employees of non-commercial participants" in these proceedings "who are counsel or consultants or experts … are entitled to review … VPCI" if they sign the protective order.  *See* JA 73, ¶ 11.

impossible, to identify the source of a wrongful or even accidental release of Petitioners' VPCI.   At least one website monitoring the FCC's review of the proposed mergers recognized that if the FCC's disclosure order is allowed to stand, "there is little doubt that [Petitioners' VPCI] would quickly be shared with the public in some forum."  JA 3900.

However, the FCC did not provide any reasoned explanation why it declined to impose heightened restrictions on who may access VPCI.   The FCC's boilerplate platitude that its review procedures "are premised on informed participation by the public" is contradicted by its subsequent admission that "the entirety of the … document productions in these proceedings is … subject to the restrictions set forth in the protective orders," which limit who may access confidential information.   In fact, the FCC expressly acknowledges that it is appropriate to "preclud[e] access to certain Highly Confidential Information by persons whose employment or activities make such access inappropriate."  JA 36, n.64.  Having already determined that the universe of individuals entitled to access Highly Confidential Information is narrower than the universe of individuals entitled to access merely Confidential Information, it would be logical and appropriate for the FCC to determine that the universe of individuals entitled to access VPCI should be narrower than the universe of individuals entitled to access other forms of Highly Confidential Information.

## CONCLUSION

For the foregoing reasons, this Court should vacate the Order to the extent that the Order authorizes third parties to access VPCI.

　　　　　　　　　　　　　　　　　　　 */s/  Robert A. Long*　　　　　
　　　　　　　　　　　　　　　　　　　Robert A. Long
　　　　　　　　　　　　　　　　　　　Mace Rosenstein
　　　　　　　　　　　　　　　　　　　Andrew Soukup
　　　　　　　　　　　　　　　　　　　Kevin King
　　　　　　　　　　　　　　　　　　　Ashley Anguas Nyquist
　　　　　　　　　　　　　　　　　　　COVINGTON & BURLING LLP
　　　　　　　　　　　　　　　　　　　One CityCenter
　　　　　　　　　　　　　　　　　　　850 10th Street NW
　　　　　　　　　　　　　　　　　　　Washington, DC 20001
　　　　　　　　　　　　　　　　　　　(202) 662-6000

　　　　　　　　　　　　　　　　　　　*Attorneys for Petitioners CBS*
　　　　　　　　　　　　　　　　　　　*Corporation, Scripps Networks*
　　　　　　　　　　　　　　　　　　　*Interactive, Inc., The Walt Disney*
　　　　　　　　　　　　　　　　　　　*Company, Time Warner Inc., Twenty-*
Dated:  December 15, 2014　　　　*First Century Fox, Inc., Univision*
　　　　　　　　　　　　　　　　　　　*Communications Inc., and Viacom Inc.*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,884 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 using 14-point Times New Roman font.


  _/s/  Robert A. Long_____
Robert A. Long
COVINGTON & BURLING LLP
One CityCenter
850 10th Street NW
Washington, DC 20001
(202) 662-6000

Dated:  December 15, 2014          *Attorney for Petitioners*

# ADDENDUM OF PERTINENT STATUTES AND REGULATIONS

**Administrative Procedure Act**

5 U.S.C. § 706. Scope of review...............................................................................60

**Trade Secrets Act**

18 U.S.C. § 1905.  Disclosure of confidential information generally ....................61

**Federal Communications Commission regulation**

47 C.F.R. § 0.457.  Records not routinely available for public inspection  ............62

47 C.F.R. § 0.459.  Requests that materials or information
  submitted to the Commission be withheld from public inspection.  .................64

47 C.F.R. § 0.461.  Requests for inspection of materials
  not routinely available for public inspection. ....................................................65

**Administrative Procedure Act, 5 U.S.C. § 706. Scope of review.**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

    (1)    compel agency action unlawfully withheld or unreasonably delayed; and

    (2)    hold unlawful and set aside agency action, findings, and conclusions found to be--

        (A)    arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        (B)    contrary to constitutional right, power, privilege, or immunity;

        (C)    in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        (D)    without observance of procedure required by law;

        (E)    unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

        (F)    unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**Trade Secrets Act, 18 U.S.C. § 1905.  Disclosure of confidential information generally.**

Whoever, being an officer or employee of the United States or of any department or agency thereof, any person acting on behalf of the Federal Housing Finance Agency, or agent of the Department of Justice as defined in the Antitrust Civil Process Act (15 U.S.C. 1311–1314), or being an employee of a private sector organization who is or was assigned to an agency under chapter 37 of title 5, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment.

**47 C.F.R. § 0.457. Records not routinely available for public inspection.**

The records listed in this section are not routinely available for public inspection pursuant to 5 U.S.C. 552(b). The records are listed in this section by category, according to the statutory basis for withholding those records from inspection; under each category, if appropriate, the underlying policy considerations affecting the withholding and disclosure of records in that category are briefly outlined. Except where the records are not the property of the Commission or where the disclosure of those records is prohibited by law, the Commission will entertain requests from members of the public under § 0.461 for permission to inspect particular records withheld from inspection under the provisions of this section, and will weigh the policy considerations favoring non-disclosure against the reasons cited for permitting inspection in the light of the facts of the particular case. In making such requests, there may be more than one basis for withholding particular records from inspection. The listing of records by category is not intended to imply the contrary but is solely for the information and assistance of persons making such requests. ….

\*      \*      \*

(d)      Trade secrets and commercial or financial information obtained from any person and privileged or confidential--categories of materials not routinely available for public inspection, 5 U.S.C. 552(b)(4) and 18 U.S.C. 1905.

      (1)      The materials listed in this paragraph have been accepted, or are being accepted, by the Commission on a confidential basis pursuant to 5 U.S.C. 552(b)(4). To the extent indicated in each case, the materials are not routinely available for public inspection. If the protection afforded is sufficient, it is unnecessary for persons submitting such materials to submit therewith a request for non-disclosure pursuant to § 0.459. A persuasive showing as to the reasons for inspection will be required in requests submitted under § 0.461 for inspection of such materials.

        \*      \*      \*

      (iv)      Programming contracts between programmers and multichannel video programming distributors.

        \*      \*      \*

(2)    Unless the materials to be submitted are listed in paragraph (d)(1) of this section and the protection thereby afforded is adequate, any person who submits materials which he or she wishes withheld from public inspection under 5 U.S.C. 552(b)(4) must submit a request for non-disclosure pursuant to § 0.459. If it is shown in the request that the materials contain trade secrets or privileged or confidential commercial, financial or technical data, the materials will not be made routinely available for inspection; and a persuasive showing as to the reasons for inspection will be required in requests for inspection submitted under § 0.461. In the absence of a request for non-disclosure, the Commission may, in the unusual instance, determine on its own motion that the materials should not be routinely available for public inspection.

**47 C.F.R. § 0.459. Requests that materials or information submitted to the Commission be withheld from public inspection.**

\*       \*       \*

(g)     If a request for confidentiality is denied, the person who submitted the request may, within ten business days, file an application for review by the Commission. If the application for review is denied, the person who submitted the request will be afforded ten business days in which to seek a judicial stay of the ruling. If these periods expire without action by the person who submitted the request, the materials will be returned to the person who submitted them or will be placed in a public file. Notice of denial and of the time for seeking review or a judicial stay will be given by telephone, with follow-up notice in writing. The first day to be counted in computing the time periods established in this paragraph is the day after the date of oral notice. Materials will be accorded confidential treatment, as provided in §0.459(g) and §0.461, until the Commission acts on any timely applications for review of an order denying a request for confidentiality, and until a court acts on any timely motion for stay of such an order denying confidential treatment.

- 64 -

**47 C.F.R. § 0.461. Requests for inspection of materials not routinely available for public inspection.**

Any person desiring to inspect Commission records that are not listed in § 0.453 or § 0.455 shall file a request for inspection meeting the requirements of this section. The FOIA Public Liaison is available to assist persons seeking records under this section. See §0.441(a).

\*     \*     \*

(i)

    (1)    If a request for inspection of records submitted to the Commission in confidence under § 0.457(d), § 0.459, or another Commission rule or order is granted in whole or in part, an application for review may be filed by the person who submitted the records to the Commission, by a third party owner of the records or by a person with a personal privacy interest in the records, or by the person who filed the request for inspection of records within the ten business days after the date of the written ruling. The application for review and the envelope containing it (if any) shall be captioned "Review of Freedom of Information Action." The application for review shall be filed within ten business days after the date of the written ruling, shall be delivered or mailed to the General Counsel, and shall be served on the person who filed the request for inspection of records and any other parties to the proceeding. The person who filed the request for inspection of records may respond to the application for review within ten business days after it is filed.

    \*     \*     \*

    (4)    If an application for review filed by the person who submitted, owns, or has a personal privacy interest in the records to the Commission is denied, or if the records are made available on review which were not initially made available, the person will be afforded ten business days from the date of the written ruling in which to move for a judicial stay of the Commission's action. The first day to be counted in computing the time period for seeking a judicial stay is the day after the date of the written ruling. If a motion for stay is not made within this period, the records will be produced for inspection.

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2014, I caused the foregoing Opening Brief of Petitioners to be electronically filed with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all parties that have entered an appearance in this action.

I further certify that, pursuant to D.C. Circuit Rules 25 and 31, I caused eight (8) paper copies of the Opening Brief of Petitioners to be hand-delivered to the Clerk of the Court.


   */s/  Robert A. Long*
Robert A. Long
COVINGTON & BURLING LLP
One CityCenter
850 10th Street NW
Washington, DC 20001
(202) 662-6000

Dated:  December 15, 2014          *Attorney for Petitioners*