NO. 14-1242

_____

IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CBS CORPORATION, SCRIPPS NETWORKS INTERACTIVE, INC., THE WALT DISNEY COMPANY, TIME WARNER INC., TWENTY-FIRST CENTURY FOX, INC., UNIVISION COMMUNICATIONS, INC., AND VIACOM, INC.,

PETITIONERS,

v.

FEDERAL COMMUNICATIONS COMMISSION
AND UNITED STATES OF AMERICA,

RESPONDENTS.

_____

ON PETITION FOR REVIEW OF AN ORDER OF THE
FEDERAL COMMUNICATIONS COMMISSION

_____

**BRIEF FOR RESPONDENTS**

_____

DAVID I. GELFAND
DEPUTY ASSISTANT ATTORNEY GENERAL

KRISTEN C. LIMARZI
DANIEL E. HAAR
ATTORNEYS

UNITED STATES DEPARTMENT
  OF JUSTICE
WASHINGTON, D.C.  20530

JONATHAN B. SALLET
GENERAL COUNSEL

DAVID M. GOSSETT
DEPUTY GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

LILY S. FAREL
COUNSEL

FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D.C.  20554
(202) 418-1745
lily.farel@fcc.gov

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**1. Parties.**

All parties and intervenors appearing in this Court are listed in Petitioners'
brief.

**2. Rulings under review.**

The ruling under review is *Applications of Comcast Corp. and Time Warner
Cable Inc. For Consent To Assign or Transfer Control of Licenses and
Authorizations and AT&T, Inc. and DIRECTV For Consent To Assign or Transfer
Control of Licenses and Authorizations*, Order, 29 FCC Rcd ___; FCC 14-202
(Nov. 10, 2014) (JA1).

**3. Related cases.**

This case has not previously been before this Court or any other court, and
we are aware of no pending related cases. Some of the issues presented in this case
were the subject of an earlier petition for review (*CBS Corp. v. FCC*, No. 14-1237)
and a related petition for a writ of mandamus (*In re CBS Corp.*, No. 14-1236),
which were dismissed by stipulation on November 12, 2014, before this Court
addressed either.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ....................................................................................i

TABLE OF AUTHORITIES .........................................................iv

GLOSSARY.................................................................vii

INTRODUCTION ..............................................................1

QUESTIONS PRESENTED....................................................3

STATUTES AND REGULATIONS............................................3

COUNTERSTATEMENT.......................................................3

I.   The FCC's Merger Review Process............................................3

II.  The Proposed Comcast-Time Warner Cable-Charter and AT&T-DIRECTV Mergers...........................................................7

    A.   The Modified Protective Orders......................................9

    B.   The Bureau Order on Reconsideration..........................15

    C.   The Commission Order. .................................................18

SUMMARY OF ARGUMENT ..................................................19

STANDARD OF REVIEW ......................................................24

ARGUMENT ........................................................................25

I.   The Commission Properly Exercised Its Discretion To Permit VPCI To Be Made Available For Comment Under The Modified Protective Orders. ...............................................27

    A.   VPCI is critical to the Commission's informed review of the proposed mergers................................................27

    B.   The FCC reasonably determined that VPCI should be made available to commenters under the protective orders................33

C.   The decision to disclose VPCI pursuant to the protective
orders does not violate the Trade Secrets Act. ........................... 44

II.   The Modified Protective Orders Are More Than Sufficient To
Prevent Unauthorized Disclosure. ....................................................... 46

A.   The protective orders contain multiple safeguards to ensure
against misuse of VPCI. ............................................................ 46

B.   Petitioners' proffered alternatives are inappropriate and
unworkable, and would only serve to derail the timely
review of the transactions. ........................................................ 53

III.   The Five-Business-Day Requirement For Appealing Bureau
Denials Of Objections Reasonably Forecloses Petitioners'
Ability To Suspend Indefinitely Third-Party Comment On The
Record. ................................................................................................. 56

CONCLUSION ............................................................................................. 64

# TABLE OF AUTHORITIES

## Cases

*Air Transport Ass'n v. FAA*, 169 F.3d 1 (D.C. Cir. 1999)......................................34

*Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986), *cert. denied*, 482 U.S. 909 (1987) ...................................................................53

*American Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008)..........34

*Ass'n of Data Processing v. Bd. of Governors*, 745 F.2d 677 (D.C. Cir. 1984) .....33

*Auer v. Robbins*, 519 U.S. 452 (1997) ....................................................................25

\*      *Braniff Master Exec. Council of Air Line Pilots Ass'n Int'l v. CAB*, 693 F.2d 220 (D.C. Cir. 1982) ...................................................................6

*Cassell v. FCC*, 154 F.3d 478 (D.C. Cir. 1998)......................................................59

*Cellco P'ship v. FCC*, 357 F.3d 88 (D.C. Cir. 2004) ..............................................24

*Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982 (D.C. Cir. 2013) ..............29

*Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009 (D.C. Cir. 2003)..........................34

*Covad Commc'ns Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006)...............................59

*Exxon Corp. v. FTC*, 665 F.2d 1274 (D.C. Cir. 1981) ...........................................53

\*      *FCC v. Schreiber*, 381 U.S. 279 (1965)................................................ 25, 38, 39, 40

*FTC v. Invention Submission Corp.*, 965 F.2d 1086 (D.C. Cir. 1992)....................25

*Indep. U.S. Tankers Owners Comm. v. Lewis*, 690 F.2d 908 (D.C. Cir. 1982).......34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...............................................................................24

*Ohio Head Start Ass'n v. U.S. Dep't of Health & Human Servs.*, 510 Fed. Appx. 1 (D.C. Cir. 2013)........................................................61

*Qwest Comm'cns Int'l, Inc. v. FCC*, 229 F.3d 1172 (D.C. Cir. 2000)....... 25, 43, 45

*SBC Communications, Inc. v. FCC*, 56 F.3d 1484 (D.C. Cir. 1995).......................40

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ............................................................61

*U.S. Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519 (D.C. Cir. 1978)...............................................................................39

*United States v. Blue Cross Blue Shield of Michigan,* No. 2:10-cv- 141 55-DPH- MKM (E.D. Mich. Oct. 18, 2010) ....................................................30

*United States v. Cal. Rural Legal Assistance, Inc.*, 722 F.3d 424 (D.C. Cir. 2013) ...............................................................................25

**Statutes**

5 U.S.C. § 706(2)(A).................................................................. 24, 53

18 U.S.C. § 1001 .........................................................................50

18 U.S.C. § 1905 .........................................................................44

28 U.S.C. § 1746 .........................................................................50

28 U.S.C. § 2342(1) .....................................................................2

28 U.S.C. § 2344 ..........................................................................3

47 U.S.C. § 154(j)........................................................................25

47 U.S.C. § 155(c)(5)...................................................................61

47 U.S.C. § 309(a) ...................................................................4, 35

47 U.S.C. § 309(b) ...................................................................4, 35

47 U.S.C. § 309(d)(1)...............................................................4, 35

47 U.S.C. § 309(d)(2)....................................................................4

47 U.S.C. § 309(e) ........................................................................4

47 U.S.C. § 310(d) ...................................................................3, 55

47 U.S.C. § 402(a) ........................................................................2

**Regulations**

47 C.F.R. § 0.457(d)(1)................................................................45

47 C.F.R. § 1.108 .......................................................................15

**Administrative Decisions**

*Adelphia Commc'ns-Time Warner Cable Inc.*, 20 FCC Rcd 20073 (2005)..............5

*Applications of Comcast Corp.*, 17 FCC Rcd 22633 (2002) ............................ 43, 44

*AT&T-Qualcomm Order*, 26 FCC Rcd 17589 (2011) ................................................5

*Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission*,
   13 FCC Rcd 24816 (1998) ...................................................... 5, 10, 35, 38, 45, 46

*News Corp.-Liberty Media Corp.*, 22 FCC Rcd 12797 (2007) .................................5

*Softbank-Sprint Order*, 28 FCC Rcd 9642 (2013)....................................................5

**Other Authorities**

Declaration of MIT Professor Richard Schmalensee, ¶ 6 attached to COMPTEL's
   December 23, 2014 Reply to Comcast's Opposition to Petition to Deny, MB

v

Docket 14-57 (December 23, 2014) (redacted version available at
http://apps.fcc.gov/ecfs/document/view? id=60001011010)................................37

Federal Communications Commission, Strategic Plan 2014-2018 (2014), *available
at* http://www.fcc.gov/document/fcc-strategic-plan-2014-2018 ...........................6

## GLOSSARY

| | |
|---|---|
| FCC or Commission | Federal Communications Commission |
| Bureau | Media Bureau of the Federal Communications Commission |
| Commission Order | Commission Order, *Applications of Comcast Corp. and Time Warner Cable Inc. and AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, 29 FCC Rcd ___; FCC 14-202 (Nov. 10, 2014). |
| Recon. Order | Order on Reconsideration, *Applications of Comcast Corp. and Time Warner Cable Inc. and AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Dkt. Nos. 14-57 & 14-90, DA 14-1601 (MB rel. Nov. 4, 2014) |
| October 7 Order | Order, *Applications of Comcast Corp. and Time Warner Cable Inc. and AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Dkt. Nos. 14-57 & 14-90, DA 14-1463 (MB rel. Oct. 7, 2014) |
| Order on Objections | Order, A*pplications of Comcast Corp. and Time Warner Cable Inc. and AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Dkt. Nos. 14-57 & 14-90, DA 14-1605 (MB rel. Nov. 4, 2014) |
| Protective Orders | Second Amended Modified Joint Protective Order, *Applications of Comcast Corp. and Time Warner Cable Inc. and AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Dkt. Nos. 14-57 & 14-90, DA 14-1639, 14-1640 (MB rel. Nov. 12, 2014) |

| | |
|---|---|
| Amended Modified Joint Protective Order | Amended Modified Joint Protective Order, *Applications of Comcast Corp. and Time Warner Cable Inc. and AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations*, MB Dkt. Nos. 14-57 & 14-90, DA 14-1602, 14-1604 (MB rel. Nov. 4, 2014) |
| Submitting Party | A person or entity who submits a Stamped Confidential Document or a Stamped Highly Confidential Document. |
| Confidential Information | Information that is not otherwise available from publicly available sources and that is subject to protection under the Freedom of Information Act, 5 U.S.C. § 552, and the Commission's implementing rules. |
| Highly Confidential Information | Information that is not otherwise available from publicly available sources; that the Submitting Party has kept strictly confidential; that is subject to protection under FOIA and the Commission's implementing rules; that the Submitting Party claims constitutes some of its most sensitive business data which, if released to competitors or those with whom the Submitting Party does business, would allow those persons to gain a significant advantage in the marketplace or in negotiations. |
| VPCI | Video Programming Confidential Information, a subset of Highly Confidential Information for which the Commission has afforded special protection, which concerns programming agreements to which a merger applicant is a party. |

MVPD                          Multichannel video programming distributor; a
                              person who makes available for purchase, by
                              subscribers or customers, multiple channels of
                              video programming (*e.g.*, a cable operator)

OTT                           Over-the-Top video content delivered over the
                              internet

## INTRODUCTION

This case involves a challenge by a group of programmers to the Federal Communications Commission's decision to permit access, under carefully tailored protective orders, to certain video programming contracts and related information that have been submitted in the record of the Commission's review of two proposed transactions between and among the nation's largest video programming distributors. The Commission is required by statute to determine whether these proposed transactions are in the public interest, and examination of this information is at the heart of that analysis. The Commission's long-standing approach is to increase its understanding of such materials, and thus the quality of its analysis and its ability to withstand potential litigation challenges, through third-party review and comment. Such review serves the purposes of the Administrative Procedure Act (APA) and the Communications Act; and providing for it under the strictures of the protective orders safeguards the ability of third parties to fully inform the Commission of their views while at the same time protecting the interests of the programmers in keeping their information confidential from decision-makers employed by their competitors.

As we show, the Commission's adoption of the governing protective orders here was well within its broad discretion to fashion its proceedings in a

manner that will best balance (i) its statutory responsibility under the
Communications Act to determine whether a proposed transaction is in the
public interest; (ii) its acknowledged obligation to provide timely review; (iii)
the APA's and the Communication Act's requirement of third-party
participation in and comment on material relevant to agency decision-
making; and (iv) the legitimate interest of programmers and others in
ensuring that sensitive business information is not unnecessarily disclosed.

## JURISDICTION

Petitioners seek review of a November 10, 2014, order of the Federal
Communications Commission, which affirmed the adoption of protective
orders governing access to certain confidential video programming contracts
and related materials relevant to the Commission's, and interested parties',
review of two proposed mergers.[1] This Court has jurisdiction to review the
order pursuant to 28 U.S.C. § 2342(1), which grants the Court authority to
review "all final orders of the [FCC] made reviewable by" 47 U.S.C.
§ 402(a). The order is final because it resolves all issues regarding disclosure
of the information under the governing protective orders. The Petition for

---

[1] *See Applications of Comcast Corp. and Time Warner Cable Inc. For*
*Consent To Assign or Transfer Control of Licenses and Authorizations and*
*AT&T, Inc. and DIRECTV For Consent To Assign or Transfer Control of*
*Licenses and Authorizations*, Order, 29 FCC Rcd ___; FCC 14-202 (JA1).

2

Review is timely because it was filed within 60 days after the Commission

issued the order. *See* 28 U.S.C. § 2344.

## QUESTIONS PRESENTED

1.   Whether the Commission's decision, in its public
     proceedings to review two proposed mergers involving
     five of the nation's largest video programming
     distributors, to permit limited and tailored third-party
     access to certain confidential video programming
     contracts and related information, subject to the detailed
     and carefully crafted limitations of highly restrictive
     protective orders, was reasonable and reasonably
     explained.

2.   Whether, in light of the public interest in the expeditious
     review of these merger applications, the Commission
     reasonably decided to give parties five business days to
     obtain a stay of a Bureau order denying an objection to
     any specific individual's access to confidential
     information under the protective orders.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum to this

brief.

## COUNTERSTATEMENT

## I.   The FCC's Merger Review Process.

The Communications Act of 1934 specifies that FCC broadcast

licenses and other authorizations may not be transferred except upon a

determination by the Commission that the proposed transfer will serve "the

public interest, convenience, and necessity." 47 U.S.C. § 310(d). The

Commission must issue public notice of the license-transfer application, 47

U.S.C. § 309(b), to allow interested parties to file a "petition to deny" the

application. 47 U.S.C. § 309(d)(1). Any such petition must "contain specific

allegations of fact sufficient to show" that grant of the proposed applications

would be inconsistent with the public interest. 47 U.S.C. § 309(d)(1), (a). The

burden of persuasion is on the applicants: if a "substantial and material

question of fact is presented or if the Commission for any reason is unable to

find that grant of the application" is in the public interest, 47 U.S.C.

§ 309(d)(2), it must "formally [set] the application for hearing … [in which]

the applicants and all other parties in interest shall be permitted to

participate." 47 U.S.C. § 309(e).

In conducting its review of proposed transactions, the FCC assesses

several important criteria, including (1) whether the applicants are qualified

to hold Commission licenses; (2) whether the proposed transaction would

result in public interest harms by, for example, diminishing competition or

degrading service for consumers; and (3) whether there are potential benefits

attributable to the transaction. The Commission's review of each proposed

transaction is fact-specific and dependent on the circumstances surrounding

that proposal. *See, e.g.*, *Softbank-Sprint Order*, 28 FCC Rcd 9642, 9651

4

(2013) (¶ 24); *AT&T-Qualcomm Order*, 26 FCC Rcd 17589, 17599 (2011) (¶ 24).

To effectively and efficiently review the often-voluminous record materials submitted to support license-transfer applications, the Commission has for many years "balance[d] the interests in disclosure and the interests in preserving the confidentiality of competitively sensitive materials" by using "protective orders." *Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission*, 13 FCC Rcd 24816, 24831 (1998) (¶ 21) (*Confidential Information Policy*). The Commission undertakes this approach because disclosure pursuant to such orders "can provide the benefits of protecting competitively valuable information while permitting limited disclosure for a specific public purpose." *Id.*; *see, e.g.*, *News Corp.-Liberty Media Corp.*, 22 FCC Rcd 12797, 12798–804 (2007); *Adelphia Commc'ns-Time Warner Cable Inc.*, 20 FCC Rcd 20073, 20078–81 (2005).

The FCC seeks to avoid unnecessary delay in its merger review process, recognizing that an unduly prolonged period of regulatory review both interferes with the business operations of the merger applicants and disserves the public interest in a timely resolution of contested competitive and other issues. *See Braniff Master Exec. Council of Air Line Pilots Ass'n*

5

*Int'l v. CAB*, 693 F.2d 220, 231 (D.C. Cir. 1982) (expeditious merger review is important to "facilitat [e] stability in the financial markets by lessening the period of uncertainty faced by the parties to the merger"). As part of its recently issued Strategic Plan, the Commission has made "expeditious and thorough review of proposed transactions" a key "strategic objective," and has promised to work toward "faster and more consistent review and analysis of applications."[2] To facilitate its expeditious review and promote transparency, the Commission endeavors to complete its review of proposed transactions within 180 days of accepting the application for filing. The status of this informal "shot-clock" is shown on the Commission's public webpage for each proposed transaction (available at http://www.fcc.gov/mergers). Although the clock is not legally binding and may be stopped temporarily when issues beyond the Commission's control prevent or impede staff review, its use is a tangible demonstration of the Commission's public commitment to complete its review of merger transactions in a timely fashion.[3]

_____

[2] Federal Communications Commission, Strategic Plan 2014-2018, at 13 (2014), *available at* http://www.fcc.gov/document/fcc-strategic-plan-2014-2018.

[3] *See* http://www.fcc.gov/encyclopedia/informal-timeline-consideration-applications-transfers-or-assignments-licenses-or-autho.

## II.     The Proposed Comcast-Time Warner Cable-Charter and AT&T-DIRECTV Mergers.

This case arises from the Commission's review of the applications to transfer certain FCC licenses and other authorizations as part of two proposed mergers and related transactions—the first among Comcast Corporation, Time Warner Cable Inc., and Charter Communications, Inc.; the second between AT&T Inc. and DIRECTV. (We refer to these five companies collectively as the "merger applicants.") As Intervenor National Association of Broadcasters (NAB) explains, "Comcast is the nation's largest multi-channel video programming distributor ("MVPD"); DIRECTV ranks second; Time Warner Cable ranks fourth; … AT&T fifth[; … and] Charter … seventh." NAB Br. at 1. In short, "the two mergers involve four of the five largest MVPDs and five of the seven largest MVPDs, which together provide pay television service to approximately 64 million subscribing households in almost every market in the United States." *Id*. As a result, these transactions, if approved, have the potential to significantly redefine the nation's video programming marketplace.[4]

On August 21, 2014, and September 9, 2014, consistent with its procedures for reviewing such transactions, the Commission's Media Bureau

---

[4] The Department of Justice is independently reviewing these mergers for compliance with the antitrust laws.

(Bureau) issued formal requests to the merger applicants for competitive information it deemed relevant to its statutorily-mandated review of the transactions. *See* JA1424 (Comcast), 1476 (Time Warner Cable), 1522 (Charter); 2189 (AT&T), 2234 (DIRECTV).

Some third-party programmers and broadcasters, including Petitioners, expressed concern that the protective orders adopted at the beginning of the merger-review proceedings did not provide adequate protection for certain confidential information in the merger applicants' possession that fell within the scope of the Commission's information requests and related to those programmers. The commenters raised concerns about what came to be called VPCI, or Video Programming Confidential Information—in particular, (1) "affiliation and distribution agreements" between their companies and the merger applicants, (2) "narrative descriptions of certain provisions of those agreements," and (3) "documents and data pertaining to the negotiating of those agreements." JA3198–99. The programmers contended that the only "effective way" to address their concerns would be to direct the applicants to refrain from producing these materials to the Commission at all, and to "deliver them instead to the custody of the Department of Justice, [where they] would be available … for review by Commission staff"—but not by third parties. JA3199.

8

On September 23, 2014, the Bureau issued a Public Notice seeking comment on the programmers' concerns, as well as soliciting proposals for possible additional protections beyond those contained in the initial protective orders. JA3201.

## A.    The Modified Protective Orders.

After considering the submitted comments, on October 7, 2014, the Media Bureau issued an Order (the *October 7 Order*) that maintained the scope of its information requests. JA130. In order to address the programmers' concerns, however, the Bureau adopted modifications to the robust protective orders already put in place, which were those traditionally used by the Commission. JA124.

The Bureau has consistently recognized that VPCI "contains highly sensitive information that is central to the contracting parties' (including both the [merger] [a]pplicants' and third parties') business strategies, including among other things, pricing and business terms." *Oct. 7 Order* ¶ 13 (JA130). "At the same time," the Bureau explained, "the Commission's review of these two major transactions requires analysis of issues" that are "directly implicated by the information contained in these materials, including competition in the video distribution market." *Id*. "Further," the Bureau stressed, "the Commission is obligated and committed to conducting its

9

review with as much transparency as the circumstances allow, to permit meaningful and effective public engagement on the issues." *Id.*

In accordance with this obligation, along with its policy of examining the need for confidentiality on a "case-by-case basis,"[5] the Bureau modified the existing protective orders to provide additional protections for the materials about which the programmers had raised concerns. But—"in light of the protections in place pursuant to this Order"—the Bureau concluded that limiting its review "to documents in the records of the Department of Justice," or providing "other additional protections," was "unnecessary … and would unduly burden and delay the Commission's review, inhibit public participation, and therefore disserve the public interest." *Oct. 7 Order* ¶ 14 (JA131).

The modified protective orders adopted as part of the *October 7 Order* included the protections already in place for access to so-called "Highly Confidential Information," defined under the protective orders to include the submitter's "*most* sensitive business data which, if released to competitors or those with whom the Submitting Party does business, would allow those persons to gain a significant advantage in the marketplace or in negotiations." *Comcast MJPO* ¶ 2 (JA133), *AT&T MJPO* ¶ 2 (JA144) (emphasis added).

---

[5] *Confidential Information Policy*, 13 FCC Rcd at 24852.

Even though there has been no showing that VPCI is more sensitive than the "most sensitive business data" that has for years been safeguarded by Commission protective orders, the Commission recognized both the sensitivity of the information about which the programmers raised concerns and the fact that the simultaneous review of the two proceedings meant that the scope of information that would be available to reviewing parties would be uniquely wide-ranging. The Commission thus issued modified orders that imposed additional procedures, even beyond those contained in the previous protective orders, on access to VPCI, a subset of Highly Confidential Information.[6]

First, the modified protective orders reiterated that access to all Highly Confidential Information, including VPCI, is limited to "Outside Counsel of Record and Outside Consultants" retained by a "Participant" in the merger proceedings,[7] and defined those terms to exclude any counsel and consultants

---

[6] VPCI was defined in the modified protective orders to include (1) "an agreement or any part thereof for distribution of any video programming (including broadcast programming) carried by an Applicant's MVPD service or [online video distribution] service," (2) a detailed description of one or more provisions of such an agreement, including, but not limited to, price terms," and (3) "information relating to the negotiation of such an agreement." *Oct. 7 Order* ¶ 4 (JA127). *See Comcast MJPO* ¶ 2 (JA134), *AT&T MJPO* ¶ 2 (JA145).

[7] Thus, no employee of any industry participant may have access to VPCI.

11

who are "involved in Competitive Decision-Making"—essentially, negotiating or advising on contracts between the participant and one of the merger applicants, and similar business advice. *Comcast MJPO* ¶ 2 (JA133), *AT&T MJPO* ¶ 2 (JA144).[8] The purpose of the "Competitive Decision-Making" restriction, the Bureau explained, is "to exclude persons whose activities on behalf of their clients would place them in a situation where their obligations under a protective order are likely to be put at risk, even if unintentionally or unconsciously." *Oct. 7 Order* ¶ 8 (JA129).

Second, the modified protective orders reaffirmed that persons obtaining access to Highly Confidential Information, including VPCI, can use the information "solely for the preparation and conduct of this proceeding before the Commission and any subsequent judicial proceeding." *Oct. 7 Order* ¶ 6 (JA127–28). The Bureau instructed that, "[o]ther than [in] limited specified instances, individuals may not keep any materials" containing Highly Confidential Information, including VPCI, "beyond the close of the

---

[8] The modified orders define "Competitive Decision-Making" to mean "a person's activities, association, or relationship with any of his clients involving advice about or participation in the relevant business decisions or the analysis underlying the relevant business decisions of the client in competition with or in a business relationship with the Submitting Party." *Comcast MJPO* ¶ 2 (JA132), *AT&T MJPO* ¶ 2 (JA143). The Bureau stressed that "any individual who participates in the negotiation of [video programming distribution] contracts likely has been involved in "'Competitive Decision-Making.'" *Oct. 7 Order* ¶ 8 (JA129).

proceeding, even for strictly individual reference," and that the restrictions on the use of confidential information governed by the orders "**do not terminate at the end of the … proceedings but remain in perpetuity**." *Id.*; *see also Comcast MJPO* ¶¶ 12, 22 (JA137, 139), *AT&T MJPO* ¶¶ 12, 22 (JA148, 150). As a further protection, the modified protective orders prohibited reviewing parties from printing, copying, or transmitting any document containing VPCI. *See Comcast MJPO* ¶ 10 (JA137), *AT&T MJPO* ¶ 10 (JA148).

Third, in order to impress upon participants their obligations under the modified joint protective orders, the Bureau required persons seeking access to Highly Confidential Information, including VPCI, to re-execute an Acknowledgment of Confidentiality agreeing to be bound to the terms of the modified protective orders before obtaining access to such material. *Comcast MJPO* ¶ 7 & Attachment B (JA135, 142), *AT&T MJPO* ¶ 7 & Attachment B (JA147, 153). *See Oct. 7 Order* ¶ 5 (JA127).

Fourth, the Bureau provided third parties such as Petitioners a right to object to the disclosure of confidential information (including VPCI) relating to that third party to an individual filing an Acknowledgment, so long as the third party objected within three business days after the Acknowledgment was posted on the Commission's website. *Comcast MJPO* ¶ 8 (JA136),

13

*AT&T MJPO* ¶ 8 (JA147). The orders provided that "[u]ntil any objection is resolved by the Commission, and, if appropriate, by any court of competent jurisdiction … a person subject to an objection shall not have access to the relevant Confidential Information." *Comcast MJPO* ¶ 8 (JA136); *AT&T MJPO* ¶ 8 (JA147).

Finally, the modified protective orders provided that, after the conclusion of the proceeding, any individual who has accessed VPCI must return or destroy any material containing or derived from VPCI, including any notes taken by the individual. Any reviewing party must certify compliance with this requirement "under penalty of perjury," pursuant to 28 U.S.C. § 1746, and subject to the criminal provisions for false statements contained in 18 U.S.C. § 1001. *Comcast MJPO* ¶ 22 (JA54); *AT&T MJPO* ¶ 22 (JA65).

The modified protective orders stressed that the "Commission retains its full authority to fashion appropriate sanctions for violations," and that these include "suspension or disbarment of Counsel or Consultants from practice before the Commission, forfeitures, cease and desist orders, and denial of further access to Confidential and Highly Confidential Information in this or any other Commission proceeding." *Comcast MJPO* ¶ 21 (JA139); *AT&T MJPO* ¶ 21 (JA150). In this regard, the Bureau underscored that the

14

Commission would "not hesitate to take swift and decisive enforcement action where warranted." *Oct. 7 Order* ¶ 7 (JA128).

### B.    The Bureau Order on Reconsideration.

On October 14, 2014, a group that included Petitioners filed with the Commission an Application for Review of the *October 7 Order*, accompanied by a petition for a stay, which requested additional modifications of the protective orders. JA159, 187. In the meantime, individuals began executing and filing Acknowledgments seeking access to VPCI pursuant to the modified protective orders.[9] Beginning October 15, 2014, various third parties (including Petitioners) filed objections to *every* such individual.

On November 4, 2014, the Bureau on its own motion issued an Order on Reconsideration. JA28.[10] In that order, the Bureau further explained why the modified protective orders "properly balance, on the one hand, the need for Commission staff and other interested parties to access … [VPCI], and,

_____

[9] By November 1, 2014, approximately 266 individuals had filed Acknowledgments in one or both dockets (although the majority of those individuals represented one of the merger applicants, and thus could have been provided the material independent of the Commission's processes). *See* http://www.fcc.gov/transaction/List-of-Ack-ComcastTWC.xlsx; http://www.fcc.gov/transaction/List-of-Ack-Att.xlsx.

[10] The FCC's rules provide that the Commission (and by necessary implication a Bureau under delegated authority) "may, on its own motion, reconsider any action made or taken by it within 30 days from the date of public notice of such action." 47 C.F.R. § 1.108.

on the other hand, the legitimate interests of programmers and broadcasters in preventing the dissemination and misuse of their VPCI." JA28–29.

The Bureau stated "that VPCI is highly relevant and indeed central to a meaningful assessment of the issues pending before the Commission in these merger proceedings." *Recon. Order* ¶ 10 (JA33). It explained that "[a] critical issue" is how each proposed transaction "will alter the incentives and abilities of the resultant companies as they bargain with video programming companies." *Id*. ¶ 11 (JA33). The requested VPCI documents "demonstrate what three distribution companies in one case" (Comcast, Time Warner Cable and Charter) and "two in the other" (AT&T and DIRECTV) "with very different characteristics (*e.g*., size, geographical location, vertical integration, possession of 'must have' programming) have sought and/or been able to achieve in past negotiations with various video programmers which themselves differ in size, breadth and attractiveness of programming." *Id*. The documents thus "provide what is likely the best evidence available to test the validity of allegations as to how incentives and abilities (and thus potential harms and benefits) vary with size, integration, and other characteristics that the transactions would alter." *Id*.

The Bureau therefore concluded that "because VPCI is central to some of the most significant and contested issues pending in these transactions,"

16

the information "must be part of the record available to commenters, subject to the multiple protections in the Modified Protective Orders that minimize any risk of competitive harm as a result of the production." *Recon. Order* ¶ 17 (JA36). "To decide otherwise," the Bureau explained, "would subject the Commission's ultimate decision … to judicial challenge as arbitrary and capricious in denying interested parties the ability to analyze whether additional documents undercut evidence on which the Commission relied, in violation of the Communications Act and the Administrative Procedure Act." *Id.*[11]

The Bureau amended the modified protective orders in one respect. In light of the fact that third parties had objected to every single individual who had sought access to confidential information—rather than limiting their objections to situations where there was some reason to doubt whether a specific individual was entitled to access under the terms of the protective order (because they had been involved in negotiating programming contracts, for example)—and in order to "remove any doubt about whether a party is able to suspend indefinitely another party's (or every other party's) effective

---

[11] The Bureau also observed that the merger "[a]pplicants … have not found the safeguards of our protective orders to be lacking," and "have collectively submitted 'several million pages of documents,'" including highly confidential information, to the Commission under the Commission's initial protective order. *Recon. Order* n.83 (JA39).

17

participation in the proceeding simply by filing an objection," the Bureau amended the protective orders to state that an individual seeking access to VPCI would have access "five (5) business days after any objection is resolved by the Bureau in favor of the person seeking access." *Recon. Order* ¶ 36 (JA45). By means of that amendment, the Bureau sought to balance appropriately the "opportunity for the consideration of legitimate objections" with the need to "proceed[] with the merger review in a timely manner." *Id*.

On November 7, 2014, the same group of programmers and broadcasters (again including Petitioners) filed an Application for Review—again accompanied by a request for a stay—of the Bureau's *Order on Reconsideration*. JA80, 104.

### C.     The Commission Order.

On November 10, the Commission released an order denying the applications for review and, "for the reasons stated by the Media Bureau," affirmed the adoption of the protective orders with a single specific modification: under the Commission order, individuals authorized to review VPCI may do so only at "the offices of the Submitting Party's Outside Counsel of Record or at other secure locations that may be established by the Submitting Party," rather than through a remote access platform (as the Bureau would have permitted). *Commission Order* ¶¶ 1–2 (JA1–2).

18

In the same order, the Commission also denied the requests for a stay,
expressing its "considered judgment that permitting access" to confidential
information including VPCI "under the terms of the Amended Modified Joint
Protective Orders will aid the Commission in the expeditious resolution of
these proceedings." *Id*. ¶ 3 (JA2). "[T]o allow the parties time to seek judicial
review," however, the Commission delayed access to VPCI (and other
confidential information) until "seven calendar days after" the "Order [was]
released." *Commission Order* ¶ 3 (JA2).

On November 13, 2014, Petitioners filed a petition for review of the
*Commission Order* in this Court and sought an emergency stay pending
review. On November 21, the Court granted the Petitioners' stay motion.
JA245. In so doing, the Court noted that—although the stay precluded third-
party access to VPCI—"[t]he *agency* has access to the relevant documents at
issue in this matter and can continue to evaluate the proposed merger during
the stay." *Id*. (emphasis added).

## SUMMARY OF ARGUMENT

This case concerns the ability of the Commission to structure its
procedures to review the proposed transactions under the Communications
Act in a way that allows it to fulfill its statutory responsibilities and serve the
public interest. Petitioners object to the use of protective orders, tailored in

several respects to address the details of these proceedings, that are of the kind traditionally used by the Commission (as well as other administrative agencies and the courts). Petitioners' challenge rests on the premise—wholly unsupported—that parties will not comply with the protective orders' provisions, and that the Commission will not punish violators when warranted. On the contrary, the modified protective orders contain robust safeguards against abuse, and the Commission has made clear that the orders will be vigorously enforced.

The protective orders, even as modified, may not satisfy Petitioners, but there is no denying that their agreements with the merger applicants are at the heart of the Commission's review, and that the orders reflect a careful and appropriate balancing of the competing interests: the need under the Communications Act for the Commission to determine whether the proposed transactions are in the public interest, the imperative that review be expeditious, the obligation to provide third-party comment on the record, and the interest in safeguarding sensitive business information. The Commission's decision how best to reconcile these competing goals is a matter within its broad discretion and should be affirmed.

1.      As the Commission reasonably determined, VPCI is critical to its review of the proposed mergers. In order to test the public interest

benefits, as well as the competitive dangers, of the proposed transactions, the Commission must be able to examine how the merger applicants—among the nation's largest video programming distributors—have conducted themselves in the video programming marketplace. VPCI is crucial to that inquiry; the information regarding the negotiation of both non-price and price contract terms allows evaluation of both potential benefits and potential harms that could arise when the nation's largest cable company (Comcast) proposes to acquire the second-largest (Time Warner Cable), or one of the nation's leading telecommunications companies (AT&T) proposes to acquire the nation's largest satellite television provider (DIRECTV). Tellingly, Petitioners do not challenge this assertion—which is why, for example, they no longer challenge the Commission's right itself to review VPCI.

2.      Petitioners' dispute is not with the Commission's access to VPCI, but with third-party access to that information. But the Commission reasonably determined that allowing a limited category of outside counsel and outside consultants, not involved in competitive decision-making, access to VPCI—under the terms of tailored protective orders with robust protections against abuse—would aid in its review of the mergers. This determination follows the traditional use of protective orders in order to

empower adjudicatory processes and serves the purposes of the

Administrative Procedure Act and the Communications Act.

This is not unusual; indeed, it is the traditional way that adjudications

work. Parties, including parties who have formally petitioned that the

transactions be denied, are entitled to confront critical evidence. Without such

confrontation, the Commission would be weakened both in its ability to

defend against judicial challenge and, equally importantly, in its ability to

garner additional insights that may prove fruitful to its understanding of

complicated transactions. Petitioners' view, if adopted, would (i) limit the

ability of the Commission to determine whether the public interest would be

served by the proposed transactions; (ii) undermine the ability of the

Commission to create a legally sustainable order free from challenges under

the APA; and (iii) disrupt and delay the review process—whether

intentionally or not—by threatening the ability of the merger applicants to

obtain timely review.

3.      The protective orders' multiple safeguards are more than

adequate, as the Commission reasonably determined, consistent with its own

past practice and the generalized use of protective orders in administrative

and judicial proceedings. Only outside counsel and outside consultants of

participants in the merger-review proceedings who are not engaged in

competitive decision-making, such as the negotiation of video programming, contracts, will obtain access to VPCI. Persons obtaining access must sign acknowledgments evidencing their understanding of the protective orders' provisions; they can review VPCI only onsite at a secure location; all VPCI is stamped with a stark identifying legend; and such material must be destroyed at the conclusion of the proceeding. Finally, there are severe sanctions, including criminal penalties under the federal perjury statute, monetary fines, and potential disbarment from practice before the Commission, for noncompliance with the protective orders. In light of these robust safeguards, Petitioners' fear that the protective orders will not shield their information from their competitors is overblown and unsupported. And their proffered alternatives—such as redaction and/or anonymization of VPCI, or requiring a specialized showing for access—would be inappropriate, are unworkable, and would only serve to create unacceptable delay that could, by itself, prevent the transactions from moving forward.

4.    Petitioners lead off their brief with a narrow attack on the Commission's decision to provide access to VPCI to any particular individual five business days after the Bureau denies an objection to that person's access. This provision is a reasonable exercise of the Commission's authority to establish a window for appealing such objection denials without permitting

parties to drag out indefinitely disputes over access to VPCI. Lengthy processes on each objection, regardless of merit, would frustrate the ability of the Commission to obtain comment from objecting parties until every means of judicial review is exhausted and would likely result in delay that may be fatal to the transactions.

The Commission's order should be affirmed, and, with respect, should be affirmed expeditiously so that the merger reviews can proceed as promptly as possible.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, the Commission's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Under this highly deferential standard of review," the Court "presumes the validity of agency action." *Cellco P'ship v. FCC*, 357 F.3d 88, 93 (D.C. Cir. 2004) (internal quotation marks omitted). The Court must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment. *E.g.*, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Commission also has broad power to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to

24

the ends of justice." 47 U.S.C. § 154(j); *FCC v. Schreiber*, 381 U.S. 279, 290 (1965). In this regard, "[i]t is well established 'that it is the agencies, not the courts, which should, in the first instance, establish the procedures for safeguarding confidentiality.'" *United States v. Cal. Rural Legal Assistance, Inc.*, 722 F.3d 424, 429 (D.C. Cir. 2013) (citation omitted). Procedural rules "establishing a presumption in favor of public proceedings[] accords with the general policy favoring disclosure of administrative agency proceedings." *Schreiber*, 381 U.S. at 293. And an "agency's own appraisal of relevancy must be accepted so long as it is not obviously wrong." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992).

Finally, while this Court need not defer to the Commission's interpretation of the Trade Secrets Act, s*ee Qwest Comm'cns Int'l, Inc. v. FCC*, 229 F.3d 1172, 1176 (D.C. Cir. 2000), the Commission's interpretation of its own regulations, which can trigger an exception to that Act, must be sustained unless "plainly erroneous or inconsistent with the regulation[s]." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (citations omitted).

## ARGUMENT

The Commission made a reasonable judgment, well within its broad discretion and consistent with the Communications Act and the APA, to permit restricted and limited access to VPCI to commenters in the Comcast-

Time Warner-Charter and AT&T-DIRECTV merger review proceedings pursuant to protective orders with robust and tailored safeguards and sanctions. Petitioners contend that the Commission has failed to make a persuasive case for access to VPCI. This contention is rebutted by the Bureau's comprehensive demonstration that VPCI is critical both to the Commission's review of, and to third parties' ability to comment on, the proposed mergers here. *See* Part I, *infra.*

Petitioners' arguments that the safeguards contained in the protective orders are insufficient to protect their confidential information are belied by the terms of the orders and the history of their use by the Commission, which limit access to outside counsel and outside consultants to participants in the merger-review proceedings and contain severe sanctions for noncompliance. *See* Part II.A, *infra*. And the Commission appropriately weighed the relevant factors and rejected Petitioners' proffered alternatives to the Commission's course of action, including redaction and/or anonymization of VPCI or requiring a specialized showing for access to such material. *See* Part II.B, *infra.*

Finally, Petitioners' narrow complaint about the FCC's decision to permit an individual to access VPCI five business days after a Bureau order denying an objection to that person's access, on which they chiefly focus,

26

ignores the need for the Commission to act with dispatch. The rule does not deprive a party of an opportunity for review; it simply requires an objecting party to make a sufficient case on the merits to support a stay pending review. Petitioners' preferred approach would preclude the Commission's timely review of the proposed transactions, and would fail to serve the "public interest, convenience and necessity." *See* Part III, *infra*.

## I.     The Commission Properly Exercised Its Discretion To Permit VPCI To Be Made Available For Comment Under The Modified Protective Orders.

### A.     VPCI is critical to the Commission's informed review of the proposed mergers.

It is "absolutely clear," as the Bureau found, that "VPCI is highly relevant and indeed central to a meaningful assessment of the issues pending before the Commission in these merger proceedings." *Recon. Order* ¶ 10 (JA33).

The starting point, as the Bureau observed, is the contention of commenters "that the transactions will increase both Comcast's and AT&T's bargaining leverage with respect to programmers" because each merger combines two of the nation's largest purchasers of programming into one company. *Recon. Order* ¶ 12 (JA34). Thus, as the Bureau explained, "[a] critical issue in each of the transactions under review is how the proposed transactions will alter the incentives and abilities of the resultant companies

27

as they bargain with video programming companies." *Recon. Order* ¶ 11 (JA33). "These documents thus provide what is likely the best evidence available to test the validity of allegations as to how incentives and abilities (and thus potential harms and benefits) vary with size, integration, and other characteristics that the transactions would alter." *Recon. Order* ¶ 11 (JA33).

The Commission, as it must, is investigating the basis for the assertion that the transactions will lead to a prospective increase in the ability to negotiate both non-price and price terms.[12]

*Non-price terms*: The Commission is considering the asserted possibility that the companies could secure non-price terms from programmers that disadvantage video-distribution rivals (either traditional Internet Service Providers or innovative companies that deliver programming over the Internet) by foreclosing them from markets or artificially raising their costs. Thus, commenters express "concern that an increase in bargaining power would enable the [merger] [a]pplicants to demand exclusionary provisions and other preferential terms from programmers," which would inflict harm on competition and consumers. *Recon. Order* ¶ 14 (JA35).

_____

[12] The following recitation of potential concerns does not constitute any conclusion on the part of the Commission; it is simply designed to illustrate the importance of the inquiries based on VPCI.

With respect to Comcast, for example, one commenter—DISH—argues that there is likely to be "a post-merger strengthening of Comcast's already powerful ability [as one of the nation's largest purchasers of video programming] to negotiate Most Favored Nation protections," *id.*, which grant a distributor "'the right to be offered any more favorable rates, terms, or conditions subsequently offered or granted by a network to another distributor.'" *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 985 n.1 (D.C. Cir. 2013) (citation omitted). In this way, DISH asserts, Most Favored Nation clauses can be used to "amplify the monopsony power of the applicants by forcing independent programmers to negotiate with a *de facto* buying cartel." *Recon. Order* ¶ 14 (JA35). The record before the Commission also contains allegations that "Comcast is already using contract provisions to limit alternative distribution of unaffiliated programming and that a combined company will have an even greater ability to do so." *Recon. Order* ¶ 14 (JA35). Commenters have also expressed concern that newfound market power could be used to disadvantage a new form of competition, so-called "Over The Top" companies (like Amazon or Netflix) that use broadband connections to deliver video programming. DISH August 25, 2014 Petition to Deny, MB Docket 14-57 at 79 (JA1790). Such an effect would "deprive consumers of competition in the [over-the-top] space," and "reduce the

29

incentive of each company standing alone to avoid discriminatory behavior." *Id.*[13]

Comcast, of course, vigorously denies that the merged entity would have either the ability or incentive to cause competitive harm to any other company through such contractual provisions. Comcast-Time Warner Cable September 23, 2014 Opposition to Petitions to Deny, MB Docket 14-57 (JA2352–3197); *see also Recon. Order* ¶ 12 (JA34).

Similar allegations have been made with respect to the AT&T-DIRECTV transaction. DIRECTV is one of the nation's largest purchasers of video programming, and commenters allege that "DIRECTV uses restrictive contract provisions (*e.g*., MFNs) to the detriment of small, independent programming networks." *Recon. Order* ¶ 14 (JA35). They further claim that "a combined AT&T-DIRECTV could use contract provisions in programming agreements to limit alternative distribution of programming by

---

[13] The Department of Justice has recognized that in some circumstances, Most Favored Nation clauses may result in anticompetitive actions. For example, the Department brought suit against an insurer to challenge the Most Favored Nation provisions in its contracts, arguing that those clauses had anticompetitive effects because they caused hospitals to raise rival insurers' rates. Complaint, *United States v. Blue Cross Blue Shield of Michigan,* No. 2:10-cv- 141 55-DPH-MKM ¶ 6, 18 (E.D. Mich. Oct. 18, 2010).

unaffiliated programmers." *Id.* AT&T and DIRECTV, of course, vigorously dispute this charge. *Recon. Order* ¶ 12 (JA34).

*Pricing terms*: The effect of the proposed mergers on pricing is also the subject of debate. For example, CenturyLink, which itself provides video programming to households in a dozen markets, "alleges that Comcast will gain unprecedented negotiating power in purchasing content, leading to decreased per-subscriber rates versus other MVPDs," *Recon. Order* ¶ 13 (JA34), a result that CenturyLink asserts should be avoided.[14] By contrast, Comcast asserts that the merged company is unlikely to be able to harm competition with other MVPDs through its bargaining over the costs of programming. *Id*.

Similar views about the impact of new combinations on pricing have been expressed in the AT&T-DIRECTV proceeding. On the one hand, AT&T asserts that "the significant savings in programming costs from the merger will enable it to deliver more value to consumers and provide stronger competition to cable bundle." *Recon. Order* ¶ 12 (JA34 ). But as in the Comcast proceeding, commenters contend that the merger will, in fact, enable the merged company to "substantially raise the programming costs of

---

[14] *See also id*. (assertions that "programmers will be required to accept lower rates to reach Comcast's customers," and that "Comcast will leverage dominance in the pay-TV market").

everyone else." DISH September 16, 2014 Petition to Deny, MB Docket 14-90 at 10 (JA2324).

The Commission can resolve these serious questions only by understanding the nature of the contracts that the merger applicants have already entered into, the means by which contractual provisions were (or were not successfully) negotiated, and the incentive and ability of the merged companies to obtain and utilize such provisions. That is because the starting point in determining the incentive and ability of merged companies to engage in actions against the public interest quite naturally relies upon the nature of past actions and motivations.

Indeed, Petitioners and Intervenor National Association of Broadcasters (NAB) implicitly concede the relevance of VPCI to the merger review by dropping any objection to the Commission's own review of such information. Thus, Petitioners contend that they "have not sought to suspend any aspect of the merger proceedings," as the FCC has "'access to the relevant documents at issue.'" CBS Br. 32 (citation omitted). *See also id*. at 40 (referring to FCC's "unfettered access to VPCI"). NAB underscores that it "is *not* arguing that the *Commission* should not have access to the

programming agreements and negotiating materials submitted by the merging

MVPDs." NAB Br. 11; *see also id*. at 16.[15]

But the Petitioners' concession is less than it seems at first glance. The

ability of the Commission to use information rests not just on the agency's

possession of that information, but, as the next section illustrates, on the

information's availability in the adjudicatory process.

### B.      The FCC reasonably determined that VPCI should be made available to commenters under the protective orders.

The Commission reasonably concluded that it could not conduct its

examination of VPCI in isolation and that third-party comment was essential

to its review of the proposed mergers.

1.      This Court has made clear that, under the APA, "at least the

most critical factual material that is used to support [an] agency's position on

review must have been made public in the proceeding and exposed to

refutation." *Ass'n of Data Processing v. Bd. of Governors*, 745 F.2d 677, 684

(D.C. Cir. 1984). A Commission decision rendered on the basis of critical

evidence on which all interested parties have not had an opportunity to

---

[15] In its stay order, this Court expressly noted that the Commission "has access to the relevant documents at issue in this matter and can continue to evaluate the proposed merger during the stay," JA245, which the Commission is doing.

comment thus runs the risk of judicial challenge as unsupported by substantial evidence. *See id.; cf. American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 238 (D.C. Cir. 2008); *Air Transport Ass'n v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999); *Indep. U.S. Tankers Owners Comm. v. Lewis*, 690 F.2d 908, 926 (D.C. Cir. 1982).[16]

Decision-making on a secret record also runs the risk of being attacked as arbitrary and capricious, as the Bureau explained: if the FCC were to refuse to give parties access to VPCI—even under the safeguards of protective orders—"the Commission's ultimate decision to approve the applications or designate them for hearing" would be subject to "judicial challenge as arbitrary and capricious in denying interested parties the ability to analyze whether additional documents undercut evidence on which the Commission relied." *Recon. Order* ¶ 17 (JA36); s*ee also id.* ("because VPCI is central to some of the most significant and contested issues pending in these transactions, it must be part of the record available to commenters").

---

[16] Although this Court affirmed the FCC's decision not to include a specific agreement in its public record in *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1013 (D.C. Cir. 2003), it specifically stated that if objecting consumer groups had "needed [that] Agreement to make" their argument that the Commission should change its policy, "perhaps the Commission would have erred in excluding it."

The opportunity for effective public participation in merger proceedings also advances the express statutory command of the Communications Act, which provides that any interested party may file a "petition to deny" approval of the license transfers, but that any such petition must "contain specific allegations of fact sufficient to show" that grant of the proposed applications would be inconsistent with the public interest. 47 U.S.C. § 309 (a), (b), (d)(1).[17] Access to VPCI is plainly important for third parties to support the "specific allegations of fact" in their petitions. *Id.*[18]

Suppose that the Commission were to approve one or both of the transactions based on its review of the record but without allowing third-parties to review VPCI. A third-party opponent of the transaction could seek judicial review of that decision, including seeking to block its closure, by arguing it was effectively foreclosed from advocating to the Commission why

---

[17] Numerous petitions to deny the applications have been filed in both proceedings. *See, e.g.,* JA1707 (DISH), 1909 (Frontier Communications), 1919 (COMPTEL), 1968 (American Antitrust Institute), 2003 (Consumer Federation of America), 2071 (RCN Telecom Services), 2113 (The Rural Broadband Association), 2122 (Public Knowledge), 2270 (Cox), 2311 (DISH). Notably, not one of the Petitioners has filed a petition to deny the application in either proposed merger proceeding.

[18] The Commission has also previously explained that "petitioners to deny [license-transfer applications] must be afforded access to all information submitted by licensees that bear upon their applications." *Confidential Information Policy,* 13 FCC Rcd at 24837 (¶ 33).

the VPCI demonstrates either that the transaction should have been set for a hearing or that any conditions imposed by the Commission are inadequate to prevent prospective harm. And it could base that challenge on the APA's requirement of "substantial evidence," prohibition on "arbitrary and capricious" decision-making, and on the express language of the Communications Act. The Commission's order permitting limited and tailored access to VPCI responds directly to this risk.

This is not mere speculation. Already, third parties have raised the prospect of the legal challenges that might arise if such access were denied. DISH, which is participating in the transaction-review dockets, vigorously argued that "[t]he merger review process would be incomplete and one-sided" if interested "parties (or their appropriate outside counsel) were denied the opportunity to review the key documents that would enable them to support their serious concerns." *Recon. Order* ¶ 13 (JA34–35) (quoting DISH Comments, at 2 (JA3218)). The American Cable Association (ACA) agreed in its opposition to a stay in this Court, explaining that without access to VPCI, "ACA will be unable to effectively make its case related to the harms of the transactions and appropriate remedies," and observing that "upon inspection of the VPCI, ACA may discover additional reasons why the proposed transactions would be harmful to competition and consumers."

American Cable Association, *Motion for Leave to Intervene and Response to Emergency Motion for Stay*, at 7–8 (Nov. 17, 2014). And COMPTEL's economic expert stated that he "expect[s] to undertake a review of the VPCI" in his examination of the competitive issues in the case, assuming access to that information is permitted. *See* Declaration of MIT Professor Richard Schmalensee, ¶ 6 attached to COMPTEL's December 23, 2014 Reply to Comcast's Opposition to Petition to Deny, MB Docket 14-57 (December 23, 2014) (redacted version available at http://apps.fcc.gov/ecfs/document/view?id=60001011010).

The Commission's interest in constructing a legally sustainable order on the proposed mergers would thus be undermined if it were not able to provide the third-party access that would head off such claims. To this, the Petitioners offer no solution. Instead, they confidently maintain, without citation of any case law, that "[i]t cannot be the case that an agency acts arbitrarily and capriciously by refusing" to provide access under a protective order to "price and other highly sensitive contract terms, particularly when the FCC has access to the full scope of such materials." CBS Br. 50. But just because this "cannot be" in the minds of the Petitioners does not mean it is not the law given the statutes and case law discussed above.

2.      As the Bureau recognized, even apart from preventing

procedural challenges, the Commission's decision-making will also be

strengthened by receiving third-party comment on VPCI. The Bureau

explained that if "a large number of … documents [were excluded] from

review by commenters, it would deprive the commenters of the opportunity

to argue that the documents have significance in ways that are not apparent to

the Commission." *Recon. Order* ¶ 16 (JA35).

Indeed, the Commission has long recognized that allowing "interested

parties" to have a "full opportunity to participate in the proceeding" permits

an important "different perspective on materials that may be relied upon by

the agency." *Confidential Information Policy*, 13 FCC Rcd at 24844. As the

Supreme Court explained, quoting the Commission with approval, "it is

highly desirable that the facts, information, data and opinion supplied by one

group or individual be known to other groups and individuals involved, so

that they may verify, refute, explain, amplify or supplement the record from

their own diverse points of view." *Schreiber*, 381 U.S. at 294.[19]

---

[19] Petitioners contend that the FCC failed to explain why it sustained an
objection by Hilton Worldwide to the release of "highly confidential pricing
information contained in agreements with certain of the merger parties,"
while "Petitioners' identical objection was rejected." CBS Br. at 44 n.13. But
the objections were hardly "identical," since Hilton's information did not
concern programming contracts or related materials, but instead involved

38

In this way, public comment on the evidence before the agency "facilitat[es] informed agency decisionmaking," *U.S. Lines, Inc. v. Federal Maritime Comm'n*, 584 F.2d 519, 534 (D.C. Cir. 1978), which itself supports the Commission's interest in executing its statutory responsibilities. This is not novel; it is the way that adjudication traditionally works, through the ability of adverse parties to confront each other and each other's evidence. Petitioners' attempt to compel the Commission to limit adjudication to a unilateral inquisition finds no support in the relevant statutes or applicable judicial precedent.

3.     The Supreme Court's decision in *Schreiber*, 381 U.S. 279, also illustrates that the Commission's judgment on providing access to VPCI is due significant deference, even if there were a question as to the nature of the legal risk that a Commission order might face. In *Schreiber*, the Court upheld the Commission's decision to require the public production of certain documents relating to an investigation of the television industry against a claim that they were trade secrets and should remain confidential. *See* 381 U.S. at 284–86. "The question for decision," the Court emphasized, "[is]

---

AT&T's provision of "managed internet service" to Hilton hotels. *See* JA3588. In any event, Commission staff did not sustain the confidentiality objection. Instead, they determined that the documents were not responsive to the Commission's information request, and AT&T withdrew the documents from production. *See* JA3642.

whether the exercise of discretion *by the Commission* was within permissible limits," *id*. at 291(emphasis added); the Commission's exercise of that discretion "may not be impeached merely because reasonable minds might differ on the wisdom thereof." *Id*. at 292; *see also SBC Communications, Inc. v. FCC*, 56 F.3d 1484, 1496 (D.C. Cir. 1995) (relying on FCC's "procedural discretion in implementing the Communications Act" in upholding decision to refuse to include documents in the record).

Here, as in *Schreiber*, the Commission's "presumption in favor of public proceedings[] accords with the general policy favoring disclosure of administrative agency proceedings." 381 U.S. at 293.

4. The Commission's decision to provide access to VPCI was not "unprecedented," as Petitioners claim. CBS Br. 38–40. For starters, Petitioners misuse the term "precedent" in this context. The relevant precedent here is the application of the normal rule of judging relevance in different proceedings on a case-by-case basis. Thus, the same document (say a photograph of a car) may be relevant in one case (litigation over an automobile collision) but irrelevant in another (an action for trespass).

Engaging in that case-by-case determination, the Commission has in fact requested VPCI before. It "requested competitively sensitive information, including programming agreements, from the cable company applicants" the

last time that it reviewed a horizontal transaction between cable companies,

which was during Comcast and Time Warner's purchase of Adelphia's cable

systems in 2005–2006. "The Commission made those documents available

for review by interested parties subject to the protections of a protective

order." *Recon. Order* ¶ 19 (JA37). Likewise, "the Commission required the

production of affiliation agreements, retransmission consent agreements and

related documents" when it reviewed "Liberty Media's application to acquire

an interest in DIRECTV from News Corporation" in 2007–2008, again

"subject to the protections of an order similar to the original Joint Protective

Orders in these proceedings." *Id.*

 Despite acknowledging that access to VPCI was afforded in those two

transactions, CBS Br. 39, Petitioners nonetheless complain that in *other*

merger review proceedings, the FCC has reviewed confidential material

"either *in camera* at the FCC or at the Department of Justice in connection

with that agency's parallel review of merger proceedings." CBS Br. 36.

 But the fact that the Commission determined, for example, that third-

party programming contracts were not necessary to the analysis of the vertical

issues presented in the Comcast-NBCU transaction simply illustrates that the

Commission is making a series of careful, case-by-case determinations. The

Bureau comprehensively explained why, given the centrality of need for

41

public comment on VPCI in *this* proceeding, it came to a different conclusion here. *Recon. Order* ¶ 17 (JA36). By contrast, the vertical merger proposal at issue in the Comcast–NBCU case did not present the potential increase in bargaining power of two of the nation's largest purchasers of video programming (Comcast and DIRECTV).[20]

Petitioners also maintain that, even though programming *contracts* have been made available pursuant to protective orders in prior merger review proceedings, "VPCI-related *negotiation materials* have *never* been made accessible to third parties in merger proceedings, even under a protective order." CBS Br. 39 (first emphasis added). But if that is so, it is only because the Commission, using case-by-case assessments of potential materiality, has not been presented with these exact circumstances before.

---

[20] NAB suggests that because the Commission recently adopted a rule "limiting certain retransmission consent negotiating practices by certain types of parties" "on the basis of economic theory and a small number of examples from commenters" without reviewing VPCI, the Commission should be able to do the same here. NAB Br. 19. But in that case the Commission had evidence before it that spoke directly to the issue (whether joint negotiations would tend to raise prices), whereas NAB has conspicuously failed to identify any other information that would serve the same probative value as VPCI in this proceeding. Moreover, the evidence before the Commission was available to third parties for comment. In short, NAB confuses the quantity of evidence with the very different question of whether evidence should be available at all for third-party review.

*See, e.g.*, *Qwest*, 229 F.3d at 1183 ("the unprecedented nature of [a] Commission Order does not itself demonstrate arbitrariness").

In this case, the relevance of negotiating materials follows naturally from the nature of the inquiry. Commenters are asserting (and merger applicants are denying) that the merged firms will have increased power to do in the future what they could not have achieved (or were not as motivated to try to achieve) in the past. Suppose, for example, that one of the applicants unsuccessfully sought the use of an MFN clause during past negotiations over a programming agreement that would have given it certain exclusive rights to the detriment of a rival. The history of that negotiation could be relevant to the commenters' arguments about the ability of the merged parties in the future to insist upon specific restrictive contractual provisions.

5.      Petitioners assert that the Commission cannot disclose VPCI under the protective orders "unless it has reviewed all of these materials and determined that they are relevant to its review of the proposed mergers." CBS Br. 44. That assertion has no basis. The Commission has no "obligation" to make an "antecedent determination regarding which documents or other evidence will be most probative and relevant to [its] decisionmaking." CBS Br. 43 (citing *Applications of Comcast Corp.*, 17 FCC Rcd 22633, 22636 (2002)). The "obligation" to which the Commission referred in that 2002

43

order is the responsibility "to include in the public record documents or evidence of decisional significance" *before making its decision*, not before deciding whether to provide access to third parties. *See* 17 FCC Rcd at 22636 ¶ 7.

The Commission is free to determine, as it has here, that the VPCI materials are of sufficient importance to the proceeding that the Commission would benefit from comment by third parties on whether and how the documents are relevant. This is especially true given that Bureau staff has in fact conducted a "preliminary review," which "confirms the expectation that the documents do reflect use and consideration of a variety of programming acquisition practices that are relevant to an analysis of issues raised in these proceedings." *Recon. Order* n.59 (JA35).

**C.      The decision to disclose VPCI pursuant to the protective orders does not violate the Trade Secrets Act.**

Petitioners rely in part on the Trade Secrets Act to challenge the Commission's determination to provide access to VPCI pursuant to the protective orders, *see* CBS Br. 35–36, but this argument is unavailing. The Trade Secrets Act provides for criminal penalties against individual federal officers or employees for the release of information relating to or concerning trade secrets unless "authorized by law." 18 U.S.C. § 1905. But the

44

Commission explicitly authorized release of information to limited parties pursuant to the modified protective orders, and thus that release does not violate the Trade Secrets Act. Indeed, this Court has clarified that the statute's limits "are not inconsistent with authorizations granted to federal agencies to release data when necessary for the carrying out of the agencies' statutory responsibilities." *Qwest*, 229 F.3d at 1177.[21]

Here, the Commission made the "considered judgment" that "permitting access to Confidential … and Highly Confidential Information [which includes VPCI] under the terms of the Amended Modified Joint Protective Orders will aid the Commission in the expeditious resolution of these proceedings." *Commission Order* ¶ 3 (JA2). That judgment is fully borne out by the record of these proceedings and the discussion above, and provides the necessary authorization for purposes of the Trade Secrets Act.

---

[21] Petitioners claim that the Commission "cannot point to any regulation authorizing disclosure of negotiation materials." CBS Br. 39. But in addition to the Commission order authorizing release pursuant to the protective orders, section 0.457(d)(1) of the Commission's rules generally permits disclosure of trade secrets and commercial or financial information upon a "persuasive showing" of the reasons in favor of the information's release. 47 C.F.R. § 0.457(d)(1). As the Commission has explained, this does not mean that the requester must "demonstrate that access is 'vital' to the conduct of a proceeding," or is "necessary to the 'fundamental integrity' of the Commission process at issue," or even "that the information have a direct impact on the requester." *Confidential Information Policy*, 13 FCC Rcd at 24829 (¶ 17).

## II.    The Modified Protective Orders Are More Than Sufficient To Prevent Unauthorized Disclosure.

The Commission has long balanced "the interests in disclosure and the interests in preserving the confidentiality of competitively sensitive materials by making … use of special remedies such as protective orders." *Confidential Information Policy* 13 FCC Rcd at 24831 (¶ 21). "Protective orders," the Commission has explained, "can provide the benefit of protecting competitively valuable information while permitting limited disclosure for a specific public purpose." *Id*. They are, as the Bureau stated here, "a time-tested means to protect highly sensitive information, including that of parties not directly involved in a transaction under review." *Recon. Order* ¶ 22 (JA39). In this case, the Bureau determined that "the Modified Joint Protective Orders provide the proper balance between, on the one hand, the need to provide access to VPCI and, on the other hand, the legitimate interests of broadcasters and programmers in preventing the dissemination and misuse of their VPCI." *Recon. Order* ¶ 23 (JA40). Petitioners' arguments to the contrary, CBS Br. 46–48, 51–56, are unpersuasive.

### A.    The protective orders contain multiple safeguards to ensure against misuse of VPCI.

1.    Petitioners contend that the Commission's determination that the modified protective orders "are sufficient to prevent Petitioners' VPCI from

being misused" is "misguided." CBS Br. 46; *see id.* at 46–48. Not so. The
protective orders adopted by the Commission contain multiple safeguards
against unwarranted disclosure of VPCI, which, taken together, provide
robust protections against abuse.

*First*, only a restricted category of persons is allowed access to the
most competitively sensitive information, including VPCI. The protective
orders limit access to "Outside Counsel of Record" and "Outside
Consultants" for participants in the merger-review proceedings (and their
employees and agents) who do not engage in "Competitive Decision-
Making." *Comcast AMJPO* ¶ 7 (JA50–51); *AT&T AMJPO* ¶ 7 (JA61–62).
"Competitive Decision-Making" is defined as "a person's activities,
association, or relationship with any of his clients involving advice about or
participation in the relevant business decisions or the analysis underlying the
relevant business decisions of the client in competition with or in a business
relationship with the Submitting Party or with a Third Party Interest Holder."
*Comcast AMJPO* ¶ 2 (JA47); *AT&T AMJPO* (JA58).

Contrary to Petitioners' and NAB's suggestions, this definition
expressly excludes individuals "involved in active contract negotiations,"
CBS Br. at 19, or "directly involved in negotiating programming
agreements," NAB Br. at 21. As the Bureau explained, "in the context of

47

VPCI, any individual who participates in the negotiation of programming contracts likely has been involved in 'Competitive Decision-Making,'" and "allowing such an individual to review the documents would raise the very problem the restriction is designed to address." *Recon. Order* ¶ 25 (JA41). Thus, as the Bureau stated, persons who "play a substantive role in the negotiation of a client's carriage agreements and provide advice regarding programming rates and other highly sensitive terms and conditions" would be involved in Competitive Decision-Making and would be disqualified from obtaining access to VPCI under the modified protective orders. *Recon. Order* ¶ 26 (JA41).[22]

   *Second*, "to ensure awareness" of the provisions of the modified protective orders and to protect third parties, any qualified individual who seeks access to VPCI must "file a supplemental Acknowledgment of Confidentiality form with the Commission," which is posted on the Commission's website and served on the party submitting the VPCI. *Recon. Order* ¶ 25 (JA41). *See Comcast AMJPO* ¶ 7 (JA51) & Attachment B (JA57);

---

[22] Although Petitioners claim that their competitors seek to review VPCI solely for commercial benefit, CBS Br. 41–42, this provision of the protective order, plus the provision authorizing objections to any given individual's access because the programmer believes the individual is involved in competitive decision-making, provide ample safeguards against precisely such a risk.

*AT&T AMJPO* ¶ 7 (JA62) & Attachment B (JA68). Any party to a VPCI

agreement has the right to object to the disclosure of the materials to a

particular individual if that party believes the individual is not qualified to

access VPCI under the terms of the protective orders; and under the modified

protective orders the objector is specifically authorized to seek review of the

Bureau's resolution of the objection with the full Commission. *Comcast*

*AMJPO* ¶ 8 (JA51), *AT&T AMJPO* ¶ 8 (JA62).

*Third*, individuals who seek to view VPCI must do so "only through a

document review platform either at the offices of the [merger applicant's]

Outside Counsel of Record or [other secure locations]." *Comcast AMJPO* ¶

10 (JA52); *AT&T AMJPO* ¶ 10 (JA63). Those individuals are specifically

barred from "print[ing], copy[ing] or transmit[ing]" any document containing

VPCI. *Id.*

*Fourth*, any party making a filing that contains VPCI must submit that

filing under seal, and each page of the filing must be marked "HIGHLY

CONFIDENTIAL INFORMATION – SUBJECT TO MODIFIED JOINT

PROTECTIVE ORDER IN MB DOCKET NO. 14-57 [or 14-90] BEFORE

THE FEDERAL COMMUNICATIONS COMMISSION." *Comcast AMJPO*

¶ 14 (JA53); *AT&T AMJPO* ¶ 14 (JA64). The filing will not be placed in the

Commission's public file. *Id.*

49

*Fifth*, after the conclusion of the proceeding, any individual who has accessed VPCI must return or destroy any material containing or derived from VPCI, including any notes taken by the individual. *Recon. Order* n.63.[23] Further, any reviewing party must certify compliance with this requirement "under penalty of perjury," pursuant to 28 U.S.C. § 1746, and subject to the criminal provisions for false statements contained in 18 U.S.C. § 1001. *Comcast AMJPO* ¶ 22 (JA54); *AT&T AMJPO* ¶ 22 (JA65).

*Sixth*, potential sanctions for violations of the protective orders are severe: they include possible criminal prosecution, as well as "suspension or disbarment of Counsel or Consultants from practice before the Commission, forfeitures [that is, financial penalties], cease and desist orders, and denial of further access to [confidential] information in this or any other Commission proceeding." *Comcast AMJPO* ¶ 21 (JA54); *AT&T AMJPO* ¶ 21 (JA65). [24]

---

[23] The only exception to the flat ban on retaining VPCI is that outside counsel and outside consultants may retain two copies of any pleadings they prepared that contain VPCI, as well as one copy of any order issued by the Commission that contains VPCI; but even those documents must be maintained "under the continuing strictures of th[e] Modified Joint Protective Order." *Id.*

[24] These are likely to be particularly significant penalties given, as NAB emphasizes, "the relatively small, inter-connected world of MVPDs, law firms, and cable trade associations involved in retransmission consent issues generally and in negotiating programming agreements for MVPDs serving most television markets specifically." NAB Br. 14. *See also* Declaration of Henry Ahn, Executive Vice President, Scripps Interactive, at ¶ 10 (JA222)

As the Bureau stated, the Commission "will not hesitate to take swift and decisive enforcement action where warranted for violation of its orders." *Oct. 7 Order* ¶ 7 (JA128).

2.     Petitioners argue that the robust safeguards in the modified protective orders "will not protect Petitioners' VPCI from improper use," because the Commission's threat of sanctions "rings hollow." CBS Br. 47. Their only purported factual basis for this claim, however, is a single incident involving AT&T's inadvertent disclosure of its own confidential information in the course of the Commission's review of that company's proposal to merge with T-Mobile. *See* CBS Br. 47 & n.16. But because that disclosure was "inadvertent," as Petitioners acknowledge, CBS Br. 47, and because it was of AT&T's own information, it is not surprising that the disclosure did not lead to a Commission sanction. In any event, the single inadvertent disclosure cited by Petitioners does not render the agency's decision to employ protective orders in this case unreasonable.

Beyond the example of AT&T's inadvertent disclosure of one of its own confidential documents, Petitioners offer nothing but speculation. They contend that "[e]ven if individuals are not currently engaged in Competitive

---

("The community of lawyers and other professionals who are involved in content distribution negotiations is small and concentrated.").

51

Decision-Making," they "may *later* be in a position to engage in Competitive

Decision-Making." Br. 48 n.17; *see* NAB Br. 14. The obligations of the

modified protective orders do not terminate with the conclusion of the

proceeding, however. *Comcast AMJPO* ¶ 22 (JA54); *AT&T AMJPO* ¶ 22

(JA65). Instead, they "remain in perpetuity." *Oct. 7 Order* ¶ 6 (JA127). Thus,

persons who have gained access to confidential material, including VPCI,

subject to the modified protective orders are under a continuing obligation not

to utilize or disclose such information even if they later change employment.

Moreover, as the Bureau observed, "it is reasonable to expect a certain

'cooling off' period"—the Bureau suggested a year—"between when an

outside agent has access to VPCI materials and when the agent seeks

alternative employment that would have rendered him ineligible to review the

VPCI materials at the time of the proceeding." *Recon. Order* ¶ 27 (JA42).

The risk that VPCI will be disclosed, even inadvertently, further diminishes

as time passes, and memories of "the precise details of complex and

voluminous submissions" fade. *Recon. Order* ¶ 27 (JA42).

In the end, Petitioners contend that there can be no "certainty" that

confidential information will not be misused. CBS Br. 46. But "certainty" is

not the standard. If it were, by that measure, neither the FCC nor any other

administrative agency or court could ever provide access to any confidential

information—VPCI or otherwise—by means of a protective order, however crafted. Such orders are a commonplace of agency and judicial practice. *See, e.g.*, *Exxon Corp. v. FTC*, 665 F.2d 1274 (D.C. Cir. 1981); *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482–85 (Fed. Cir. 1986), *cert. denied*, 482 U.S. 909 (1987); Fed. R. Civ. P. 26(c). And the APA requires only that the Commission act in a manner that is not "arbitrary and capricious." 5 U.S.C. 706(2)(A). Protective orders thus need not be perfect, only reasonable. Agencies are free to exercise their judgment to take reasonable steps to protect against a given harm while providing third parties sufficient access to critical information.

>    **B.    Petitioners' proffered alternatives are inappropriate and unworkable, and would only serve to derail the timely review of the transactions.**

Petitioners contend that even if the Commission made a persuasive showing that commenters should be provided access to VPCI, it failed to explain adequately why it did not adopt alternatives, such as requiring redaction or anonymization of VPCI or mandating that persons demonstrate a particularized need for access. CBS Br. 51–56. But the Bureau properly concluded that these alternatives were both inappropriate and unworkable.

Thus, according to Petitioners, the Commission should have "redact[ed] identifying information" from any VPCI made available to third

53

parties, or allowed only the release of "an anonymized spreadsheet or schedule prepared by the FCC's staff" with "the universe of the most relevant terms and conditions" in the programming contracts. *Id.* at 52. But in order to be effective, anonymization would have to involve "extensive" redactions "to ensure that the parties and programming involved are not identifiable from the material." *Recon. Order* ¶ 34 (JA44). Such extensive cuts, in turn, "would likely render the material unusable for purposes of analyzing the issues pending in the merger," because understanding the particulars of "the parties" to an agreement, the "price and non-price terms," and "the programming content involved" would be "essential for parties to properly assess the significance of the material." *Id*. (JA44–45). Moreover, as the Bureau observed, the merger applicants stated "that it would be unworkable to prepare redacted or anonymized versions of the hundreds of thousands of pages of programming contract materials that have been produced." *Id.* (JA44).

Similarly, Petitioners contend that the Commission should limit access to VPCI to individuals who "make a particularized, good-faith showing that they need[] access to VPCI in order to support a specific argument or proposal to be made in the merger review proceedings." CBS Br. 55. Petitioners make no effort to describe how such a showing could be set forth

54

in advance of access to VPCI in the first place. In any event, Petitioners'
proposal is misguided. As the Bureau stated, "[t]his is not a private dispute in
which only specific individuals have an interest to protect." *Recon. Order*
n.64 (JA36). Instead, it is a proceeding for the Commission to determine
whether proposed transactions will serve the public interest. 47 U.S.C.
§ 310(d). In fulfilling that obligation, and consistent with the
Communications Act and the APA, the Commission has established
procedures that "are premised on informed participation by the public."
*Recon. Order* n.64 (JA36). The need for public access to the information thus
does not depend on the particular interests of outside commenters; it rests
principally on the Commission's judgment that the opportunity for public
comment serves the public interest in this case.

Finally, Petitioners notably do not assert that the Commission's
judgment that a particularized showing had been made would be immune
from further judicial review; rather, there is no reason to doubt that they
would challenge any such determination. As we discuss below, the
Commission reasonably weighed the costs of such delay in making its
determination here.

### III.   The Five-Business-Day Requirement For Appealing Bureau Denials Of Objections Reasonably Forecloses Petitioners' Ability To Suspend Indefinitely Third-Party Comment On The Record.

Petitioners lead their brief with an attack on a single provision in paragraph 8 of the Amended Modified Joint Protective Orders. *See* CBS Br. 22–34. That provision, added by the Bureau in its *Order on Reconsideration*, specifies that if a third party objects to a specific person's access to confidential information, including VPCI, and the Bureau rules in favor of allowing that person access, the person "shall not have access to the relevant … [i]nformation until five business days after the objection is resolved by the Bureau." *Comcast AMJPO* ¶ 8 (JA51); *AT&T AMJPO* ¶ 8 (JA62). As the Bureau explained, the provision was put in place "to remove any doubt about whether a party is able to suspend indefinitely any party's (or every other party's) effective participation in the proceeding simply by filing an objection." *Recon. Order* ¶ 36 (JA45). Given the context, it was entirely reasonable to place the burden on a party that has already had its objection heard and denied by the Bureau to make a preliminary showing on review that it is likely to succeed on the merits of its claim.

1.     Petitioners claim that this provision deprives them of their right to seek "meaningful review" of an order allowing an individual to access VPCI. CBS Br. 22. But as the Bureau determined, the five-business-day

period "provides an appropriate balance between providing ample opportunity for the consideration of legitimate objections and proceeding with the merger review in a timely manner." *Recon. Order* ¶ 36 (JA45).

Contrast the Bureau's determination with the Petitioners' favored approach, which would withhold an individual's access to VPCI until all administrative and judicial appeals of a Bureau denial of an objection have been exhausted (presumably including resolution of any petition for a writ of certiorari). That would give parties an obvious incentive to file objections and pursue appeals in every case in order to delay access for as long as possible. But this would disrupt the Commission's expeditious review of these mergers and threaten the effectuation of the transactions merely because capital markets might not wait for regulatory resolution.

This concern is not hypothetical. After the Bureau's October 7 Order, individuals began executing the Acknowledgments required to gain access to highly confidential information, including VPCI. A group of third parties (including Petitioners) filed timely objections against "*every* individual" who signed an Acknowledgment. *Recon. Order* ¶ 5 (JA31) (emphasis added). It turned out that "[a]s to 235 of [the initial set of] 266 separate individuals" who signed Acknowledgments and against whom objections were filed, "no specific basis for objection" was set forth—the parties simply "reiterate[d]

57

their objection to permitting *any* individual to access" VPCI under the protective orders. Order, DA 14-1605, ¶ 4 (Nov. 4, 2014) (JA70). In an additional 10 instances, the objections ignored the specific terms of the protective orders—the objections challenged Acknowledgments filed by in-house counsel, consultants, and experts of *non-commercial* entities (including state organizations), despite the fact that the protective orders specifically include such individuals within the definition of "Outside Counsel" and "Outside Consultants," and exclude only employees of *commercial* enterprises. *Id.* ¶ 11 (JA72–73).[25] By filing objections to access by every individual (without any basis under the protective orders for objecting to almost any specific individual), Petitioners' tactics (a) threatened to hobble the Commission's merger review by forestalling its ability to obtain the benefits of public comment on information that it has determined to be critical to its review; and (b) unfairly disadvantage the merger review participants.

Petitioners assert that the Bureau's Order "places aggrieved parties, the Commission, and the Court in a perpetual state of emergency." CBS Br. 33. But there is no reason to think, once Petitioners' blanket objections to

---

[25] The Bureau has since issued an order disposing of some of those objections and deferring others pending this Court's review. JA3677.

58

essentially everyone who sought access to VPCI are put to the side, that there are likely to be many cases in which there is a genuine issue for appeal as to whether a specific individual is entitled to access to VPCI under the protective orders. Whether a person is or is not involved in Competitive Decision-Making should be a relatively straightforward question, particularly if, as NAB asserts, the universe of those involved in negotiating video programming distribution contracts is "relatively small" and "inter-connected." NAB Br. 14.

Petitioners contend that the five-business-day window is "unreasonable[]." CBS Br. 27 n.10. But every day the Commission withholds access in order to wait for parties to appeal the denial of an objection delays the benefits of third-party access to and comment on the record. The length of time to provide for parties to seek a stay is thus a matter of balancing the opportunity for review against the need for expeditious conduct of the Commission's proceedings in this case. And the precise line drawn is generally immune from challenge unless it is "patently unreasonable" and "[has] no relationship to the underlying regulatory problem." *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 541 (D.C. Cir. 2006) (quoting *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998)). As the proceedings in this case show, the Commission (and this Court) can move with dispatch when

59

necessary. Furthermore, there is nothing in the protective orders or the Commission's rules that would preclude the Bureau (or the Commission) from granting a stay of its own determination with respect to any individual about whom there is a serious question whether access should be provided. If a party has a plausible case for a stay pending review, it should be able to obtain one, just as Petitioners did in this case.[26]

2.      In addition to their substantive challenges to paragraph 8 of the protective orders, Petitioners challenge the process by which this paragraph was adopted. These arguments, too, have no merit.

First, Petitioners contend that the Commission's Order "ignored" their second application for review, filed November 7, which objected to the modification to paragraph 8 contained in the Order on Reconsideration. They argue that the Commission's Order should be vacated "on this basis alone." CBS Br. 28. Petitioners are incorrect. The Commission made clear in its order that it had before it both of Petitioners' "applications for review"—the October 14 Application for Review and the November 7 Application for

---

[26] Petitioners note that "this Court generally requires parties to seek emergency relief at least seven days before judicial intervention is required." CBS Br. 27 n.10 (citing D.C. Cir. Rule 27(f)). But (taking into account weekends and holidays) the five business days provided for by the protective orders is at least the equivalent of the seven calendar days required by this Court.

Review. *Commission Order* ¶ 1 & n.1 (JA1). And it expressly ordered that

both "applications for review" be denied. *Commission Order* ¶ 4 (JA2).

Petitioners next contend that in its November 10 Order, the

Commission failed to "meet the requirement" that the basis for an agency's

action must be "clearly disclosed." Br. at 29 (citing *SEC v. Chenery Corp.*,

318 U.S. 80, 94 (1943)). Similarly, Petitioners contend that the Commission

rejected their challenge to the revisions to paragraph 8 of the protective orders

"without articulating any supporting rationale." *Id.* These arguments, too, are

incorrect. As we have explained, the Commission denied the applications for

review and affirmed the adoption of the protective orders, as modified, "for

the reasons stated by the Media Bureau in its November 4, 2014 *Order on*

*Reconsideration*." *Commission Order* ¶ 1 (JA1).[27]

---

[27] The Petitioners make much of the fact that the Commission, obviously
motivated to act quickly given the pendency of petitions for review, issued a
short affirmance of the Bureau's decision. Of course, this Court, like other
appellate courts, renders binding decisions in the same manner. *See, e.g.*,
*Ohio Head Start Ass'n v. U.S. Dep't of Health & Human Servs.*, 510 Fed.
Appx. 1 (D.C. Cir. 2013). And the Communications Act specifically provides
that the Commission need not specify reasons in denying applications for
review. 47 U.S.C. § 155(c)(5) ("[i]n passing upon applications for review, the
Commission may grant, in whole or in part, or deny such applications without
specifying any reasons therefor"). Nor did the Commission rubber stamp the
Bureau's order, as it modified the protective order to add a new provision
regarding remote access to VPCI. *Commission Order* ¶¶ 1–2 (JA1–2).

Petitioners contend that it is "logically impossible for an order issued on November 4 [the Bureau order] to respond to an argument raised for the first time on November 7." CBS Br. 28. But the Commission issued *its* Order on November 10, and it was perfectly free to respond to Petitioners' November 7 contentions by pointing to the Bureau's *reasons* for revising the protective orders on November 4—to foreclose a party's ability to indefinitely suspend access to VPCI "simply by filing an objection," as well as to allow the merger proceeding to progress "in a timely manner." *Recon. Order* ¶ 36 (JA45).

Finally, Petitioners contend that the Bureau did "not acknowledge" that its revision diverged from prior practice (and presumably thus that the Commission could not adopt the Bureau's determination that this change was reasonable). CBS Br. 31. But the Bureau expressly "amend[ed]" the protective orders. *Recon. Order* ¶ 36 (JA45). In doing so, it necessarily made clear that it was changing its approach from that it had previously taken. Furthermore, the Bureau explained the *reason* for the change—to counter the third parties' abuse of the objection process and "remove any doubt about whether a party is able to suspend indefinitely … every other party's … effective participation in the proceeding simply by filing an objection." *Id.*

Given the unprecedented nature of the objections filed in these proceedings, a change from prior practice was entirely appropriate.

* * * * *

In sum, the Commission reasonably determined that providing limited, restricted access to VPCI to participants in the proposed merger proceedings appropriately balances the competing interests in these proceedings—the Commission's legitimate interests; those of the merger applicants in timely administrative action; those of third parties in having an opportunity to comment; and the need to protect sensitive business information. In fact, the safeguards contained in the modified protective orders are robust, the sanctions for noncompliance are severe, and the alternatives proposed by Petitioners are inappropriate and unworkable. Examination of VPCI is critical to the competitive issues raised by these mergers, which involve the nation's largest video programming distributors. As the Commission determined, public comment can help to identify relevant evidence for the Commission and elucidate its significance for the proceedings, and can provide third parties with the material necessary to test the record in accordance with the APA and the Communications Act. Finally, the Commission's five-business-day window for parties to appeal Bureau denials of objections to access by

specific individuals was a reasonable exercise of the agency's broad

discretion to ensure public comment on the record in a timely fashion.

## CONCLUSION

The petition for review should be denied.

Respectfully submitted,

DAVID I. GELFAND
DEPUTY ASSISTANT ATTORNEY GENERAL

KRISTEN C. LIMARZI
DANIEL E. HAAR
 ATTORNEYS

UNITED STATES DEPARTMENT
  OF JUSTICE
WASHINGTON, D.C.  20530

JONATHAN B. SALLET
GENERAL COUNSEL

DAVID M. GOSSETT
DEPUTY GENERAL COUNSEL

JACOB M. LEWIS
ASSOCIATE GENERAL COUNSEL

LILY S. FAREL
COUNSEL

FEDERAL COMMUNICATIONS
   COMMISSION
WASHINGTON, D.C.  20554
(202) 418-1745

January 2, 2015

No. 14-1242

_____

IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA
CIRCUIT

CBS CORPORATION, SCRIPPS NETWORKS
INTERACTIVE, INC., THE WALT DISNEY
COMPANY, TIME WARNER INC., TWENTY-FIRST
CENTURY FOX, INC., UNIVISION
COMMUNICATIONS, INC., AND VIACOM, INC.,
                         PETITIONERS,

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,

                         RESPONDENTS.

CERTIFICATE OF COMPLIANCE

Pursuant to the requirements of Fed. R. App. P. 32(a)(7), I hereby certify

that the accompanying Brief for Respondents in the captioned case contains 13,709

words.

                    */s/ Lily S. Farel*
                    Lily S. Farel
                    Counsel
                    Federal Communications Commission
                    Washington, D.C. 20554
                    (202) 418-1745 (Telephone)
                    (202) 418-0078 (Fax)

January 2, 2015

# STATUTORY ADDENDUM

**Page**

5 U.S.C. § 706 …………………………………………………………....... 2

18 U.S.C. § 1905 …………………………………………………………… 3

47 U.S.C. § 154(j) ……………………………………………………….….. 4
47 U.S.C. § 309(a)-(e) …………………………………………………….… 5
47 U.S.C. § 310 ……………………………………………………………... 8

47 C.F.R. § 0.457 …………………………………………………………… 10
47 C.F.R. § 1.108 …………………………………………………………... 15

5 U.S.C. § 706

UNITED STATES CODE ANNOTATED
TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES
PART I. THE AGENCIES GENERALLY
CHAPTER 7. JUDICIAL REVIEW

**§ 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

  **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

  **(B)** contrary to constitutional right, power, privilege, or immunity;

  **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

  **(D)** without observance of procedure required by law;

  **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

  **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

18 U.S.C. § 1905

UNITED STATES CODE ANNOTATED
TITLE 18. CRIMES AND CRIMINAL PROCEDURE
PART I. CRIMES
CHAPTER 93. PUBLIC OFFICERS AND EMPLOYEES

**§ 1905. Disclosure of confidential information generally**

Whoever, being an officer or employee of the United States or of any department or agency thereof, any person acting on behalf of the Federal Housing Finance Agency, or agent of the Department of Justice as defined in the Antitrust Civil Process Act (15 U.S.C. 1311-1314), or being an employee of a private sector organization who is or was assigned to an agency under chapter 37 of title 5, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment.

47 U.S.C. 154(j)

UNITED STATES CODE ANNOTATED
TITLE 47. TELEGRAPHS, TELEPHONES, AND RADIOTELEGRAPHS
CHAPTER 5. WIRE OR RADIO COMMUNICATION
SUBCHAPTER I. GENERAL PROVISIONS

**§ 154. Federal Communications Commission**

*   *   *   *   *   *

(j) Conduct of proceedings; hearings

The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice. No commissioner shall participate in any hearing or proceeding in which he has a pecuniary interest. Any party may appear before the Commission and be heard in person or by attorney. Every vote and official act of the Commission shall be entered of record, and its proceedings shall be public upon the request of any party interested. The Commission is authorized to withhold publication of records or proceedings containing secret information affecting the national defense.

*   *   *   *   *   *

47 U.S.C. § 309

UNITED STATES CODE ANNOTATED
TITLE 47. TELECOMMUNICATIONS
CHAPTER 5. WIRE OR RADIO COMMUNICATION
SUBCHAPTER III. SPECIAL PROVISIONS RELATING TO RADIO
PART I. GENERAL PROVISIONS
**Effective: February 22, 2012**

## § 309. Application for license

(a) Considerations in granting application

Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 of this title applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

(b) Time of granting application

Except as provided in subsection (c) of this section, no such application--

**(1)** for an instrument of authorization in the case of a station in the broadcasting or common carrier services, or

**(2)** for an instrument of authorization in the case of a station in any of the following categories:

**(A)** industrial radio positioning stations for which frequencies are assigned on an exclusive basis,

**(B)** aeronautical en route stations,

**(C)** aeronautical advisory stations,

**(D)** airdrome control stations,

**(E)** aeronautical fixed stations, and

**(F)** such other stations or classes of stations, not in the broadcasting or common carrier services, as the Commission shall by rule prescribe,

shall be granted by the Commission earlier than thirty days following issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof.

(c) Applications not affected by subsection (b)

Subsection (b) of this section shall not apply--

  **(1)** to any minor amendment of an application to which such subsection is applicable, or

  **(2)** to any application for--

    **(A)** a minor change in the facilities of an authorized station,

    **(B)** consent to an involuntary assignment or transfer under section 310(b) of this title or to an assignment or transfer thereunder which does not involve a substantial change in ownership or control,

    **(C)** a license under section 319(c) of this title or, pending application for or grant of such license, any special or temporary authorization to permit interim operation to facilitate completion of authorized construction or to provide substantially the same service as would be authorized by such license,

    **(D)** extension of time to complete construction of authorized facilities,

    **(E)** an authorization of facilities for remote pickups, studio links and similar facilities for use in the operation of a broadcast station,

    **(F)** authorizations pursuant to section 325(c) of this title where the programs to be transmitted are special events not of a continuing nature,

    **(G)** a special temporary authorization for nonbroadcast operation not to exceed thirty days where no application for regular operation is contemplated to be filed or not to exceed sixty days pending the filing of an application for such regular operation, or

    **(H)** an authorization under any of the proviso clauses of section 308(a) of this title.

(d) Petition to deny application; time; contents; reply; findings

**(1)** Any party in interest may file with the Commission a petition to deny any application (whether as originally filed or as amended) to which subsection (b) of this section applies at any time prior to the day of Commission grant thereof without hearing or the day of formal designation thereof for hearing; except that with respect to any classification of applications, the Commission from time to time by rule may specify a shorter period (no less than thirty days following the issuance of public notice by the Commission of the acceptance for filing of such

application or of any substantial amendment thereof), which shorter period shall be reasonably related to the time when the applications would normally be reached for processing. The petitioner shall serve a copy of such petition on the applicant. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a) of this section (or subsection (k) of this section in the case of renewal of any broadcast station license). Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof. The applicant shall be given the opportunity to file a reply in which allegations of fact or denials thereof shall similarly be supported by affidavit.

**(2)** If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with subsection (a) of this section (or subsection (k) of this section in the case of renewal of any broadcast station license), it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with subsection (a) of this section (or subsection (k) of this section in the case of renewal of any broadcast station license), it shall proceed as provided in subsection (e) of this section.

(e) Hearings; intervention; evidence; burden of proof

If, in the case of any application to which subsection (a) of this section applies, a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing on the ground or reasons then obtaining and shall forthwith notify the applicant and all other known parties in interest of such action and the grounds and reasons therefor, specifying with particularity the matters and things in issue but not including issues or requirements phrased generally. When the Commission has so designated an application for hearing the parties in interest, if any, who are not notified by the Commission of such action may acquire the status of a party to the proceeding thereon by filing a petition for intervention showing the basis for their interest not more than thirty days after publication of the hearing issues or any substantial amendment thereto in the Federal Register. Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate. The burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant, except that with respect to any issue presented by a petition to deny or a petition to enlarge the issues, such burdens shall be as determined by the Commission.

*      *      *      *      *

7

47 U.S.C. § 310

UNITED STATES CODE ANNOTATED
TITLE 47. TELECOMMUNICATIONS
CHAPTER 5. WIRE OR RADIO COMMUNICATION
SUBCHAPTER III. SPECIAL PROVISIONS RELATING TO RADIO
PART I. GENERAL PROVISIONS

**§ 310. License ownership restrictions**

(a) Grant to or holding by foreign government or representative

The station license required under this chapter shall not be granted to or held by any foreign government or the representative thereof.

(b) Grant to or holding by alien or representative, foreign corporation, etc.

No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by--

   **(1)** any alien or the representative of any alien;

   **(2)** any corporation organized under the laws of any foreign government;

   **(3)** any corporation of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof or by any corporation organized under the laws of a foreign country;

   **(4)** any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

(c) Authorization for aliens licensed by foreign governments; multilateral or bilateral agreement to which United States and foreign country are parties as prerequisite

In addition to amateur station licenses which the Commission may issue to aliens pursuant to this chapter, the Commission may issue authorizations, under such conditions and terms as it may prescribe, to permit an alien licensed by his government as an amateur radio operator to operate his amateur radio station licensed by his government in the United States, its possessions, and the Commonwealth of Puerto Rico provided there is in effect a multilateral or bilateral agreement, to which the United States and the alien's government are parties, for such operation on a reciprocal

basis by United States amateur radio operators. Other provisions of this chapter and of subchapter II of chapter 5, and chapter 7, of Title 5 shall not be applicable to any request or application for or modification, suspension, or cancellation of any such authorization.

(d) Assignment and transfer of construction permit or station license

No construction permit or station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby. Any such application shall be disposed of as if the proposed transferee or assignee were making application under section 308 of this title for the permit or license in question; but in acting thereon the Commission may not consider whether the public interest, convenience, and necessity might be served by the transfer, assignment, or disposal of the permit or license to a person other than the proposed transferee or assignee.

(e) Administration of regional concentration rules for broadcast stations

**(1)** In the case of any broadcast station, and any ownership interest therein, which is excluded from the regional concentration rules by reason of the savings provision for existing facilities provided by the First Report and Order adopted March 9, 1977 (docket No. 20548; 42 Fed. Reg. 16145), the exclusion shall not terminate solely by reason of changes made in the technical facilities of the station to improve its service.

**(2)** For purposes of this subsection, the term "regional concentration rules" means the provisions of sections 73.35, 73.240, and 73.636 of title 47, Code of Federal Regulations (as in effect June 1, 1983), which prohibit any party from directly or indirectly owning, operating, or controlling three broadcast stations in one or several services where any two of such stations are within 100 miles of the third (measured city-to-city), and where there is a primary service contour overlap of any of the stations.

47 C.F.R. § 0.457

CODE OF FEDERAL REGULATIONS
TITLE 47. TELECOMMUNICATION
CHAPTER I. FEDERAL COMMUNICATIONS COMMISSION
SUBCHAPTER A. GENERAL
PART 0. COMMISSION ORGANIZATION
SUBPART C. GENERAL INFORMATION
PUBLIC INFORMATION AND INSPECTION OF RECORDS
**Effective: October 14, 2014**


**§ 0.457 Records not routinely available for public inspection.**

The records listed in this section are not routinely available for public inspection pursuant to 5 U.S.C. 552(b). The records are listed in this section by category, according to the statutory basis for withholding those records from inspection; under each category, if appropriate, the underlying policy considerations affecting the withholding and disclosure of records in that category are briefly outlined. Except where the records are not the property of the Commission or where the disclosure of those records is prohibited by law, the Commission will entertain requests from members of the public under § 0.461 for permission to inspect particular records withheld from inspection under the provisions of this section, and will weigh the policy considerations favoring non-disclosure against the reasons cited for permitting inspection in the light of the facts of the particular case. In making such requests, there may be more than one basis for withholding particular records from inspection. The listing of records by category is not intended to imply the contrary but is solely for the information and assistance of persons making such requests. Requests to inspect or copy the transcripts, recordings or minutes of closed agency meetings will be considered under § 0.607 rather than under the provisions of this section.

(a) Materials that are specifically authorized under criteria established by Executive Order (E.O.) to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order, 5 U.S.C. 552(b)(1).

   (1) Classified materials and information will not be made available for public inspection, including materials classified under E.O. 10450, "Security Requirements for Government Employees"; E.O. 10501, as amended, "Safeguarding Official Information in the Interests of the Defense of the United States"; and E.O. 12958, "Classified National Security Information," or any other executive order concerning the classification of records. See also 47 U.S.C. 154(j).

   (2) Materials referred to another Federal agency for classification will not be disclosed while such a determination is pending.

(b) Materials that are related solely to the internal personnel rules and practices of the Commission, 5 U.S.C. 552(b)(2).

(1) Materials related solely to internal management matters, including minutes of Commission actions on such matters (see paragraph (f) of this section).

(2) Materials relating to the negotiation of contracts.

(c) Materials that are specifically exempted from disclosure by statute (other than the Government in the Sunshine Act, 5 U.S.C. 552b, provided that such statute either requires that the materials be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of materials to be withheld). The Commission is authorized under the following statutory provisions to withhold materials from public inspection.

(1) Section 4(j) of the Communications Act, 47 U.S.C. 154(j), provides, in part, that, "The Commission is authorized to withhold publication of records or proceedings containing secret information affecting the national defense." Pursuant to that provision, it has been determined that the following materials should be withheld from public inspection (see also paragraph (a) of this section):

(i) Maps showing the exact location of submarine cables.

(ii) Minutes of Commission actions on classified matters.

(iii) Maps of nation-wide point-to-point microwave networks.

(2) Under section 213 of the Communications Act, 47 U.S.C. 213(f), the Commission is authorized to order, with the reasons therefor, that records and data pertaining to the valuation of the property of common carriers and furnished to the Commission by the carriers pursuant to the provisions of that section, shall not be available for public inspection. If such an order has been issued, the data and records will be withheld from public inspection, except under the provisions of § 0.461. Normally, however, such data and information is available for inspection.

(3) Under sec. 412 of the Communications Act, 47 U.S.C. 412, the Commission may withhold from public inspection certain contracts, agreements and arrangements between common carriers relating to foreign wire or radio communication. Any person may file a petition requesting that such materials be withheld from public inspection. To support such action, the petition must show that the contract, agreement or arrangement relates to foreign wire or radio communications; that its publication would place American communication companies at a disadvantage in meeting the competition of foreign communication companies; and that the public interest would be served by keeping its terms confidential. If the Commission orders that such materials be kept confidential, they will be made available for inspection only under the provisions of § 0.461.

(4) Section 605 of the Communications Act, 47 U.S.C. 605(a), provides, in part, that, "no person not being authorized by the sender shall intercept any communication [by wire or radio] and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communications to any person." In executing its responsibilities, the Commission regularly monitors radio transmissions. Except as required for the enforcement of the communications laws, treaties and the provisions of this chapter, or as authorized in sec. 605, the Commission is prohibited from divulging information obtained in the course of these monitoring activities; and such information, and materials relating thereto, will not be made available for public inspection.

(5) Section 1905 of the federal criminal code, the Trade Secrets Act, 18 U.S.C. 1905, prohibits the unauthorized disclosure of certain confidential information. See paragraph (d) of this section and § 19.735–203 of this chapter.

(d) Trade secrets and commercial or financial information obtained from any person and privileged or confidential--categories of materials not routinely available for public inspection, 5 U.S.C. 552(b)(4) and 18 U.S.C. 1905.

(1) The materials listed in this paragraph have been accepted, or are being accepted, by the Commission on a confidential basis pursuant to 5 U.S.C. 552(b)(4). To the extent indicated in each case, the materials are not routinely available for public inspection. If the protection afforded is sufficient, it is unnecessary for persons submitting such materials to submit therewith a request for non-disclosure pursuant to § 0.459. A persuasive showing as to the reasons for inspection will be required in requests submitted under § 0.461 for inspection of such materials.

(i) Financial reports submitted by radio or television licensees.

(ii) Applications for equipment authorizations (type acceptance, type approval, certification, or advance approval of subscription television systems), and materials relating to such applications, are not routinely available for public inspection prior to the effective date of the authorization. The effective date of the authorization will, upon request, be deferred to a date no earlier than that specified by the applicant. Following the effective date of the authorization, the application and related materials (including technical specifications and test measurements) will be made available for inspection upon request (see § 0.460). Portions of applications for equipment certification of scanning receivers and related materials will not be made available for inspection.

(iii) Information submitted in connection with audits, investigations and examination of records pursuant to 47 U.S.C. 220.

(iv) Programming contracts between programmers and multichannel video programming distributors.

(v) The rates, terms and conditions in any agreement between a U.S. carrier and a foreign carrier that govern the settlement of U.S.-international traffic, including the method for

allocating return traffic, except as otherwise specified by the Commission by order or by the International Bureau under delegated authority. See, e.g., International Settlements Policy Reform, IB Docket Nos. 11–80, 05–254, 09–10, RM–11322, Report and Order, FCC 12–145 (rel. Nov. 29, 2012).

(vi) Outage reports filed under Part 4 of this chapter.

(vii) The following records, relating to coordination of satellite systems pursuant to procedures codified in the International Telecommunication Union (ITU) Radio Regulations:

(A) Records of communications between the Commission and the ITU related to the international coordination process, and

(B) Documents prepared in connection with coordination, notification, and recording of frequency assignments and Plan modifications, including but not limited to minutes of meetings, supporting exhibits, supporting correspondence, and documents and correspondence prepared in connection with operator-to-operator arrangements.

Note to paragraph (d): The content of the communications described in paragraph (d)(1)(vii)(A) of this section is in some circumstances separately available through the ITU's publication process, or through records available in connection with the Commission's licensing procedures.

(viii) Information submitted with a 911 reliability certification pursuant to 47 CFR 12.4 that consists of descriptions and documentation of alternative measures to mitigate the risks of nonconformance with certification elements, information detailing specific corrective actions taken with respect to certification elements, or supplemental information requested by the Commission with respect to such certification.

(ix) Confidential Broadcaster Information, as defined in § 1.2206(d) of this chapter, submitted by a broadcast television licensee in a broadcast television spectrum reverse auction conducted under section 6403 of the Middle Class Tax Relief and Job Creation Act of 2012 (Pub.L. 112–96) (the "Spectrum Act"), or in the application to participate in such a reverse auction, is not routinely available for public inspection until the reassignments and reallocations under section 6403(b)(1)(B) of the Spectrum Act become effective or until two years after public notice that the reverse auction is complete and that no such reassignments and reallocations shall become effective. In the event that reassignments and reallocations under section 6403(b)(1)(B) of the Spectrum Act become effective, Confidential Broadcaster Information pertaining to any unsuccessful reverse auction bid or pertaining to any unsuccessful application to participate in such a reverse auction will not be routinely available for public inspection until two years after the effective date.

(2) Unless the materials to be submitted are listed in paragraph (d)(1) of this section and the protection thereby afforded is adequate, any person who submits materials which he or she wishes withheld from public inspection under 5 U.S.C. 552(b)(4) must submit a request for non-disclosure pursuant to § 0.459. If it is shown in the request that the materials contain

13

trade secrets or privileged or confidential commercial, financial or technical data, the materials will not be made routinely available for inspection; and a persuasive showing as to the reasons for inspection will be required in requests for inspection submitted under § 0.461. In the absence of a request for non-disclosure, the Commission may, in the unusual instance, determine on its own motion that the materials should not be routinely available for public inspection.

(e) Interagency and intra-agency memoranda or letters, 5 U.S.C. 552(b)(5). Interagency and intra-agency memoranda or letters and the work papers of members of the Commission or its staff will not be made available for public inspection, except in accordance with the procedures set forth in § 0.461. Normally such papers are privileged and not available to private parties through the discovery process, since their disclosure would tend to restrain the commitment of ideas to writing, would tend to inhibit communication among Government personnel, and would, in some cases, involve premature disclosure of their contents.

(f) Personnel, medical and other files whose disclosure would constitute a clearly unwarranted invasion of personal privacy, 5 U.S.C. 552(b)(6). Under E.O. 10561, the Commission maintains an Official Personnel Folder for each of its employees. Such folders are under the jurisdiction and control, and are a part of the records, of the U.S. Office of Personnel Management. Except as provided in the rules of the Office of Personnel Management (5 CFR 293.311), such folders will not be made available for public inspection by the Commission. In addition, other records of the Commission containing private, personal or financial information concerning particular employees and Commission contractors will be withheld from public inspection.

(g) Under 5 U.S.C. 552(b)(7), records compiled for law enforcement purposes, to the extent that production of such records:

   (1) Could reasonably be expected to interfere with enforcement proceedings;

   (2) Would deprive a person of a right to fair trial or an impartial adjudication;

   (3) Could reasonably be expected to constitute an unwarranted invasion of personal privacy;

   (4) Could reasonably be expected to disclose the identity of a confidential source;

   (5) Would disclose investigative techniques or procedures or would disclose investigative guidelines if such disclosure could reasonably be expected to risk circumvention of the law; or

   (6) Could reasonably be expected to endanger the life or physical safety of any individual.

47 C.F.R. § 1.108

CODE OF FEDERAL REGULATIONS
TITLE 47. TELECOMMUNICATION
CHAPTER I. FEDERAL COMMUNICATIONS COMMISSION
SUBCHAPTER A. GENERAL
PART 1. PRACTICE AND PROCEDURE
SUBPART A. GENERAL RULES OF PRACTICE AND PROCEDURE
RECONSIDERATION AND REVIEW OF ACTIONS TAKEN BY THE
COMMISSION AND PURSUANT TO DELEGATED AUTHORITY; EFFECTIVE
DATES AND FINALITY DATES OF ACTIONS
**Effective: June 1, 2011**

**§ 1.108 Reconsideration on Commission's own motion.**

The Commission may, on its own motion, reconsider any action made or taken by it within 30 days from the date of public notice of such action, as that date is defined in § 1.4(b). When acting on its own motion under this section, the Commission may take any action it could take in acting on a petition for reconsideration, as set forth in § 1.106(k).

No. 14-1242

_____

IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

CBS CORPORATION, SCRIPPS NETWORKS INTERACTIVE, INC., THE WALT DISNEY COMPANY, TIME WARNER INC., TWENTY-FIRST CENTURY FOX, INC., UNIVISION COMMUNICATIONS, INC., AND VIACOM, INC.,

PETITIONERS,

V.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,

RESPONDENTS.

CERTIFICATE OF SERVICE

I, Lily S. Farel, hereby certify that on January 2, 2015, I electronically filed the foregoing Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

| | |
|---|---|
| Mace Rosenstein | Robert B. Nicholson |
| C. William Phillips | Daniel E. Haar |
| Kevin King | U.S. Dept. of Justice, Antitrust Div. |
| Covington & Burling, LLP | 950 Pennsylvania Ave., N.W. |
| 1201 Pennsylvania Ave., N.W. | Room 3228 |
| Washington, D.C. 20004 | Washington, D.C. 20530 |
| *Counsel for: CBS Corp., et al.* | *Counsel for: USA* |

Michael K. Kellogg
Scott H. Angstreich
Kellogg, Huber, Hansen, Todd,
  Evans & Figel, PLLC
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
*Counsel for: AT&T, Inc.*

Lori Fink
Gary Phillips
AT&T Inc.
1120 20th Street, N.W.
Suite 100
Washington, D.C. 20036
*Counsel for: AT&T, Inc.*

Matthew A. Brill
Latham & Watkins, LLP
555 Eleventh Street, N.W.
Suite 1000
Washington, D.C. 20004
*Counsel for: Time Warner
  Cable, Inc.*

William M. Wiltshire
Christopher J. Wright
Timothy J. Simeone
Harris, Wiltshire & Grannis
1919 M Street, N.W.
8th Floor
Washington, D.C. 20036
*Counsel for: DIRECTV*

D. Wayne Watts
David R. McAtee II
AT&T, Inc.
208 South Akard Street
Room 3303
Dallas, TX 75202
*Counsel for: AT&T, Inc.*

David P. Murray
Francis M. Buono
Willkie Farr & Gallagher, LLP
1875 K Street, N.W.
Washington, D.C. 20006
*Counsel for: Comcast Corp.*

Samuel L. Feder
John Flynn
Jenner & Block
1099 New York Ave., N.W.
Suite 900
Washington, D.C. 20001
*Counsel for: Charter
  Communications, Inc.*

Pantelis Michalopoulos
Stephanie A. Roy
Steptoe & Johnson, LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036
*Counsel for: DISH Network*

David A. LaFuria
Brooks E. Harlow
Lukas, Nace, Gutierrez & Sachs
8300 Greensboro Drive
Suite 1200
McLean, VA 22012
*Counsel for: American Cable Assn*

Barbara S. Esbin
Cinnamon, Mueller
1875 Eye Street, N.W.
Suite 700
Washington, D.C. 20006
*Counsel for: American Cable Assn*

 Rick Kaplan
Jerianne Timmerman
Erin L. Dozier
National Association Of
 Broadcasters
1771 N Street, NW
Washington, D.C. 20036
*Counsel for: NAB*

*/s/ Lily S. Farel*
Lily S. Farel
Counsel
Federal Communications Commission
Washington, D.C. 20554
(202) 418-1745 (Telephone)
(202) 418-0078 (Fax)