**ORAL ARGUMENT SCHEDULED FOR FEBRUARY 20, 2015**

No. 14-1242

# In the United States Court of Appeals
# for the District of Columbia Circuit

CBS CORPORATION, SCRIPPS NETWORKS INTERACTIVE, INC., THE WALT DISNEY COMPANY, TIME WARNER INC., TWENTY-FIRST CENTURY FOX, INC., UNIVISION COMMUNICATIONS INC., AND VIACOM INC.

*Petitioners,*

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED STATES OF AMERICA,

*Respondents.*

## On Appeal from an Order of the Federal Communications Commission

## BRIEF OF INTERVENORS DISH NETWORK CORPORATION AND THE AMERICAN CABLE ASSOCIATION

David A LaFuria
Brooks E. Harlow
LUKAS, NACE, GUTIERREZ
& SACHS, LLP
8300 Greensboro Drive
Suite 1200
McLean, Virginia  22102
(703) 584-8678
*Counsel for the American
Cable Association*

Pantelis Michalopoulos
Stephanie A. Roy
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
*Counsel for DISH Network
Corporation*

January 2, 2015

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Intervenors DISH Network and the American Cable Association state as follows:

### A.    Parties:

All parties, intervenors, and amici appearing in this Court are listed in the Brief for Petitioners CBS Corporation, et al.

### B.    Rulings Under Review:

Applications of Comcast Corp. and Time Warner Cable Inc. for Consent to Assign or Transfer Control of Licenses and Authorizations and AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations, *Order*, MB Docket Nos. 14-57, 14-90, FCC 14-202 (rel. Nov. 10, 2014).

### C.    Related Cases:

Intervenors are not aware of any related case pending before this Court or any other court.  Some of the issues presented in this case were the subject of an earlier petition for review and a related petition for a writ of mandamus, both filed in this Court on November 10, 2014.  *See In re CBS Corp.,* 14-1236; *CBS Corp. v. FCC*, 14-1237.  Before this Court issued any orders in those proceedings, the parties stipulated to a dismissal of the proceedings on November 12, 2014.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rules 18(a)(4) and 26.1, Intervenors state as follows:

### DISH NETWORK CORPORATION

DISH Network Corporation ("DISH") has issued publicly traded equity. Based on reports filed publicly with the Securities and Exchange Commission, no publicly traded company owns 10% or more of DISH except Putnam Investments LLC, which owns 16.1% of the publicly traded equity of DISH. DISH Network L.L.C. is a wholly owned subsidiary of DISH DBS Corporation, a corporation with publicly traded debt. DISH DBS Corporation is a wholly owned subsidiary of DISH Orbital Corporation. DISH Orbital Corporation is a wholly owned subsidiary of DISH. DISH Network L.L.C. serves over 14 million satellite TV customers.

### AMERICAN CABLE ASSOCIATION

The American Cable Association ("ACA") is incorporated in Pennsylvania as a 501(c)(6) nonprofit trade association. ACA is principally engaged in representing the interests of its members before Congress and regulatory agencies, such as the FCC. Its membership consists of about 840 small and mid-sized multichannel video program distributors collectively serving about seven million households, primarily in small markets and rural areas. ACA does not issue stock and is not publicly traded. ACA has no parent company, and no publicly held

corporation pays more than 10% of its dues or possesses or exercises more than

10% of the voting control over ACA.

## TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES**................................................................................................**i**

**CORPORATE DISCLOSURE STATEMENT**........................................**ii**

    **DISH NETWORK CORPORATION**..............................................**ii**

    **AMERICAN CABLE ASSOCIATION** .......................................**ii**

**TABLE OF AUTHORITIES** ...............................................................**vi**

**GLOSSARY** .......................................................................................**viii**

**STATUTES AND REGULATIONS** .....................................................**1**

**STATEMENT OF THE CASE**.............................................................**1**

**SUMMARY OF ARGUMENT** ............................................................**3**

**ARGUMENT** ......................................................................................**6**

**I.    THE PROTECTIVE ORDERS ARE WELL WITHIN FCC
    PRECEDENT**.............................................................................**6**

    **A.    The FCC Frequently Requires Access To Sensitive
        Programming Agreements In Media Mergers** ...............**6**

    **B.    The Only Difference With Past Mergers Is That The FCC
        Has Taken Additional Measures To Protect The Documents
        Here**..........................................................................**9**

    **C.    The Petitioners Have Not Pointed To A Difference That
        Justifies Less Access Or More Protection In The Instant
        Merger Proceedings** .................................................**10**

**II.   ACCESS TO THE VIDEO PROGRAMMING CONFIDENTIAL
    INFORMATION IS CRITICAL FOR INTERVENORS**.................**11**

    **A.    Informed Review By Appropriate Third Parties Is Required
        By Law** ....................................................................**11**

    **B.    The Video Programming Confidential Information Is
        Essential To Merger Evaluation** ................................**15**

**III.  THE ANTITRUST LAWS DO NOT PRECLUDE THE FCC'S
    NORMAL DOCUMENT DISCLOSURE PROCEDURES** ...............**17**

**CONCLUSION**..................................................................................................**19**

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
     APPELLATE PROCEDURE 32(a)** .......................................................**20**

**CERTIFICATE OF SERVICE** ........................................................................**21**

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Association of Data Processing v. Board Of Governors,*
    745 F.2d 677 (D.C. Cir. 1984)...................................................................11

\* *Bilingual Bicultural Coalition on Mass Media, Inc. v. FCC,*
    595 F.2d 621 (D.C. Cir. 1978)..............................................................12, 14

*California Motor Transport Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972)...............................................................................18

*Chevron U.S.A. v. Natural Resources Defense Council,*
    467 U.S. 837 (1984)...............................................................................13

*Consumer Federation of America v. FCC,*
    348 F.3d 1009 (D.C. Cir. 2003).............................................................12

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961)...............................................................................18

*FCC v. Pottsville Broadcasting Co.,*
    309 U.S. 134 (1940)...............................................................................13

\* *FCC v. Schreiber,*
    381 U.S. 279 (1965).........................................................................13, 14

*FTC v. Texaco, Inc.,*
    555 F.2d 862 (D.C. Cir. 1977).............................................................13

*National Association of Regulatory Utility Commissions v. FCC,*
    737 F.2d 1095 (D.C. Cir. 1984)...........................................................15

*Springfield Television Broadcasting Corp. v. FCC,*
    328 F.2d 186 (D.C. Cir. 1964).............................................................12

\* *U.S. v. Container Corporation of America,*
    393 U.S. 333 (1969).........................................................................17, 18

---

[*]     Authorities upon which we chiefly rely are marked with asterisks.

*United Mine Workers of America v. Pennington*,
  381 U.S. 657 (1965)......................................................................18

*United States Lines, Inc. v. Federal Maritime Commission*,
  584 F.2d 519 (D.C. Cir. 1978)......................................................15

*United States v. California Rural Legal Assistance, Inc.*,
  722 F.3d 424 (D.C. Cir. 2013)......................................................13

**Agency Proceedings**

* Applications of Adelphia Commcations Corp., Time Warner Cable, Inc.,
  and Comcast Corp. for Consent to the Assignment and/or Transfer of
  Control of Licenses, *Memorandum Opinion and Order*, 26 FCC Rcd.
  4238 (2011)..................................................................................9

* Applications of Verizon Communications Inc. and MCI, Inc. for Approval
  of Transfer of Control, *Order*, 20 FCC Rcd. 10420 (2005) .............................14

*Examination of Current Policy Concerning the Treatment of Confidential
  Info. Submitted to the Commission*,
  13 FCC Rcd. 24816 (1998)..........................................................15

FCC, Cable Services Bureau, Initial Information and Document Request, CS
  Docket No. 01-348 (Feb. 4, 2002) ...................................................7

Letter from John Muleta, FCC, to David Jatlow, AT&T Wireless Services,
  Inc. and David Richards, Cingular Wireless LLC, MB Docket No. 04-70
  (June 30, 2004)..............................................................................8

Letter from John Scott, III, Verizon, to Marlene Dortch, FCC, WT Docket
  No. 11-65 (Nov. 1, 2011).................................................................8

**Statutes**

47 U.S.C. § 154(j) ...........................................................................13

* 47 U.S.C. § 309............................................................................11, 12

# GLOSSARY

| | |
|---|---|
| ACA | American Cable Association |
| Applicants | Comcast Corporation, Time Warner Cable Inc., Charter Communications, Inc., AT&T, Inc., and DIRECTV |
| Bureau | Media Bureau of the Federal Communications Commission |
| Confidential Information | Information that is not otherwise available from publicly available sources and that is subject to protection under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the FCC's implementing rules. |
| DISH | DISH Network Corporation |
| FCC or Commission | Federal Communications Commission |
| Highly Confidential Information | Information that is not otherwise available from publicly available sources; that the Submitting Party has kept strictly confidential; that is subject to protection under FOIA and the FCC's implementing rules; that the Submitting Party claims constitutes some of its most sensitive business data which, if released to competitors or those with whom the Submitting Party does business, would allow those persons to gain a significant advantage in the marketplace or in negotiations. |
| Intervenors | DISH Network and the American Cable Association |
| JA | Joint Appendix |

| | |
|---|---|
| MVPD | Multichannel Video Programming Distributor |
| NBCU | NBCUniversal |
| *Order* | Applications of Comcast Corp. and Time Warner Cable Inc. and AT&T, Inc. and DIRECTV for Consent to Assign or Transfer Control of Licenses and Authorizations, *Order*, MB Docket Nos. 14-57, 14-90, FCC 14-202 (rel. Nov. 10, 2014) |
| OTT | Over-the-top video content delivered over the Internet |
| OVD | Online Video Distributor |
| Petitioners | CBS Corporation, Scripps Networks Interactive, Inc., The Walt Disney Company, Time Warner Inc., Twenty-First Century Fox, Inc., Univision Communications Inc., and Viacom Inc. |
| TWC | Time Warner Cable |
| Video Programming Confidential Information or VPCI | Video Programming Confidential Information is a subset of Highly Confidential Information for which the FCC has afforded special protection in the current merger proceedings, and which includes programming agreements to which an Applicant is a party and related materials, including negotiation materials. |

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief for Respondents Federal Communications Commission and United States of America.

## STATEMENT OF THE CASE

This case is about whether the FCC can meaningfully evaluate two proposed large mergers without proper input from the many parties that have opposed or expressed concern about these mergers.  The mergers in question are Comcast's proposed acquisition of Time Warner Cable Inc. ("TWC"), and AT&T Inc.'s ("AT&T") acquisition of DIRECTV.  The Comcast-TWC merger is especially troubling, as it would reshape the national media landscape, particularly the video programming and distribution industries.  Comcast is dominant in both industries. It is the nation's largest multichannel video programming distributor ("MVPD"), and a significant owner of national, regional, and local programming assets.  TWC is also dominant as the nation's second-largest cable operator, and as a significant owner of regional programming.  The effect of this merger will be acutely felt by other MVPDs, including the Intervenors—DISH, a satellite distributor second to DIRECTV, and the hundreds of small and mid-sized cable operators making up the membership of ACA.  Comcast and TWC are also broadband Internet service providers.  This means that online video distributors ("OVDs"), such as DISH, depend on them for access to consumers.

1

A wide range of parties have objected to the deals, and particularly Comcast-TWC, on the ground that they would anti-competitively harm the ability of MVPDs and OVDs to purchase programming for distribution to consumers on non-discriminatory terms.  The current programming agreements and negotiations between each merger applicant and programmers are key to an evaluation of these issues.  Do the existing agreements allow the merged entities to exert increased leverage in order to extract rate concessions and preferential over-the-top ("OTT") terms?  Do programming negotiations indicate that the merged entities will use their enhanced bargaining position to demand anticompetitive terms that will disadvantage key MVPD and OVD rivals?

To evaluate the mergers, the FCC has gone through the usual procedure of requesting a range of confidential documents from the Applicants, including video programming confidential information ("VPCI").  *See* JA 8 ¶ 2.  The FCC issued a fairly standard protective order that would guarantee the agreements remained protected, while allowing interested parties to review the documents.  *See generally* JA 47, 58 (Amended Modified Joint Protective Orders). Review of VPCI designated as Highly Confidential was limited to outside counsel of record who had certified that they were not involved in competitive decision making on behalf of their clients.  JA 49 ¶ 2, 50-51 ¶ 9, 60 ¶ 2, 62-63 ¶ 9.

2

When the Petitioners objected to the Applicants' production of VPCI despite the well-established protections put in place, the FCC restricted access to VPCI even further. *See generally* JA 6, 17 (Second Amended Modified Joint Protective Orders). Under the FCC's new restrictions, VPCI is available "only at the offices of the [Applicants'] Outside Counsel of Record or at other secure locations" and cannot be accessed "through remote access." JA 2 ¶ 2.

This appeal is the result of the Petitioners' continuing refusal to allow well-established procedures to move forward, despite the FCC's unusual accommodations.

## SUMMARY OF ARGUMENT

The Petitioners' brief depicts a surreal world where the ordinary need for review of programming documents in a media merger proceeding has somehow become unprecedented, and the extraordinary protections that the FCC has already afforded Petitioners have correspondingly become insufficient. The Petitioners' central contention—that documents of this type have never been produced for third party review in merger proceedings—is false. Carriage agreements and similarly sensitive documents have routinely been requested, and provided, in major media merger reviews, including:

- Comcast's acquisition of control over NBCUniversal, approved with conditions in 2011;

- The acquisition by Comcast and TWC of Adelphia's cable systems, approved with conditions in 2006; and

- The proposed acquisition of Hughes and DIRECTV by DISH's predecessor company, EchoStar, set for a hearing in 2002.

In truth, what is unusual is the level of protection that the FCC has afforded the documents. In recent mergers, carriage agreements and related negotiation materials were produced under the Highly Confidential designation without further or special protection. But following the *Order* at issue here, VPCI is available "only at the offices of the [Applicants'] Outside Counsel of Record or at other secure locations" and cannot be accessed "through remote access." JA 2 ¶ 2. Intervenors did not believe that these extraordinary protections were necessary, and DISH expressed that view to the FCC. *See* JA 3573. Nevertheless, the Intervenors recognize the sensitivity of some programming information. They have therefore decided to accept these additional burdens and labor on, allowing the substantive issues to be joined, and the FCC's evaluation to proceed.

But reasonableness is not a trait that the Petitioners have exhibited in this proceeding. Despite the well-established precedent, the centrality of the VPCI to this proceeding, and the extraordinary lengths to which the FCC has gone to assuage any reasonable concerns, the Petitioners have used every weapon available to them, and at least one weapon that is not available to parties except in the most

extreme circumstances (a request for a writ of mandamus), to stop review of the documents.

The Intervenors do not know if the true motive of the Petitioners is to thwart the underlying mergers, and whether, for tactical reasons, some of them would rather not oppose these transactions on their merits. If that were indeed the case, it would have been more productive for the Petitioners to express candidly that opposition, tactical considerations aside. But what Petitioners say they want is another example of an extraordinary process presented by them as routine. Petitioners claim that the FCC should read the VPCI documents without the benefit of any third party review, and then rely on their contents when reaching a decision on the proposed mergers. Pet. Br. at 19-20. That has never happened, and it cannot lawfully happen. Under applicable law, interested parties must be provided reasonable access to decisionally significant material in the FCC's party-based proceedings. Failure to provide such access would be grounds to overturn any FCC decision approving either merger.

Finally, the Petitioners take an absurdly broad view of antitrust law. If the Sherman Act were violated by the carefully limited viewing of confidential information by third parties' outside counsel in the context of an agency proceeding, all FCC merger proceedings and much of federal court litigation would have to come to a halt.

Petitioners cannot bear the heavy burden of showing that the FCC acted in an arbitrary or capricious manner, particularly where, as here, the FCC has bent over backwards to accommodate Petitioners' own interests, and imposed additional burdens on Intervenors in the process.

## ARGUMENT

## I.   THE PROTECTIVE ORDERS ARE WELL WITHIN FCC PRECEDENT

The Petitioners' argument is that the FCC has never done this—allowed review of sensitive third party documents in merger proceedings—before.  In their words: "[The FCC] has never approved such a widespread disclosure of programming materials and negotiation strategies in prior media mergers."  Pet. Br. at 2.  That claim is false.  The FCC has, in fact, done so in essentially every recent media merger proceeding, requiring merger applicants to provide, for review by *both* the FCC and interested parties, highly sensitive documents (including carriage agreements and related negotiation materials).

The only material difference between the past and the present two mergers does not help the Petitioners.  What is different here is that the FCC has established exceptional safeguards above and beyond the usual guarantees of protection.

### A.    The FCC Frequently Requires Access To Sensitive Programming Agreements In Media Mergers

In Comcast/NBCU, the FCC asked for "all agreements currently in effect and all agreements executed since January 1, 2006 that [Comcast] has entered into

with any provider of Video Programming which discuss cable network carriage, retransmission consent, program carriage, and distribution rights for Video Programming."  JA 3743 ¶ 44; *see also* JA 3740 ¶ 20 ("Provide all agreements . . . since January 1, 2006 between the Company and any other Person that grant online video distribution rights to the Company."); JA 3727 (Protective Order).

In Adelphia/Time Warner/Comcast, the FCC also requested highly sensitive proprietary information on video programming.  The agency made material available for review to third parties subject to the protections of a Second Protective Order.  *See* JA 3719-20 ¶ 7; *see also* JA 3708-12 (requesting granular details of the parties' video programming information).

The FCC also required the applicants in the EchoStar/Hughes/DIRECTV merger proceeding to produce and make available certain "programming agreements" and other programming-related information to interested parties under protective order procedures.  *See* FCC, Cable Services Bureau, Initial Information and Document Request, CS Docket No. 01-348, at 1 (Feb. 4, 2002) (Attachment to Letter from W. Kenneth Ferree, to Pantelis Michalopoulos, Counsel to EchoStar, and Gary Epstein, Counsel to General Motors and Hughes Electronics, CS Docket No. 01-348 (Feb. 4, 2002)) (requesting documents related to a number of issues, including programming material, and certain programming agreements).  Indeed, review of the programming agreements at issue here is such a standard practice for

7

regulatory proceedings that it is common for programming agreements to include an exception to the contract's non-disclosure agreement that permits them to be disclosed to government officials upon request.  JA 3236.

This survey of past mergers[2] confirms that not only has "the Commission . . . never refused to receive entire categories of information highly relevant to a pending merger," the FCC has affirmatively required the receipt of similar information to evaluate past mergers.  JA 3246.  In the agency's words below, a refusal to allow review of such documents would be a "radical departure" from FCC practice.  *Id.*

Ironically, what the Petitioners seem to be taking advantage of to concoct these claims of unprecedented access is the very lack of substantial controversy or serious incident over the access that the FCC has afforded previously.  The FCC's requests conclusively demonstrate that the FCC asked for the information.  Had there been an allegation of misuse, then the FCC would have had to decide it.  But it seems that there was no such allegation, and nothing to decide.  This absence of decisions hardly means that access was not granted.  It means the opposite—that it

---

[2]      In non-media transactions, too, the FCC routinely requires limited disclosure of similarly sensitive documents, such as roaming agreements in the wireless industry.  *See* Letter from John Muleta, FCC, to David Jatlow, AT&T Wireless Services, Inc. and David Richards, Cingular Wireless LLC, MB Docket No. 04-70 at 4 (June 30, 2004) (requesting "all underlying data and analyses that address . . . roaming charges"); Letter from John Scott, III, Verizon, to Marlene Dortch, FCC, WT Docket No. 11-65 at 1 (Nov. 1, 2011) (producing "some of Verizon Wireless' most sensitivity business information" for review).

was, and it posed no problems of any kind.  Indeed, even though the relevant

information was redacted from pleadings and from the FCC's decisions

themselves, the FCC does appear to have affirmatively relied on such documents.

*See, e.g.*, Applications of Adelphia Commc'ns Corp., Time Warner Cable, Inc.,

and Comcast Corp. for Consent to the Assignment and/or Transfer of Control of

Licenses, *Memorandum Opinion and Order*, 21 FCC Rcd. 8203, 8272-73 ¶ 153

(2006).

> **B.    The Only Difference With Past Mergers Is That The FCC Has
>          Taken Additional Measures To Protect The Documents Here**

In none of the mergers discussed above did the FCC single out programming

documents or any other category of Highly Confidential Information for more

restrictive treatment.  In addition, the protections the FCC imposed on access to the

VPCI are unusually restrictive.  Outside counsel of Intervenors and other parties

must review it at a secure location, they may not copy any part of it, and they may

not even carry a cellphone with a camera with them during their review,

presumably meaning that they must tolerate a search of their person if they are to

gain access.  JA 2 ¶ 2; 11 ¶ 10.  Are these cumbersome procedures necessary?  The

Intervenors do not believe so.  But they have decided to soldier on under them.

The Petitioners, for their part, have placed themselves in the peculiar position of

arguing that these extraordinary protections are still insufficient.

**C.**    **The Petitioners Have Not Pointed To A Difference That Justifies Less Access Or More Protection In The Instant Merger Proceedings**

The FCC's past practice puts into proper perspective the large number of pages that Petitioners take to explain the  highly confidential and sensitive nature of their carriage agreements, Pet. Br. at 4-6, their lack of control over the information submission process as non-applicants in these proceedings, *id.* at 1, and their proposal to allow the FCC (and only the FCC) to review their carriage agreements under the watchful eye of the Department of Justice, *id.* at 7.  None of this is new.

The agreements between the Petitioners and the present merger participants, while undoubtedly sensitive, are not more so than the programming agreements requested by the FCC in past merger proceedings.  *See* supra Part I.A.  Moreover, third party programmers were no more in control of the production of the requested documents in those mergers than they are here.

As for the Department of Justice, it was no less involved in the antitrust review of these prior mergers; yet no one expressed the view that it would have been enough for the FCC staff to visit the DOJ's offices for the purposes of reviewing the information, without access to it by any parties to those proceedings. In short, nothing has changed compared to these prior merger proceedings other than the Petitioners' own tactics.

10

## II.    ACCESS TO THE VIDEO PROGRAMMING CONFIDENTIAL INFORMATION IS CRITICAL FOR INTERVENORS

### A.    Informed Review By Appropriate Third Parties Is Required By Law

Applications to transfer control of FCC-licensed radio facilities are subject to the public notice and petition to deny provisions of § 309 of the Act.  *See* 47 U.S.C. § 309(b), (d).  Withholding relevant documents from participants in the merger review proceedings "would subject the Commission's ultimate decision . . .  to judicial challenge as arbitrary and capricious in denying interested parties the ability to analyze whether additional documents undercut evidence on which the Commission relied, in violation of the Communications Act and the Administrative Procedure Act."  JA 36 ¶ 17.  This Court has observed that "at least the most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Ass'n of Data Processing Serv. Organizations v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984).  Unless parties are given access to these documents, which are crucial to evaluating potentially significant public interest harms, *see* infra Part II.B, the FCC cannot rely on the information in reaching a decision.

11

Every party in interest has a statutory right to participate by filing a petition to deny. *See* 47 U.S.C. § 309(d)(1); *Springfield Television Broad. Corp. v. FCC*, 328 F.2d 186, 187-88 (D.C. Cir. 1964). This participation must be meaningful. This Court has stated that, even if the FCC elected to proceed with its own inquiry: "The full report of the Commission's investigation, including all evidence it receives, must be placed in the public record, and a stated reasonable time allowed for response and rebuttal by petitioners. Those procedures will permit meaningful participation by petitioners without necessitating potentially burdensome discovery." *Bilingual Bicultural Coal. on Mass Media, Inc. v. FCC*, 595 F.2d 621, 634 (D.C. Cir. 1978) (*en banc*). In *Consumer Fed'n of Am. v. FCC*, 348 F.3d 1009, 1010, 1014 (D.C. Cir. 2003), this Court affirmed the FCC's decision to reject "a request from several consumer groups to place in the record" certain confidential documents, calling it "at worst harmless error." However, this Court noted that "[i]f [the consumer groups] needed the [agreement] to make" their full argument to the FCC, "perhaps the Commission would have erred in excluding it." *Id.* at 1013. That is the case here.

The FCC's discretion to determine how to protect confidential information necessary for a thorough review is rooted in statute. The

12

Communications Act grants broad and flexible authority to the FCC to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." 47 U.S.C. § 154(j). Since soon after the creation of the FCC, the Supreme Court has recognized the FCC's authority to determine "subordinate questions of procedure," *FCC v. Pottsville Broad. Co.*, 309 U.S. 134, 138 (1940), and "to prescribe rules for specific investigations, and to make *ad hoc* procedural rulings in specific instances," *FCC v. Schreiber*, 381 U.S. 279, 289 (1965) (citations omitted) (upholding an FCC decision denying a request for an *in camera* hearing to protect trade secrets). In light of this statutory grounding, *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) and its progeny require deferential review of the agency's decision here.

Expert agencies, well-versed in the regulated industry, are best suited to evaluate the complex policy concerns implicated by the specifics of protective orders. "It is well established 'that it is the agencies, not the courts, which should, in the first instance, establish the procedures for safeguarding confidentiality.'" *United States v. Cal. Rural Legal Assistance, Inc.*, 722 F.3d 424, 429 (D.C. Cir. 2013) (citing *FTC v. Texaco, Inc.*, 555 F.2d 862, 884 n. 62 (D.C. Cir. 1977). The ultimate question is "whether the exercise of discretion by the Commission was within permissible limits."

13

*Schreiber*, 381 U.S. at 291.  The underlying protective orders in this case are certainly within those limits.

Petitioners did not ask the Bureau to quash its requests for the production of the programming agreements.  Instead, they simply "advised the Bureau of their concern that the existing protective orders in the proceedings did not adequately protect the confidentiality of their [agreements] and related negotiation materials." Pet. Br. at 7.  By their acquiescence, Petitioners have effectively triggered the FCC's statutory duty to place the VPCI in the public record and afford parties-in-interest meaningful access to the information.  *See Bilingual Bicultural Coal.*, 595 F.2d at 634.

As the Media Bureau recognized, "review of [the transaction] requires analysis of issues directly implicated by the information contained in these materials, including competition in the video distribution market."  JA 131 ¶ 13. And, as the FCC has stated:

> We find that [certain highly confidential] materials are necessary to develop a more complete record on which to base the Commission's decision in this proceeding and therefore require their production.  We are mindful of their highly sensitive nature, but *we must also protect the right of the public to participate in this proceeding in a meaningful way*.

Applications of Verizon Commc'ns Inc. and MCI, Inc. for Approval of Transfer of Control, *Order*, 20 FCC Rcd. 10420, 10421 ¶ 3 (2005) (emphasis added).

14

**B.      The Video Programming Confidential Information Is Essential To Merger Evaluation**

Petitioners claim that that FCC has not shown "'that the information is a necessary link in a chain of evidence' that will resolve an issue before the Commission." Pet. Br. at 18 (citing *Examination of Current Policy Concerning the Treatment of Confidential Info. Submitted to the Comm'n*, 13 FCC Rcd. 24816, 24822-23 (1998)). Of course, decision-making personnel within the FCC's Media Bureau has already determined that the VPCI is "highly relevant and indeed central to a meaningful assessment of the issues pending before the Commission." JA 33 ¶ 10. It is not for the Court to second guess that determination. This Court has ruled that material considered highly relevant by the expert agency must be "disclosed to the parties for adversarial comment." *United States Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 534 (D.C. Cir. 1978). This is because a "denial of a fair opportunity to comment on [the VPCI] may fatally taint the agency's decisional process." *Nat'l Ass'n of Regulatory Utility Comm'ns v. FCC*, 737 F.2d 1095, 1121 (D.C. Cir. 1984).

In addition, a passing look at DISH's and ACA's arguments in the Comcast-TWC proceeding, which are in line with at least hundreds of other comments, underscores the FCC's determination that the VPCI is an essential link in any effort to evaluate the public interest impact of that merger. For instance, DISH has pointed out that the combined company would have increased incentive and ability

to demand that third party programmers withhold OTT or online video rights from competing MVPDs or OVDs or to secure preferential OTT terms. JA 1774-75, 2328-30. ACA has argued that the merged firm may use its enhanced market power to demand "most favored nation" clauses in their programming agreements that are more harmful to competition than those contained in existing contracts. JA 3239. ACA has also pointed out that the programming agreements are important to testing some of the savings alleged by the merger applicants to flow from the merger, which the Applicants heavily rely upon to argue the transaction's benefits outweigh its harms. JA 3240.

Intervenors have also argued that Comcast's and TWC's combined strength in the market would squeeze programmers' margins, forcing programmers to recoup the shortfall through higher prices extracted from smaller distributors, and potentially consumers. *See* JA 1590-91. And DISH and ACA are not alone. Numerous other parties have raised salient questions about the effect of the proposed transaction on the programming market. *See, e.g.*, JA 1919, 2003, 2122.

Comcast and TWC have countered that "there can be no question of Comcast dominating the market for buying programming," and that the merger is "unlikely to affect the relative bargaining position of Comcast and content companies." JA 2511, 2515. DISH, ACA and the other interested parties cannot

16

fully investigate and develop their claims or fully dispose or Comcast's rebuttals without access to the VPCI.

## III.  THE ANTITRUST LAWS DO NOT PRECLUDE THE FCC'S NORMAL DOCUMENT DISCLOSURE PROCEDURES

The Petitioners next express the remarkable view that document production in FCC merger reviews violates antitrust law.  If that were so, FCC merger proceedings and much of federal court litigation including, ironically, all antitrust litigation, would have to be enjoined as illegal.  Neither the Sherman Act's prohibitions on price fixing, nor any other antitrust rule or precedent, can be read to prohibit parties to administrative or court litigation from sharing information through normal discovery processes.

The Supreme Court has never held "the exchange of specific information among sellers as to prices charged to individual customers, pursuant to mutual arrangement, is a *per se* violation of the Sherman Act.  Absent *per se* violation, proof is essential that the practice resulted in an unreasonable restraint of trade." *United States v. Container Corp. of Am.,* 393 U.S. 333, 338-39 (1969) (Fortas, J. concurring).  The danger of Petitioners' overbroad and misleading statements about the law concerning access to pricing information is that their conclusions might be adopted by the Court without the kind of fact-intensive and fact-specific review that is necessary to determine if price sharing has anti-competitive or *pro-competitive* effects in the given situation.

17

The information sharing that Petitioners challenge is twice removed from the scenario in *Container Corp.*  The sharing would not take place in the marketplace, but instead in an administrative litigation proceeding, conducted by a federal agency, and subject to significant restrictions on who may gain access to VPCI and how it may be utilized.  In this case, only representatives of parties, such as "outside counsel" and "outside experts," who are not involved in competitive decision making or marketplace activities, are permitted access to the VPCI.  These individuals are strictly barred from sharing the VPCI with their clients, making it impossible that "the practice [could] result[] in an unreasonable restraint of trade." *See Container Corp.*, 293 U.S. at 339 (Fortas, J. concurring).

The *Noerr-Pennington* doctrine,[3] which allows firms to act collaboratively and share information to influence court or administrative decisions, even when such actions are "intended to eliminate competition," further illustrates the incongruity of Petitioners' reliance on antitrust law.  If firms are shielded from antitrust scrutiny even in the circumstances of *Noerr*, it strains common sense to argue that the antitrust laws bar the FCC from releasing information to representatives of firms as part of an administrative review process that seeks to *protect competition*.

---

[3]     *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).  The *Noerr-Pennington* exemption "extends to all departments of the Government." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972).

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully Submitted,

  /s/ Pantelis Michalopoulos

| | |
|---|---|
| David A LaFuria | Pantelis Michalopoulos |
| Brooks E. Harlow | Stephanie A. Roy |
| LUKAS, NACE, GUTIERREZ & SACHS, LLP | STEPTOE & JOHNSON LLP |
| 8300 Greensboro Drive | 1330 Connecticut Avenue, NW |
| Suite 1200 | Washington, DC 20036 |
| McLean, Virginia  22102 | (202) 429-3000 |
| (703) 584-8678 | *Counsel for DISH Network* |
| *Counsel for the American Cable* | *Corporation* |
| *Association* | |

January 2, 2015

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,084 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1), as determined by the word-counting feature of Microsoft Word.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: January 2, 2015

 /s/ Pantelis Michalopoulos
Pantelis Michalopoulos
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
*Counsel for DISH Network Corporation*

20

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2015, I caused the foregoing Brief of

Intervenors DISH Network Corporation and the American Cable Association to be

electronically filed with the Clerk of the Court using the CM/ECF System, which

will send notice of such filing to all parties that have entered an appearance in this

action.  I further certify that I caused eight paper copies of the Brief to be hand

delivered to the Clerk of the Court.

Dated: January 2, 2015

 /s/ Pantelis Michalopoulos
Pantelis Michalopoulos
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
*Counsel for DISH Network
Corporation*